VERDIN *et al.*, Appellants, v. THE CITY OF ST. LOUIS, *et al.*

In Banc, November 19, 1895.

1. Practice: DEMURRER. A demurrer to a petition admits all the material facts alleged therein.

2. Void Paving Tax Bill: CLOUD ON TITLE: EQUITY: INJUNCTION: VOID ORDINANCE. A bill in equity may be maintained by an abutting property owner to cancel a void paving tax bill against his property, if issued, and to divest the apparent lien thereof, or, if not issued, to enjoin its issuance and delivery, upon the theory that the tax bill is

Verdin v. The City of St. Louis.

or will be a cloud upon the title, and this is true although the tax bill is absolutely void because issued under an ordinance contrary to the city charter in that it authorizes the letting in one contract the work of paving the street and its maintenance for a term of years. (Per BURGESS, J.; MACFARLANE and GANTT, JJ., concurring.)

3. **Municipal Corporation**: STREET IMPROVEMENT: BOARD OF PUBLIC IMPROVEMENTS, NOTICE OF MEETING OF. A requirement by a city charter that published notice shall be given of the time, place, and object of a meeting of board of public improvements, to consider the improvement of a street, is complied with by a notice naming a day, hour, and place of meeting for the purpose of considering the matter of reconstructing with asphaltum certain designated streets, even though a particular kind of asphaltum had already been determined upon. (Per BURGESS and SHERWOOD, JJ.; BRACE, C. J., ROBINSON, MACFARLANE and GANTT, JJ., concurring.)

4. ———: ———: PAVING: REPAIRS: VOID TAX BILLS. A city charter providing that the paving of streets shall be charged to adjoining property, as a special tax, while repairs shall be paid out of the general fund, and that public work shall be paid out of the general funds, and be let to the lowest bidder, renders void an ordinance providing that when a street is to be improved there shall be let in one contract the work of construction, or reconstruction, and of maintaining it for a term of years. Such maintenance is nothing more than repairs, and where the work of paving with asphalt, and of maintenance thereof for nine years, are let in one contract, even though the work of maintenance is actually paid for out of the general fund, the tax bills issued for the paving are wholly void for want of authority to issue same, and abutting property can not be charged for any part of the work done. (Per BURGESS, J.; MACFARLANE and GANTT, JJ., concurring.)

5. ———: ———: CHARTER: CONTRACT: MONOPOLY. A charter requiring upon an advertisement the letting of work to the lowest responsible bidder prevents the city from letting a contract for paving with asphalt from the island of Trinidad, when it appears that one corporation has, by virtue of a contract with the government of the island, a monopoly of furnishing such material. (Per BURGESS, J.)

6. ———: ———: ———: VOID CONTRACT: LIABILITY OF ABUTTING OWNERS. Where a contract for street improvement is, under the charter, void for want of authority in the city to enter into it, the owners of property abutting on the street proposed to be improved can not be held liable for any part of the work done against their will and protests. (Per BURGESS, J.; MACFARLANE and GANTT, JJ., concurring.)

Verdin v. The City of St. Louis.

7. ——: ——: ——: ——: ——: ESTOPPEL: TAX BILL: INJUNCTION. Where a contract for paving a street is wholly void because made under an ordinance contrary to the charter in that it permits the letting in one contract the work of paving and of maintenance, property owners standing by in silence and seeing money invested by the contractor on the faith of the contract are not estopped from defending against the tax bills issued for the work. Where the property owner by no act misled the contractor, nor did anything to induce the belief that he would pay for the work, but protested against it from the beginning, and notified the contractor that he would contest the legality of the proceedings, there is no bar to injunctive or equitable relief after the work is done. It is only in case of some irregularity in doing the work under a valid contract, or partial invalidity of the contract, that an abutting lot owner will be required, as a condition precedent to enjoining the collection of a tax bill, to pay or tender what is justly due. (Per BURGESS, J.; MACFARLANE and GANTT, JJ., concurring.)

8. ——: ——: TAX BILL: EQUITY: INJUNCTION: PETITION: PRACTICE: LEGAL REMEDY. A petition in equity by an abutting property owner to cancel a tax bill, if issued, and to divest the lien thereof, or, if not issued, to enjoin its issuance and delivery, must affirmatively show on its face by a particular statement of facts, as distinguished from legal conclusions and general allegations of fraud, that the plaintiff has no plain, adequate, and complete remedy at law. Such showing is a *jurisdictional necessity*, and the failure to so show may at any time or at any stage of the proceeding be taken advantage of by the court by its own motion, or by the adversary party, without the point being pleaded. Where the tax bill and the contract for the work done are by such petition averred to be *"null, void, and of no effect,"* and that plaintiff's property *"can not in any manner be legally bound"* for the tax because the ordinance under which the work was done was contrary to the charter, all of which is matter of record, there is disclosed an adequate remedy at law by a defense to a suit on the tax bill, or by *certiorari*. Such a petition is also fatally defective when it fails to show any threatened suit on the tax bills, if issued, or, if not issued, that the city has threatened to issue the bills. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

9. ——: ——: ——: ——: ——: LIEN: CLOUD ON TITLE. If a paving tax bill be held absolutely void because issued under an ordinance contrary to a city charter, in that it permits the letting in one contract the work of paving the street and its maintenance for a term of years, so that its invalidity is apparent from matter of record, yet a court of equity will not interfere, for such court will only grant relief in canceling a tax bill, or enjoining its issue, where it is, or will be when issued, of apparent validity and its total invalidity can only be established by proof *aliunde*. Or, if the tax

bill be only partially invalid no case is made for the interposition of equity to remove a cloud, because there can be no cloud on the title if the lien is partially valid. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

10. **Cloud on Title**: LEGAL ACUMEN DOCTRINE. The *"legal acumen"* doctrine, declared in *Bank v. Evans*, 51 Mo. 345, that whenever you have to consult a lawyer as to whether you have a good title to land that authorizes a proceeding to remove a cloud on title, disapproved; and *Clark v. Insurance Co.*, 52 Mo. 272, and subsequent cases announcing a different rule, approved. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

11. **Municipal Corporation**: STREET IMPROVEMENT: BOARD OF PUBLIC IMPROVEMENTS: ORDINANCE: NOTICE OF MEETING: BIDS: MATERIALS. While an ordinance recommended by the board of public improvements for the construction or reconstruction of a street in the city of St. Louis must specify the material to be used (charter, sec. 15, art. 6), it is not necessary under the charter (sec. 14, art. 6) that the notice by such board that a public meeting would be held to consider the matter of construction or reconstruction should specify the material to be used; but the board of public improvements must, under the direction of the ordinance, advertise for bids for the work to be done, specifying the kind of material to be used, character of work, etc. But such a bid when made and accepted becomes only a contract for *work*, and not a contract for the purchase of the *materials* mentioned in the advertisement for bids. Under charter provisions the board of public improvements has no more power to contract for *materials* than has the commissioner of supplies to contract for *work*. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

12. ——: ——: ORDINANCE: MATERIALS: MONOPOLY. Where ordinances for the construction and reconstruction of streets specify the work to be done and materials to be used, as required by the city charter, no subsequent action in advertising for bids for such construction, etc., can change the nature of the material fixed by the ordinance; and hence any question of monopoly as to such material can have no place, and can not be considered. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

13. ——: ——: ——: ——: NOTICE OF MEETING. Where a section of the charter of the city of St. Louis requires that an ordinance passed in pursuance thereof providing for street construction and reconstruction shall specify the character of the work, its extent and the materials to be used, and an associate section providing for a public meeting to consider such construction, etc., contains no such requirement, notice of such meeting by the board of public improvements need not include such specifications. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

14. **Legislative Enactment:** INVALIDITY: VALIDITY OF NONSPECIFIED ACT. A legislative enactment declaring certain acts invalid unless done in a particular way does not render null a nonspecified act not thus declared to be null for failing to be done in that particular way. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

15. **Municipal Corporation:** STREET IMPROVEMENT: BOARD OF PUBLIC IMPROVEMENTS: BIDS: ADVERTISEMENT. Section 27 of article 6 of the charter of the city of St. Louis providing that the board of public improvements shall advertise for bids for proposed public work, "as provided for purchases by the commissioner of supplies," refers only to the *form* of the advertisement, the *number of times* it is to be inserted, etc., the board being empowered to let the contract to the "lowest responsible bidder," and the commissioner having no discretion but being required to let the contract to the "lowest bidder" as provided by section 29 of article 4. The latter section provides for a contract of *purchase* by the commissioner, and the former for a contract for *work* by the board, and the details of the section controlling the commissioner do not control the board of public improvements. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

16. **Statute:** CONSTRUCTION. The letter of a statute may be enlarged or restricted according to the true intent of its framers. The reason of a law should prevail over its letter, and general terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence, the presumption being that the legislature intended no such anomalous results. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

17. **Municipal Corporation:** STREET IMPROVEMENT: GRADING: PAVING: SEVERAL CONTRACTORS: SEPARATE TAX BILLS. The provisions of the charter of the city of St. Louis that the grading of new streets, etc., and cleaning the same shall be paid for out of the general revenue of the city, and that the paving, curbing, guttering, and sidewalks shall be charged upon the adjoining property as a special tax (art. 6, sec. 18), and special tax bills issued therefor which become a lien on the property (art. 6, sec. 25) contemplate the issuance of but *one* tax bill against each property owner for the proportion of the cost of the completed street in front of his property; and the board of public improvements has no power to issue separate tax bills to each of several contractors who might furnish different parts of the materials used in the construction of the street, and advertisements for separate bids and awarding separate contracts would be nugatory. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

18. ——: ——: ——: ——: ——: ——. Reasons enumerated showing that it would be impracticable to invite separate bids and award separate contracts for the various materials necessary to street construction or reconstruction. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

19. **City Charter:** CONSTRUCTION. All of the provisions of a city charter bearing upon the same subject should be construed together. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

20. **City:** ORDINANCE, VALIDITY OF. The mere fact that the provisions of an ordinance *may be liable to abuse* constitutes no argument against the validity of such ordinance. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

21. ——: STREET IMPROVEMENT: PAVING: MAINTENANCE: ORDINANCE VALID IN PART, INVALID IN PART. Where an ordinance separates into different sections provisions as to paving a street and its maintenance, the whole ordinance should not fall, but the part relating to paving should be upheld, if the provisions as to maintenance be void, or if there is a failure to comply with a provision requiring the indorsement thereon of the cost of maintenance, such a provision being only directory in its nature. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

22. ——: ——: ——: ——: ORDINANCE: CONSTRUCTION: ST. LOUIS: CHARTER: CONTRACT. An agreement by a contractor who paves the street to maintain the same for a term of years is in the nature of a guaranty of the character of the work, to the effect that the street will be so maintained that it will not, during the term, be permitted to become out of repair. The St. Louis charter confers on the city the power of repairing "streets, and in addition thereto the power to construct and keep in repair" all streets, and hence there is power for providing, in a contract for paving a street, for the maintenance thereof for a term of years, and no abutting property holder can complain when the maintenance is paid for from the general funds of the city. In determining whether an ordinance is contrary to a city charter, as where a statute is claimed to be contrary to the constitution, courts lean toward a construction which favors and upholds the validity of the ordinance. There being no provision in the charter prohibiting, the paving of a street and the maintenance thereof may be let in one contract; and this is especially true where the record discloses that the maintenance must of necessity be with the same material with which the street is paved, of which material the contractor has the exclusive use. An ordinance so requiring is valid, and the tax bills issued for the paving are good. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

23. ——: ——: ——: CONTRACT: MONOPOLY. Where a city charter requires upon advertisement the letting of work for street paving to the lowest responsible bidder, the city may let a contract for paving with asphalt from the island of Trinidad, although it appears that the contractor has, by virtue of a contract with the government of the island, a monopoly of the material. (*Barber Asphalt Co. v. Hunt*, 100

Mo. 22, followed.) If it were otherwise, the doctrine adopted in that case should be followed, as a rule of property, on the faith of which contractors had a right to rely. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring; MACFARLANE and GANTT, JJ., concurring in the result.)

24. ———: ———: ———: ———: ESTOPPEL: INJUNCTION: EQUITY: TENDER. An abutting lot owner who stands by and sees the work of paving finished, taking no steps by injunction, but contenting himself with notice of protest to the contractor, can not, after the work is done, without offering to do equity, have relief, either to cancel bills if issued, or, if not issued, to restrain their issuance and delivery, on the ground that in one contract for the work there was included the work of construction and of maintenance. As a condition precedent to his relief he should tender or offer to pay what is justly due to the contractor for the work of construction. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

25. ———: ———: RECONSTRUCTION: MAINTENANCE: ORDINANCE VALID IN PART, VOID IN PART. Where the board of public works upon proper notice recommends an ordinance for the reconstruction and maintenance of a street, and the ordinance is passed, and the provisions therein are so separated that so much as refers to maintenance may be stricken out, still leaving separate sections as to reconstruction intact, the ordinance and contract as to reconstruction will be upheld and maintained. (Per SHERWOOD, J.; BRACE, C. J., and ROBINSON, J., concurring.)

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

REVERSED AND REMANDED.

Plaintiffs' petition is as follows:

For cause of action against defendants, plaintiffs state as follows, to wit:

On or about the fourth day of September, 1888, one James Verdin departed this life in the city of St. Louis, leaving a last will and testament, dated the thirtieth day of June, 1888, which will was duly probated in the probate court in the city of St. Louis on the thirteenth day of September, 1888.

By the terms of said will, the said James Verdin gave to his children, Louis, Bernard M., John N., Harriet A.,

and Mary Josephine, wife of the petitioner, William H. Swift, the sum of one dollar ($1) each. All the rest and residue of his estate, real, personal, and mixed, except such personal property as should be allowed to a widow by law, the said James Verdin gave, devised, and bequeathed unto the plaintiffs herein in trust, to hold the same for the use and benefit of Margaret Verdin, wife and widow of said James Verdin, during her lifetime, and to pay over to her the net income thereof, with authority in said trustees, with the consent of said widow, to sell the whole or any part of the property so held in trust from time to time, and invest the proceeds in real estate or safe securities. Upon the death of the said Margaret Verdin, widow as aforesaid, the said trustees were directed to pay over to Mary Ann, a sister of said James Verdin, $4,000, and to divide the remainder of the property remaining in their hands equally among the children of said James Verdin, share and share alike, the heirs of any of said children not then living to take the share which the parent would be entitled to if living.

By the terms of said will, plaintiffs were appointed as executors of said will without bond, and having been duly qualified as such executors, took possession of said estate and administered thereon, and on the twenty-fourth day of December, 1890, upon final settlement, were by judgment of the probate court discharged as such executors, and thereafter held and now hold the remainder of said estate as trustees under the terms of said will, for the use and benefit of said Margaret Verdin, widow, who is still living.

Among other properties now held and owned by plaintiffs as trustees under the terms of said will is the following real estate, of the city of St. Louis:

A lot in block 1723 of the city of St. Louis, beginning at a point in the western line of Jefferson avenue,

two hundred and four feet and ten inches (204-10) northwardly from the intersection of the north line of Clark avenue; thence running northwardly along the west line of Jefferson avenue forty (40) feet; thence westwardly and along the south line of a lot now or formerly of John A. Coulon, one hundred and forty (140) feet, more or less, to an alley; thence south along the east line of said alley forty (40) feet, more or less, to lot now or formerly of Philip Roetger; thence eastwardly along north line of said Roetger lot one hundred and thirty-six (136) feet, more or less, to the point of beginning, which was acquired by said deceased from Christopher Schroeder and Minna Schroeder, his wife, by deed dated thirtieth day of November, A. D. 1883, and recorded in the recorder's office of city of St. Louis, in book 712, page 519—said property having two (2) brick stone-front buildings on it, bringing an income of nine hundred and sixty dollars ($960).

Said property is situated on Jefferson avenue, between Adams street and Market street, in the city of St. Louis.

Prior to the twenty-first day of June, 1892, the defendant, the Barber Asphalt Paving Company, caused to be circulated among the owners of the property on both sides of said Jefferson avenue, between Adams street and Market street, a petition for their signatures, which petition was addressed to the board of public improvements of the city of St. Louis, asking for the reconstruction of that part of Jefferson avenue with asphaltum from the asphaltum lake owned by the government of the island of Trinidad. Said petition was not signed by a majority in number of the property holders aforesaid, nor by the property holders owning a majority of front or linear feet to be affected by the cost of the proposed reconstruction. On the contrary, said petition was signed only by a minority

in number of the said property holders, representing less than one half of the owners of front and linear feet of property to be affected by the cost of such reconstruction. Said petition was not presented to plaintiffs for their signatures, and did not receive their signatures, nor were they aware until after the letting of the contract hereinafter referred to, that any of the property holders were desiring the reconstruction of said street with asphaltum.

The said petition, induced, obtained, and signed as aforesaid, plaintiffs are informed and believe, and so aver, was presented to the board of public improvements of the city of St. Louis, on or prior to June 21, 1892. Thereafter, at the request of the street commissioner, the said board on August 30, 1892, designated September 20, 1892, at 10 o'clock A. M., as the time when it would consider the matter of reconstruction with asphaltum sundry streets, among them the following: Number 3397, petition 5162, for reconstructing with asphaltum Jefferson avenue from Adams street to Market street; and the president of said board was directed to give two weeks' public notice thereof in the papers doing the city printing.

Thereafter the president of said board caused to be published in the said papers the following public notice:

"PUBLIC NOTICE.

"OFFICE OF PRESIDENT BOARD OF }
PUBLIC IMPROVEMENTS, }
"ST. LOUIS, September 1, 1892.

"Public notice is hereby given that the board of public improvements will hold a special meeting at the hour of 10 A. M., of the twentieth day of September, 1892, at its office in the city hall, for the purpose of considering the matter of reconstructing with asphaltum streets as hereinafter mentioned, viz.:

"No. 3396.   Petition No. 5160—For reconstructing with asphaltum, Carr street from Broadway to Seventh street.

"No. 3397.  Petition No. 5162—For reconstructing with asphaltum, Jefferson avenue from Adams street to Market street.

"No. 3398.   Petition No. 5163—For reconstructing with asphaltum, Jefferson avenue from Market street to Morgan street.

"No. 3399.   Petition No. 5170—For reconstructing with asphaltum, Carr street from Seventh to Eighth street.

"No. 3400.   Board's motion for petition No. 5176 —For reconstructing with asphaltum, Vandeventer avenue from Olive street to Page avenue, now Page boulevard.

"All citizens interested in any of the improvements above mentioned are requested to attend.

"By order of the board.
    (Signed)                    "M. L. HOLMAN,
                                "President pro tem.
"Attest:  EMORY S. FOSTER, Secretary."

Plaintiffs aver that neither said public notice nor the official record of the board of public improvements at that time afforded any evidence that the said street was to be reconstructed with asphaltum from the asphaltum lake from the island of Trinidad, and that the asphalt to be used in such reconstruction would be limited to Trinidad lake asphaltum.

Plaintiffs allege that said notice was insufficient and did not comply with the terms and spirit of sections 14 and 15, article 6, of the charter of the city of St. Louis, by the provisions of which sections the board of public improvements is required to give two weeks' public notice of the time, place, and object of the meeting of the owners of the property to be affected by the

cost of such construction; and after the property own-
ers shall have been heard at such meeting, in the
ordinance recommending such reconstruction, the said
board shall specify the character of the work, its extent,
the material to be used, etc.

On September 20, 1892, in accordance with the
public notice aforesaid, the board considered said recon-
struction of Jefferson avenue, and recommended the
reconstruction thereof with asphaltum, and directed its
committee on street department to prepare and submit
an ordinance for such reconstruction. There was noth-
ing, however, in the instruction given said committee
directing them to prepare and submit an ordinance
requiring that said street should be reconstructed with
Trinidad lake asphaltum.

Nevertheless the said committee on street depart-
ment prepared and submitted to the board, and the
board recommended to the municipal assembly of the
city of St. Louis, an ordinance for such reconstruction,
which ordinance is in words and figures as follows, to-
wit:

"ORDINANCE 17151.

"An ordinance to reconstruct Jefferson avenue,
from Adams street to Market street.

"Be it ordained by the municipal assembly of the
city of St. Louis, as follows:

"SECTION 1. The board of public improvements
is hereby authorized and directed to cause Jefferson
avenue, from Adams street to Market street, to be
reconstructed by taking up and removing the old pave-
ment from the roadway, preparing the roadbed, renew-
ing and readjusting the curbing, laying a roadway pave-
ment of best quality of Trinidad lake asphalt on a
concrete base, except between the rails of the street
railway company occupying the street, which last men-

tioned space shall be paved with granite blocks, laid on a bed of sand, and making all proper connections and intersections with other streets and alleys, and to contract for the maintenance of said constructed street for a period of nine years, commencing one year after the work of reconstruction is completed and accepted.

"SEC. 2.    The curbing shall be of limestone, and the wearing surface of the pavement shall be composed of a mixture of best quality of refined Trinidad lake asphaltum, heavy petroleum oil, sand and powdered carbonate of lime, laid on a base of hydraulic cement concrete.

"SEC. 3.    The old guttering and macadam shall be removed from the street, and the roadbed properly formed to a depth of about nine inches below the intended surface of the pavement.    All curbing suitable to be used again shall be readjusted and if necessary redressed; all broken or defective curbing shall be removed and replaced with new stone.    The curbstones shall have a straight and even face on the side toward the gutter, and shall have close end joints to the full depth of the stone, and no stone shall be less than four and one half feet long, nor less than six inches thick, nor less than 24 inches deep.    On the roadbed there shall be laid a base of hydraulic cement concrete six inches deep.    After the concrete is set it shall be covered with the pavement mixture at a temperature of about 250 degrees Fahrenheit, and be carefully spread by means of hot iron rakes, in such manner that after having received its ultimate compression by rolling with a steam roller, it will have a uniform depth of two and one half inches.

"SEC. 4.    The cost of the foregoing work of reconstruction and all proper connections and intersections required, except so much thereof as the railway company having tracks on said street are by law obligated

to pay, shall be charged as a lien upon the adjoining. property fronting or bordering on the improvement herein provided for, and shall be paid by the owners thereof, except as hereinafter provided. When said work is completed, the president of the board of public improvements shall compute the cost thereof, and levy and assess the same as a special tax against each lot of ground chargeable therewith, in the names of the owners thereof respectively, in proportion that the linear feet of each lot fronting or bordering on said improvement bears to the total number of linear feet of all property chargeable with the special tax aforesaid, and shall make out and certify to the comptroller, on behalf of the contractor, bills of such cost and assessment accordingly, as required by law.

"SEC. 5. Whereas the estimated cost of the foregoing work and all proper connections and intersections required, as provided for by this ordinance to be assessed against some of the lots fronting or bordering on the aforesaid improvement amounts to more than 25 per centum of the assessed value of said lots, therefore, the amount in excess of 25 per centum shall be paid by the city of St. Louis, and the sum of $1,045 is hereby appropriated on account thereof, payable out of the fund set apart for street reconstruction.

"SEC. 6. The cost of the maintenance shall be paid by the city of St. Louis out of the fund set apart annually for street repairs—Reconstructed Streets.

"SEC. 7. That portion of the cost of the above work which is chargeable against the property of the city of St. Louis fronting or bordering on said Jefferson avenue shall be paid by the city of St. Louis, and the sum of $263 is hereby appropriated and set apart out of special tax fund—New Work—on account thereof.

"Approved March 28, 1893."

Said ordinance, known as ordinance number 17151, was passed and adopted by the municipal assembly of the city of St. Louis, and was approved by the mayor of said city on the twenty-eighth day of March 1893.

Thereafter, to wit, on April 11, 1893, the president of the board of public improvements was by said board directed to advertise sundry lettings for public work, and May 9, 1893, at 12 M., was set for opening bids thereunder. Thereafter the said president of said board did advertise for bids for the said reconstruction of Jefferson avenue as follows:

"TO CONTRACTORS.

"OFFICE PRESIDENT BOARD OF }
PUBLIC IMPROVEMENTS, }

"ST. LOUIS, April 13, 1893.

"Sealed proposals for the public work hereinafter mentioned will be received at the office of the board of public improvements until 12 M., of the ninth day of May, 1893, at which hour they will be publicly opened and read, viz.:

\*      \*      \*      \*      \*      \*      \*      \*

"Letting number 3968. For reconstructing with best quality of Trinidad lake asphalt, Jefferson avenue, from Adams street to Market street, and for the maintenance of the same.

"Deposit required, $489.

"The streets to be maintained in good condition for a term of nine years, beginning one year after the completion and acceptance of the work.

"Bond for $6,540 must be given for the maintenance, in addition to the bond for reconstruction, when contract is executed.

\*      \*      \*      \*      \*      \*      \*      \*      \*

"Plans, specification, and forms of contract may be seen at the office of the street commissioner.

"By order of the board.

"GEO. BURNET,
"President.

"Attest:   EMORY S. FOSTER,
"Secretary."

Among these specifications and forms of contract, exhibited in the office of the street commissioner for the information and guidance of prospective bidders for said work referred to in the advertisement last above set forth, was a provision that the street commissioner should have the right to make alterations in the line, grade, form, or dimensions of the work contemplated, either before or after the commencement of the work; and plaintiffs aver that all persons who might bid upon said work were bound to take into consideration the fact that the street commissioner might before or after the commencement of said work make alterations in the line, grade, plan, form, or dimensions of said work.

Prior to the time at which said committee on street department submitted said ordinance to the board of public improvements, there was nothing in the official record of said board, or in any notice published by its authority, showing or giving out that the board would at any time consider the matter of the maintenance of said street after reconstruction, or giving out or showing that the maintenance or the contract for the maintenance of such street would be coupled with the reconstruction or with the contract for reconstruction; or that the reconstruction of said street, and the maintenance thereof, would, and must be, embraced in the same letting, bidding, and contract.

Plaintiffs aver, however, that in coupling said reconstruction and maintenance together in said ordinance and letting, the said board of public improvements claimed, and now claims, to have been acting under the authority of the provision of section number 542 of the Revised Ordinance of the city of St. Louis (revision of 1887), by which it was provided that whenever a street of St. Louis is to be improved, either on the motion of the board of public improvements, or on petition of the adjoining property owners, the board of public improvements may submit to the municipal assembly a bill for letting in one contract the work of constructing or reconstructing such street and of maintaining it in good condition for a term of years; and after such bill, so recommended, shall have become a law, the board of public improvements shall advertise for proposals, including the construction or reconstruction and maintenance, under the same regulations as are provided for the improvements of streets.

But plaintiffs aver that said ordinance is null, void, and of no effect, by reason of the repugnance of its provisions to the letter and spirit of the provisions of the scheme and charter of the city of St. Louis, and particularly to the letter and spirit of section 27, article 6, of said charter, which is in words and figures as follows, to wit:

"SECTION 27. *Assembly forbidden to contract for public work—Board of public improvements to award contracts subject to approval by council—Sureties on contractors' bonds.*—The assembly shall have no power directly to contract for any public work or improvement, or repairs thereof, contemplated by this charter, or to fix the price or rate therefor; but the board of public improvements shall in all cases, except in case of necessary repairs requiring prompt action, prepare and submit to the assembly estimates of cost of any pro-

posed work, and, under the direction of the ordinance, shall advertise for bids as provided for purchases by the commissioner of supplies, and let out said work by contract to the lowest responsible bidder, subject to the approval of the council. Any other mode of letting out work shall be held as illegal and void. No surety on any bond shall be taken unless he shall pay taxes on property equal in amount to his liabilities on all bonds on which he may be surety to the city. And no contract shall be made under this section without a bond for its faithful performance, with at least two sufficient sureties."

And plaintiffs aver that as to the maintenance of the roadway of that part of said Jefferson avenue so reconstructed, the said board of public improvements did not make, prepare, and submit to the assembly of the city of St. Louis estimates of the cost of said maintenance, either as to the material, labor or other elements involved in such maintenance, and did not specify what particular kind of asphalt should be used in said maintenance.

Plaintiffs further state that on May 9, 1893, when the bids were opened for said work of reconstruction and maintenance referred to in said ordinance and in said advertisements, it was found that there was but one bid under said letting, 3968, for the reconstruction and maintenance of Jefferson avenue, provided for by said ordinance, and said bid was made by and in behalf of the defendant, the Barber Asphalt Paving Company, for the aggregate sum of $18,508.80, which bid and amount was itemized as follows, to wit:

|  | Quantities. | The Barber Asphalt Paving Co. | |
| --- | --- | --- | --- |
| Taking up roadway, etc... | 436 | $ 8.30 | $ 1,438.80 |
| New six-inch curbing. ... | 2100 | .96 | 2,016.00 |
| Old curbing reset. . ..... | 60 | .20 | 12.00 |
| Asphalt on six-inch concrete | 436 | 30.00 | 13,080.00 |
| Maintenance............. | 3924 | .50 | 1,962.00 |
|  |  |  | $ 18,508.80 |

And thereafter, in due form of law, the defendant, the city of St. Louis, entered into a written contract with the defendant, the Barber Asphalt Paving Company, for said work of reconstruction and maintenance, for the prices above named and itemized; a copy of said contract is hereto annexed as part hereof, marked "Exhibit A."

Plaintiffs further state that the defendant, the Barber Asphalt Paving Company, is a corporation legally existing under the laws of the state of New York, and has its chief office and place of business at number 1, Broadway, in said city of New York, and has an office in the city of St. Louis for the purpose of carrying on its business in the state of Missouri. Said corporation was organized by one Amzi Lorenzo Barber, for the purpose of constructing asphalt pavements in the towns and cities of the civilized world. Said Barber, by reason of his large holding of the shares of the capital stock, or by combination with others holding its capital stock, dominates the affairs of said corporation and gave to it his name.

Prior to the twelfth day of July, 1888, for the purpose of preventing other persons from competing with said Barber Asphalt Paving Company in its business aforesaid, the said Amzi Lorenzo Barber and his associates, bound together by identical interests, organized under the laws of the state of New York a corporation under the name of the New York and Trinidad Asphalt Company, and established its chief office and place of business at number 1, Broadway, in said city of New York. Said Barber and his associates from the beginning of the existence of said corpo ration have controlled its affairs, and the said Barber has been and is now the president and dominating mind and force in the affairs of said corporation. On the said twelfth day of July, 1888, said New York and

Trinidad Asphalt Company, with others, procured from the government of the island of Trinidad a concession or grant by which said corporation and parties acquired the exclusive right to win, remove, and take asphalt from the asphalt or pitch lake in said island of Trinidad. A copy of said concession or grant is hereto annexed as part hereof, marked "Exhibit B."

Subsequently the said Amzi L. Barber and his associates organized, under the laws of the state of New York, a corporation under the name of the Trinidad Asphalt Company, which is now a legally existing corporation, and has its chief office at number 1, Broadway, in the city of New York, and the said Barber has ever been and now is the president and controlling spirit of the said Trinidad Asphalt Company. All the property, contracts, and rights of the said New York and Trinidad Asphalt Company were transferred to the said Trinidad Asphalt Company, and became vested in it. On the twenty-eighth day of July, 1891, the government of the island of Trinidad made to the new company, to wit, the Trinidad Asphalt Company, a concession, or grant, conveying to it the exclusive right to win, remove, and take asphalt from the said asphalt or pitch lake aforesaid, barring out all other persons and corporations. By the terms of said concessions, or grants, the government of the island of Trinidad bound itself not to permit any other persons to win, take, or remove asphalt from any other of the government lands situated in said island of Trinidad, upon which government lands there were large deposits of what is known as "land," "deposit," or dry asphalt, caused by overflows of pitch asphalt from said pitch lake, which land, deposit, or dry asphalt on said other government lands was equal in quality for every purpose to the asphalt contained in said asphalt or pitch lake. A copy of said concessions, of

date July 28, 1891, is hereto annexed as part hereof, marked "Exhibit C."

Plaintiffs further state that by reason of the control exercised by said Barber in the management of the affairs of the said Trinidad Asphalt Company, holding said exclusive privilege and monopoly of Trinidad lake asphalt, no one but the said Barber Asphalt Paving Company can purchase of it Trinidad lake asphalt at any price, or only at such excessive and exorbitant prices over the prices accorded to the Barber Asphalt Paving Company as would make it impossible for such purchaser to compete with the said Barber Asphalt Paving Company, and thus a monopoly of Trinidad lake asphalt is established in the United States in favor of the defendant, the Barber Asphalt Paving Company, and there can be no competition in the city of St. Louis for work of reconstruction which said city or its board of public improvements has ordered or shall order to be done with Trinidad lake asphalt. All of which facts were, prior to, on, and after the twenty-first day of June, 1892, fully known to the defendants herein.

Plaintiffs further state that outside of said pitch lake, and outside of the government lands in the island of Trinidad, all covered by the monopoly created by said concessions, and the monopoly of the defendant Barber company, there are other sources of supply of asphalt, of just as good a quality for every purpose, in the island of Trinidad itself, and in the island of Pedermales, sixteen miles southwest from said Trinidad island; also in the state of Bermudez, in the republic of Venezuela, and also other deposits in the republic of Mexico and in the island of Cuba and in the United States of America, from all of which other deposits large quantities have been and are now being taken and sold in countries presenting a demand for the same where there is free competition. And plaintiffs now

aver that there is no good or sufficient reason for the city of St. Louis, by recommendation of its board of public improvements, or by ordinance, to direct the reconstruction of its streets with Trinidad lake asphalt, to the exclusion of other asphalts of an equally good quality above referred to. By so limiting the reconstruction of its streets to the material known as Trinidad lake asphalt, all such reconstruction is thrown into the hands of the defendants, the Barber Asphalt Paving Company, which results in the city and its property owners being required to pay a larger price for such reconstruction than they would have to pay if the material for reconstruction were not limited to Trinidad lake asphalt.

Plaintiffs further state that while the petition aforesaid, framed and circulated among the property owners on Jefferson avenue by the agents and solicitors of the defendant, the Barber Asphalt Paving Company, did in terms ask for the reconstruction of said street with Trinidad lake asphalt, which is controlled by the monopoly hereinbefore alleged, nevertheless said petition was not signed by a majority of the property holders to be affected by the cost of such reconstruction, and the board of public improvements, in finally selecting the material for such reconstruction, and recommending an ordinance therefor, were not in any manner bound by law, duty, or morals to follow the suggestion of said petition as to Trinidad lake asphalt, nor to recommend said reconstruction of Trinidad lake asphalt, of which the said Barber Asphalt Paving Company owns and exercises a monopoly, and as to which there can be no competition, as required by the charter of the city of St. Louis; on the contrary, as plaintiffs aver, said board of public improvements were bound by law, duty, and morals, in the interest of said city, and of all of said property owners, to select and recommend for

such reconstruction a genuine asphalt, suitable for the purpose, to be taken and drawn from any deposit or source of supply anywhere in the world, so as to bring to the city, its taxpayers and property owners aforesaid, the benefits of that competition contemplated by the charter of said city.

The limitation by said board, and by the said city of St. Louis in said ordinance of said reconstruction, to Trinidad lake asphalt, destroyed all competition as to asphalt and as to reconstruction; and plaintiffs aver that wherever in the past the ordinance of the city of St. Louis for the reconstruction of any of its streets with asphalt has contained a limitation to Trinidad lake asphalt, there has been but one bid, and that by the Barber Asphalt Company, and under the condition of things as hereinbefore set forth, there never can be but one bid under any such ordinances.

Plaintiffs further state that inasmuch as the said Barber Asphalt Paving Company is of necessity the sole and only bidder on all such contracts, and was of necessity the only bidder for the work of reconstruction aforesaid on said Jefferson avenue, the said company was practically given a monopoly and exclusive control of the bids for all other material, limestone, cement, and concrete incidentally necessary for the work of said reconstruction, and enabled said Barber Asphalt Paving Company to obtain an excessive and exorbitant price and compensation for the limestone used in said concrete, and for the six-inch curbing required in said construction, and for removing old roadway. And plaintiffs aver that under its bid and contract, under said ordinance, the said Barber Asphalt Paving Company was enabled to charge and obtain the price of ninety-six cents per linear foot for six-inch curbing, when in other contracts for the reconstruction of other streets with wooden pavements or with granite pave-

ments, where there was no limitations as to the source of supply of material to be used, and where there was open competition, the contractors bid and received only a price running from sixty-five to seventy-five cents per linear foot for similar six-inch stone curbing, and obtained $1.18 per square for removing old roadway, when the same could have been done for a profit at (0.75) seventy-five cents per square.

Plaintiffs further state that while the said ordinance does not prescribe that said street, after being reconstructed, should be maintained by the use of Trinidad lake asphalt, yet by necessary implication, and by the fact that the maintenance of said street is coupled with the reconstruction thereof, and required to be let in the same contract and to the same contractor, the use of Trinidad lake asphalt in said maintenance is enforced and made necessary. And plaintiffs further state that the said requirements of the provisions of the charter of the city of St. Louis, hereinbefore set forth as to contracts for material to be used in the construction and maintenance of the streets in said city, have not been complied with as to the asphalt and work to be done in the maintenance of said street after reconstruction.

Plaintiffs further state that by the provisions, section 25, article 6, of the charter of the city of St. Louis, the cost of reconstruction of said Jefferson avenue is to be levied as a special tax upon the owners of the property in front of which said pavement is constructed, but the cost of maintenance of said street after reconstruction is to be paid by the city out of its general revenue. Plaintiffs aver that the board of public improvements of the city of St. Louis, in view of the foregoing provisions, have verbally announced and made it an unwritten law for the control of said board,

that no bid for maintenance which shall exceed fifty cents per square will be considered or recommended by said board—the city of St. Louis thereby obtaining the maintenance of said street at about the cost thereof, or less than cost. By letting the said contract for maintenance and reconstruction together, the bidder is invited to make a bid for such maintenance at about cost, and to save himself from loss on maintenance by bidding a higher price for reconstruction, which is to be paid as aforesaid by the property owners. This scheme and plan, outside of the consideration of the asphalt monopoly hereinbefore referred to, would, under any condition of things, or competition, work a great injustice to the property owner by enhancing the price of reconstruction which is to be paid by the property owner, and thereby enabling the city to impose upon the property owner a part of the cost of maintenance. But in view of the asphalt monopoly hereinbefore referred to, and which is aided and abetted by the city of St. Louis, in providing that the reconstruction of said Jefferson avenue should be limited to Trinidad lake asphalt, the defendant, the Barber Asphalt Paving Company, is enabled to impose upon the owners of the property to be affected by the cost of such reconstruction an excessive, exorbitant, and fraudulent price for the reconstruction of said street with Trinidad lake asphalt, while the city of St. Louis obtains the maintenance of said street at a price about equal to or less than the cost of such maintenance.

Plaintiffs further state that after the letting of said work of reconstruction and maintenance, and after the making of said contract, the street commissioner of the city of St. Louis, by an order duly issued, lowered the grade of said Jefferson avenue, and ordered the Jefferson Avenue Railway Company, which occupied said street with its tracks, to lower its tracks to correspond

with the grade of said street as lowered. All of which action of the said board of public improvements was contemplated by the said defendant, the Barber Asphalt Paving Company, in the specifications which were made the basis of its bid, and said lowering of said grade necessitated the excavation and removal from said roadbed of more earth and macadam than would be and was required, for the purpose of laying the concrete foundation for the said reconstruction of said street with asphalt, as required by said ordinance and contract. And the said defendant, the Barber Asphalt Company, in view of the specifications which permitted the lowering of said grade after the making of said contract included in their said bid an amount necessary to cover the additional cost of labor and work involved in the said labor and work of lowering the said street. The grade of said street was lowered at least six inches for a distance of——hundred feet; the cost of which was at least the sum of $——. Plaintiffs aver that under the terms of the charter of the city of St. Louis, all grading of streets in said city must be paid for by the city of St. Louis out of its general revenue, and can not be taxed against the property owners in front of whose property such grading is done. But by the city of St. Louis requiring the said contractor, in advance, to agree, as part of his contract, that the city might order the defendant, the Barber Asphalt Paving Company, to lower the grade of said street by additional excavation as part of the compensation to be paid the said company after such work of reconstruction, the city of St. Louis has been enabled to and does impose upon plaintiffs as property owners the burden and cost of such excavation, which will be carried into the special tax bills to be issued against plaintiffs' property, for the reconstruction of the said street, whereas said cost of lowering the grade of said street

should be paid by the said city itself out of its general revenue.

Plaintiffs further state that by reason of the premises, and by reason of the repugnance of said ordinance number 17151 to the provisions of the charter of the city of St. Louis, and particularly to the provisions of the said charter hereinbefore referred to and set out, the said ordinance is null, void, and of no effect, and the said contract between the defendant, the city of St. Louis, and the defendant, the Barber Asphalt Paving Company, is null and void, and of no effect; and the property of these plaintiffs can not in any manner be bound for the payment of the reconstruction provided for in said ordinance.

Heretofore, to wit, on the twenty-sixth day of July, 1893, at the beginning of the work by the said Barber Asphalt Paving Company under said contract, these plaintiffs caused to be served upon the said defendant, the Barber Asphalt Paving Company, a written notice, that, for the reasons set forth in this petition, plaintiffs would contest and deny the validity of said ordinance number 17151, and the validity of the awarding of said work of reconstruction, and the legality and validity of the assessment of any part of the cost of said reconstruction, and the validity and legality of any special tax bills for the cost of said reconstruction, so far as such would or could affect the property of plaintiffs hereinbefore described. Nevertheless the defendant, the Barber Asphalt Paving Company, proceeded with said work of reconstruction and has finished the same. And the city of St. Louis by its executive officers is about to, and will, unless restrained by the orders of this court, make out, sign, and certify special tax bills against plaintiffs' property for the cost of such reconstruction, for about and not to exceed the amount of

$400, and such tax bills will be registered in the office of the comptroller of the said city of St. Louis.

Plaintiffs allege that by the terms of section 25, of article 6, of the scheme and charter of the said city of St. Louis, the said special tax bills, when so signed, certified, and registered, as provided for by the terms of said charter and by the terms of said ordinance 17151, will become a lien on the property of petitioners hereinbefore described, and will be a cloud upon plaintiffs' title to said land, and will damage and injure plaintiffs' title to and the value of said land.

Plaintiffs allege that they have no adequate remedy at law in the premises, but can only have a proper and adequate remedy and relief in a court of equity, where all such matters are properly cognizable. The plaintiffs further aver that unless the defendant, the city of St. Louis, is enjoined and restrained from issuing, registering, and delivering said special tax bills against plaintiffs' property as aforesaid, the plaintiffs will suffer irreparable injury.

Plaintiffs further allege that the city of St. Louis is a municipal corporation legally existing under the laws of the state of Missouri; that said Robert E. Mc Math is president of the board of public improvements of the city of St. Louis; that said Isaac Sturgeon is comptroller of the city of St. Louis; that said Robert E. McMath and said Isaac Sturgeon are respectively charged with the performance of the duties of president of the board of public improvements and of comptroller of said city.

Whereupon, the premises considered, plaintiffs pray that the court may declare said ordinance number 17151 null, void, and of no effect, by reason of its repugnance to the provisions of the charter of the city of St. Louis, and for the same reasons that section 542, Revised Ordinances of said city (1887), is null,

void, and of no effect.   Also that the said contract of
date twenty-third of May, 1893, between the defend-
ant, the city of St. Louis, and the defendant, the Bar-
ber Asphalt Paving Company, is null, void, and of no
effect.   Also that neither these plaintiffs nor their
property in this petition described, either or both of
them, are legally bound for the payment of any part
of the cost of the reconstruction of said Jefferson ave-
nue under the terms of said ordinance and under the
terms of said contract.

That  the court will, by its  writ of injunction,
enjoin and restrain the defendant, the city of St.
Louis, and the defendant, Robert E. McMath, presi-
dent of the board of public improvements of the city
of St. Louis, and the defendant, Isaac Sturgeon, comp-
troller of the city of St. Louis, from making out,
signing, certifying, and registering any special tax
bills for the cost of said reconstruction against the
aforesaid property of these plaintiffs, and from deliver-
ing any such special tax bills to the defendant, the
Barber Asphalt Paving Company, and enjoining and
restraining the said defendant, the Barber Asphalt
Paving Company, from demanding or receiving from
the said city of St. Louis and from the said presi-
dent of the board of public improvements, or from the
said comptroller of the said city of St. Louis, any
special tax bills against the plaintiffs' said property,
for the cost of said work of reconstruction.   And if,
prior to the service on said defendants of process in
this case, or prior to the issuing of the injunction
against said defendants therein prayed for, the said
city and its said executive officers, defendants herein,
shall have assessed said cost of reconstruction against
said property, and shall have signed, certified, issued,
and registered any special tax bills against plaintiffs'
said property for any part of said cost of reconstruc-

tion, and shall have delivered said special tax bills to
the said defendant, the Barber Asphalt Paving Com-
pany, then the plaintiffs pray that this court will enter
a decree canceling and annulling said special tax bill
or tax bills, and decree that the same shall be for
naught held.

And plaintiffs pray for such other orders, decrees,
aid, and relief as upon the pleadings and the evidence
the court may deem the plaintiffs entitled to. And
plaintiffs will ever pray, etc.

*Hiram J. Grover* and *Denis Devoy* for appellants.

(1) A court of equity has jurisdiction to enjoin
the unlawful assessment, imposition, or collection of
taxes by municipal or state authorities, and will exer-
cise its jurisdiction to enjoin such collection, either
upon the ground that the statute or ordinance under
which it is sought to assess and collect the tax is void,
or upon the ground that the proper steps have not been
taken to exercise an acknowledged power to levy the
tax. Dillon on Mun. Corp. [4 Ed.], secs. 914, 916,
919, and note, and 924, and note; Missouri cases cited
under section 916; Cooley on Tax. pp. 773, 774; *Lock-
wood v. St. Louis*, 24 Mo. 20; *Fowler v. St. Joseph*, 37
Mo. 228; *Leslie v. City*, 47 Mo. 474; *McPike v. Pen*,
51 Mo. 463; *Valle v. Ziegler*, 84 Mo. 218; *Book v. Earl*,
87 Mo. 248; *Railroad v. Apperson*, 97 Mo. 300; *Mc-
Elroy v. Kansas City*, 21 Fed. Rep. 260; *Dean v. City*,
9 Wis. 402; *Lee v. Ruggles*, 62 Ill. 427; *Bellevue, etc.,
Co. v. Bellevue*, 58 N. W. (Neb.) 446. (2) The juris-
diction of a court of equity to prevent and remove a
cloud upon a title to land, whether that cloud is im-
posed by unlawful assessments and sales for taxes, or
arises from deeds, conveyances or from any other
source, is also too well established by elementary law

and by the decisions of this court to be now brought in question. 3 Pom. Eq. Jur., sec. 1398; Cooley on Tax. p. 780; *Lockwood v. St. Louis, supra; Railroad v. Apperson, supra; Gardner v. Terry,* 99 Mo. 523; *Sneathin v. Sneathin,* 104 Mo. 206; *Johnson v. Duer,* 115 Mo. 366; *Morse v. Westport,* 110 Mo. 509; *Warren v. Barber Company,* 115 Mo. 575. (3) The contention of respondents, that because the petition alleged that the ordinances under which the special tax bill was issued are null and void and that the tax bills proposed to be issued would be null and void, no cloud would be cast on the title and there is no ground for the interference of equity, is untenable. 3 Pom. Eq. Jur., sec. 1399, p. 2150. "A cloud upon title is a title or incumbrance apparently valid, but in fact invalid." 2 Am. and Eng. Encyclopedia of Law, p. 298; *Bank v. Evans,* 51 Mo. 345; *Clark v. Ins. Co.,* 52 Mo. 272; *Mason v. Black,* 87 Mo. 344; *State ex rel. v. Philips,* 97 Mo. 33; *Harrington v. Utterback,* 57 Mo. 519. (4) In order to charge fraud and unfair dealing, it is not necessary to use any specific words. The petition charges facts which constitute both fraud and unfair dealing as against the plaintiffs. The municipal authorities were guilty of unfair dealing, and constructive, if not actual, fraud, both as to the maintenance and reconstruction of Jefferson avenue. Dillon, Mun. Corp., sec. 914; Welty on Assessments, sec. 291, p. 437. (5) The assessment against appellants' property for the work called for by ordinance number 17151, is not a mechanics' lien, but is a tax. The assessment against the property is a lien and incumbrance against the property; and the special tax bill is declared by the charter to be a lien and incumbrance: "Said tax bill shall be, and become a lien on the property charged therewith, and may be collected of the owner of the land, in the name of and by the contractor." Charter, section 25, article

6; Cooley on Tax. [2 Ed.] pp. 206, 209, 509; Cooley on Const. Lim. [2 Ed.] p. 612; *Garrett v. St. Louis*, 22 Mo. 505; *State ex rel. v. St. Louis*, 62 Mo. 244; *St. Louis v. Speck*, 67 Mo. 403; *Keith v. Bingham*, 100 Mo. 307. (6) The general provisions of section 542, Revised Ordinances of the city of St. Louis, directing reconstruction of streets and the maintenance of all streets so reconstructed, to be let together; and ordinance number 17151, ordering Jefferson avenue to be reconstructed with Trinidad lake asphaltum, when there were other asphaltums equally as good; and directing a contract for such reconstruction of said street, and for the repair thereof for nine years, to be let in the same contract and to the same contractor, are absolutely null and void. The contract let thereunder, for such reconstruction and maintenance, and the assessment of the cost thereof against appellants' property, and the special tax bill issued against the plaintiffs for a *pro rata* of such cost are null and void. Cooley on Tax. pp. 656, 660; *Steckert v. Saginaw*, 22 Mich. 104; *Dallas v. Ellison*, 30 S. W. Rep. 128; *Cooper v. Lumber Co.*, 31 S. W. Rep. 981; Welty on Assessments, sec. 319. (7) The notice calling a meeting of property holders to discuss the improvement was insufficient. *Galbreath v. Newton*, 30 Mo. App. 398. (8) That the Barber Asphalt Paving Company has a monopoly of Trinidad lake asphaltum, and that no other person could produce and use it in St. Louis for the purpose of this work, is admitted by the pleadings, and fully demonstrated by the fact that it was the only bidder. *First*. Monopolies are unlawful at common law and under Revised Statutes, Missouri, that part of the common law has been embodied in the law of Missouri. Coke, Third Institutes, p. 181; 2 Robinson Patents, secs. 9–12; 2 Cooley's Blackstone [3 Ed.], p. 159; R. S. sec. 6561. See, also, the Missouri

laws against trusts. *Second.* Neither the state nor any subdivision thereof can lawfully agree to pay public money to a monopoly whose existence is prohibited by the laws of the state. *People v. Refining Co.*, 121 N. Y. 582; 5 Miscellaneous Rep. 391; *Standard Oil Co. v. Adoue*, 83 Tex. 650; *Lester v. Brewing Co.*, 2 Pa. Dist. Ct. 177. (9) The principle of competitive bidding. "Any other mode of letting out work shall be held as illegal and void." Charter section 27, art. 6; *Vulcan Powder Co. v. Powder Co.*, 96 Cal. 516. (10) An estimate of the cost of. repairs must be indorsed on the ordinance recommended by the board of public improvement. The ordinance number 17151 is null and void for the reason that it was not indorsed with an estimate of cost, for the "whole cost" of the work of reconstruction and maintenance. The giving of an arbitrary figure to the contractors was not equivalent to indorsing an honest estimate on the ordinance. The members of the municipal assembly could not be compelled to go to the contractors for information as to the estimate for the cost and repairs for nine years. *City v. Gault*, 117 Ill. 20; *City v. Potter*, 119 Ill. 324; *Lev v. Chicago*, 113 Ill. 650. (11) The ordinance is null and void because it did not specify the material to be used in the repairs for nine years. *Labs v. Cooper*, 40 Pac. Rep. (Cal.) 1042. (12) Every ordinance requiring such work to be done shall contain a specific appropriation from the proper revenue and fund based upon an estimate of the cost, etc. Sec. 28, art. 6, of the charter. (13) It was unlawful for the board to advertise and let together in one contract and to the same contractor the contract for reconstruction and maintenance. *Brown v. Jenkins*, 98 Cal. 10; *People v. Maher*, 56 Hun, 81, approved in *Schenectady v. Trustee*, 66 Hun, 179, and in *Gilmore v. Utica*, 131 N. Y. 27, 36. (14) The ordinance for any purpose, reconstruction or mainte-

nance, is null and void without a doubt, and the theory of separating that which is valid from that which is invalid can not be applied. (15) In view of the fact that section 542 of the Revised Ordinances, and ordinance 17151, and the contract, are absolutely null and void the doctrine of estoppel has no application. The property holders by their charter having prohibited and declared such ordinances and such contracts absolutely null and void in advance, are not estopped now from saying that they are null and void. *Steckert v. Saginaw*, 22 Mich. 111, 28 S. W. Rep. 776; *New Whatcom v. Improvement Co.*, 38 Pac. Rep. 1024; *Crawfordsville v. Clemens*, 39 N. E. Rep. 540; *Dallas v. Ellison*, 30 S. W. Rep. 1128; *Galbreath v. Newton*, 30 Mo. App. 399; *Ruggles v. Collier*, 43 Mo. 352; *Cole v. Skrainka*, 37 Mo. App. 433; *Keating v. Kansas City*, 84 Mo. 519.

*W. C. Marshall* for city of St. Louis, respondent.

(1) The facts stated in plaintiffs' petition do not sustain plaintiffs' claim that the ordinance and contract between the city and the Barber Asphalt Paving Company is void, because said company has a monopoly of material. Even if it be true that by virtue of a contract with the government of the island of Trinidad, which controls all of the Trinidad lake asphalt obtainable, the Barber Asphalt Paving Company has secured a monopoly of material, and that thereby no other person could compete with said company, this could not have the effect of preventing the city from making a contract to have its streets constructed with Trinidad lake asphalt. *Barber Asphalt Paving Co. v. Hunt*, 100 Mo. 27, and cases cited; *Morse v. Westport*, 110 Mo. 502; *Warren v. Barber Paving Co.*, 115 Mo. 572. There is no legal distinction between the cases cited and the

case at bar. (2) The fact that the contract between the city and the Barber Asphalt Paving Company requires the same contractor to do the work of reconstruction, and thereafter to maintain the street, does not make the contract void nor increase the burden on the property holder. *Warren v. Barber Paving Co.*, 115 Mo. 579, and cases cited. (3) *First.* It would have been superfluous to set out in the call the particulars of the proposed improvement and to specify the materials to be used in the reconstruction. *Second.* Inasmuch as the property owners had nothing to do with the question of repairs, but the cost thereof had to be paid by the city, the public meeting could not properly consider the question, and there was no necessity of referring to repairs in the notice. *Third.* Whether the majority of the owners of the abutting property opposed the improvement is immaterial, if the board recommends it by a unanimous vote. The petition does not allege that the board was not unanimous in recommending this ordinance. *Fourth.* It was not necessary that the ordinance contain an estimate of the cost of maintenance, as required by section 28 of article 6 of the city charter; said section only applies to public work which is to be paid for by the property owner, and has no application to continuing work to be paid for out of the general revenue.

*W. C. Scarritt* and *Adiel Sherwood* for the Barber Asphalt Paving Company, respondent.

(1) The allegations of the bill as a whole present no case within the jurisdiction of a court of equity because the bill does not show affirmatively that for the wrongs and grievances complained of there is no adequate and complete remedy at law. Beach, Pub. Corp., sec. 1200; *Railroad v. Cheyenne*, 113 U. S. 525; *Clarke*

*v. Ganz*, 21 Minn. 387; *Duck v. Peeler*, 74 Tex. 268; *Gas Co. v. Higby*, 25 N. E. Rep. 660; *Shelton v. Platt*, 139 U. S. 596. A court of equity should be informed by the facts stated in the bill how, and why, irreparable injury will result from a refusal of the prayer. *Crisman v. Heiderer*, 5 Col. 589; *Waldron v. Marsh*, 5 Cal. 119; *Carlisle v. Stevenson*, 3 Md. ch. 505; *Troy v. Railroad*, 86 N. Y. 107; *Swift v. Jenks*, 19 Fed. Rep. 641; *Gas Co. v. Barker*, 36 How. Pr. 233; *Steamboat Co. v. Livingston*, 3 Cow. 713. The improvement having been completed, there is no remedy in equity to vacate the assessment levied under the authority of the public improvement ordinance—upon the ground that the ordinance is illegal and void. Admitting this to be true, there is a complete and adequate remedy at law. *Page v. St. Louis*, 20 Mo. 141; *Michael v. St. Louis*, 112 Mo. 610; Elliott, Roads and Streets, 442; *Strusburgh v. Mayor*, 87 N. Y. 455; *Taber v. Ferguson*, 109 Ind. 227; *Leroy v. New York*, 4 Johns. Ch. 353; *Heywood v. Buffalo*, 14 N. Y. 506; *McCormack v. Patchin*, 53 Mo. 33. Such a proceeding, after the completion of the work, is equivalent to enjoining the prosecution of an action at law wherein the complainant (the defendant) has a complete and adequate remedy,—which, of course, can not be done. *Railroad v. Cannon*, 49 Fed. Rep. 518. (2) If there is any remedy, it is at law. *Haskell v. Thurston*, 13 Atl. Rep. 274; *Appeal of Hoch*, 19 Atl. Rep. 360; *Thomas v. Musical Union*, 24 N. E. Rep. 360; *Roemer v. Conlon*, 19 Atl. Rep. 664; *New Orleans Co. v. Lowenstein*, 11 So. Rep. 187; *Strusburgh v. Mayor*, 87 N. Y. 455; *Michael v. St. Louis*, 112 Mo. 610; *Winter v. City Council*, 9 So. Rep. 366. Even if we admit that all of the alleged defenses are good and sufficient, every one of them could be made in a suit at law upon the tax bill issued against plaintiffs' property. For this reason they have an adequate

remedy at law and no standing in a court of equity. *Michael v. St. Louis*, 112 Mo. 614; *McClanahan v. West*, 100 Mo. 323; *Railroad v. Cheyenne*, 113 U. S. 525. (3) This pavement was laid under the provisions of ordinance number 17151, and plaintiffs allege that said ordinance is "null, void, and of no effect," etc., that is to say, the illegality complained of is shown upon the face of the record. Therefore, the allegations of the bill do not show a cloud upon plaintiff's title; besides there is no provision in the city charter that a sheriff's deed made in pursuance of a sale upon execution under, and by virtue of, a judgment rendered upon such a special tax bill would be *prima facie* evidence of title, or anything else. 1 High on Inj. [3 Ed.], sec. 525. For a void tax bill can not be a cloud upon title. *Ewing v. St. Louis*, 5 Wall. 417; approved in *Anderson v. St. Louis*, 47 Mo. 479. (4) The bill shows that the work authorized by the ordinance has been completed. This being true, complainants have no standing in equity, for they have stood by in silence and seen money invested upon the faith of the ordinance and contract authorizing the improvement, and have failed to make their objections, if any they had, in a legal manner. Equity and good conscience demand that they should be now estopped from attacking the validity of the assessment. *Warren v. Barber Asphalt Paving Co.*, 115 Mo. 572; 1 Spelling, Ex. Relief, sec. 657. (5) Plaintiffs' bill is bad for the further reason that it does not allege payment of the amount justly due, and does not tender payment of the amount found to be justly due. *Powell v. Hopkins*, 38 Md. 13; *Gwynn v. Lee*, 9 Gill, 137; *Baugher v. Nelson*, 9 Gill, 299; *Rogers v. Rathbun*, 13 Johns. Ch. 367; *Fanning v. Dunham*, 5 Johns. Ch. 143. (6) The tax bills are valid. The tax bills being for construction alone, that portion of the ordinance is certainly valid, whatever may be said

of section 6, the maintenance clause, and whatever may be said of the validity of section 542, Revised Ordinances, 1887. *State v. Clark*, 54 Mo. 36; *State v. Williams*, 77 Mo. 313; *St. Louis v. Railroad*, 89 Mo. 44; *Railroad v. Railroad*, 105 Mo. 590; *Lamar v. Weidman*, 57 Mo. App. 514; 1 Dillon on Mun. Corp. [3 Ed.], sec. 421; *Johnson v. Duer*, 115 Mo. 366. (7) There is no prohibition in the city charter which denies the municipal assembly the right to contract for construction and maintenance, or reconstruction and maintenance together, and there is in the city charter no provision which prohibits a maintenance ordinance to be passed. *Trimble v. McGee*, 112 Ind. 312; *Wisman v. McGee*, 112 Ind. 312; *Gibson v. Owens*, 115 Mo. 258; *Warren v. Barber Asphalt Paving Co.*, 115 Mo. 580. (8) Equity has no jurisdiction to remove a cloud on title, where there is a remedy at law. *McClanahan v. West*, 100 Mo. 323. (9) A suitor who seeks to have a public improvement enjoined must apply promptly, show an invasion of clear right, and that he has no other adequate remedy, and where, by laches, he has made it impossible for the court to enjoin without inflicting great injury, an injunction will be refused, and he will be remitted to his remedy at law. *Traphagen v. Jersey City*, 29 N. J. Eq. 206. And this is true even if the proceedings be void. *State v. Water Commissioners*, 30 N. J. Law, 247; *State v. Patterson*, 36 N. J. Law, 162. (10) It is now too late to complain that sufficient notice of the hearing, and of the letting, was not given. "The legislative authority may prescribe what the manner of the notice shall be." *St. Louis v. Ranken*, 96 Mo. 506. (11) Before a court is authorized to set aside an ordinance, it ought to be shown contrary to some great public principle. *Paxon v. Sweet*, 13 N. J. Law, 196; *St. Louis v. Foster*, 52 Mo. 515; *State v. Able*, 65 Mo. 357; *State v. Ransom*, 73 Mo. 95;

*Morse v. Westport*, 110 Mo. 502; *Warren v. Paving Co.*, 115 Mo. 572. (12) "The maintenance ordinance," (sec. 542, R. O. 1887), is a valid enactment. The power to enact it, if not expressly given in the broad grant of powers above set forth, results by necessary implication as a power essential to make effective the granted powers. *Morse v. Westport*, 110 Mo. 509. (13) The board of public improvements has the sole and exclusive right to determine what public improvements shall be made, their character, extent, and dimensions, and the material out of which they shall be constructed. *Barber Asphalt Paving Co. v. Hunt*, 100 Mo. 27; *Warren v. Barber Asphalt Paving Co.*, 115 Mo. 579. (14) It results that the board of public improvements and municipal assembly may contract for an article or a thing which is patented, or which is controlled by one or more corporations or individuals, either upon the ground that the competition meant is that of which the subject will admit, giving the charter provision a fair and reasonable construction, or upon the ground that the charter provision is inapplicable. *Hobart v. Detroit*, 17 Mich. 246; *Motz v. Detroit*, 18 Mich. 515; *Yarnold v. Lawrence*, 15 Kan. 131; *In re Dugro*, 50 N. Y. 513; *Baird v. Mayor*, 96 N. Y. 582; *Hunt v. Barber Asphalt Paving Co.*, 100 Mo. 27; *Hunt v. Barber Asphalt Paving Co.* (manuscript opinion, BARCLAY, J.); *Kansas City Transfer Co. v. Huling*, 22 Mo. App. 654.

*Frank Hagerman, J. McD. Trimble* and *Boyle, Priest & Lehmann* for respondents.

(1) A court of equity has no jurisdiction to entertain the bill; or the claim is of such a nature as is not cognizable in a court of equity. *Public Ledger Co. v. Memphis*, 23 S. W. Rep. 57; 2 Beach on Inj., sec.

1295; *Bellevue Imp. Co. v. Bellevue,* 58 N. W. Rep. 446; Charter; Ordinance; *Hull v. Bunte,* 20 Ind. 304; *Clark v. Davenport,* 30 Hun, 161; *Gillman v. VanBrunt,* 29 Minn. 271; *Eastman v. Thayer,* 60 N. H. 408; *Guest v. Brooklyn,* 69 N. Y. 507. (2) If the ordinance number 17151 and section 524 are invalid because opposed by the provisions of the charter such invalidity must be apparent from their conflicting terms, and any authority or rights claimed under them are not apparently valid, and the complainant's title is not endangered thereby. *Anderson v. St. Louis,* 47 Mo. 479; *Ewing v. St. Louis,* 5 Wall. 413; *Townsend v. N. Y.,* 77 N. Y. 542; *Wells v. Buffalo,* 80 N. Y. 253; *Lee v. Ruggles,* 62 Ill. 427; *Hamilton v. Fon Du Lac,* 25 Wis. 490; *Taylor v. Roundtree,* 28 Wis. 391; *Loud v. Charleston,* 99 Mass. 208; *Hunnewell v. Charleston,* 106 Mass. 350. (3) An injunction will not be issued as a matter of legal right. The chancellor will weigh well all of the circumstances and carefully estimate the consequences before granting such a harsh and extreme remedy. If the complaint is trifling, if the complainant is opposing some just moral obligation, although by strict legal right he might be entitled to do so; if he has not done equity or offered to do what would be just and right under the circumstances; if he has not acted promptly so that his delay may occasion others loss or great inconvenience; if the result will be injurious to public interests or cause confusion in the administration of public affairs and his benefit will be comparatively slight, a court of equity will withhold its aid, and remit him to his naked legal recourse. *Parker v. Winnipisoegee,* 2 Black. 545; *Tuttle v. Church,* 53 Fed. Rep. 422; *Bailey v. Culver,* 84 Mo. 531; *Bassett v. Mfg. Co.,* 47 N. H. 437; *Sprague v. Rhodes,* 4 R. I. 301; *Railway Co. v. Payne,* 49 Fed. Rep. 114; *Bulton v. Railroad,* 4 S. W. Rep. (Ky.) 332;

*Steins v. Franklin Co.*, 48 Mo. 175. (4) Complainants have no interest in the maintenance cost; they are charged with no part of it and hence have no standing in court to contest it. They are alone interested in the cost of reconstruction and in that only to the extent of twenty-five per cent of the assessed value of their property; the cost of reconstruction above that must be borne by the general revenue fund of the city. *Olsen v. Topeka*, 42 Kan. 709. (5) But the ordinance may be void in part and valid in part; valid as to reconstruction and void as to maintenance. Sutherland on Stat. Const., sec. 169, and cases cited; *State v. Clark*, 54 Mo. 36; *Johnson v. Duer*, 115 Mo. 366; *Neenan v. Smith*, 60 Mo. 292; *Farrar v. St. Louis*, 80 Mo. 393. (5) It is not a violation of the charter to couple the contract for the reconstruction with the contract for maintenance. The latter is in the nature of a guaranty of the former. There is nothing in the charter prohibiting it. *Gibson v. Owens*, 115 Mo. 258; *Warren v. Barber Co.*, 115 Mo. 572; *Morse v. Westport*, 110 Mo. 502; *Schenectady v. Trustees*, 21 N. Y. Sup. 147. It inures to the interest of the property owner because it saves the cost of a second construction, which may lawfully be imposed. *McCormick v. Patchen*, 53 Mo. 33; *Estes v. Owen*, 90 Mo. 113; *Farrar v. St. Louis*, 80 Mo. 379. (6) The fact that Barber Asphalt Company has the proprietary control of Trinidad lake asphaltum does not prohibit the city, if in its judgment it is wise to do so, from making a valid contract for using it upon its streets. If the courts assume to supervise and control the discretion of municipal officers as to the material and processes which they shall employ in public work they will find little time for doing anything else. The discretion in such matters is wisely lodged with officers selected to look after the municipal welfare, and when their judgment has been honestly and fairly exercised that is the

end of the matter so far as the judiciary is concerned. *City v. Bonnell*, 31 Atl. Rep. 408; *Hobert v. Detroit*, 17 Mich. 246; *In re Dugro*, 50 N. Y. 513; *Paving Co. v. Hunt*, 100 Mo. 23; *Warren v. Paving Co.*, 115 Mo. 572. (7) The complainants are debarred of equitable relief by delay and estoppel. *Bliss v. Pritchard*, 67 Mo. 181; *Cline v. Vogel*, 90 Mo. 239; *Simpson v. Justice*, 8 Ired. Eq. 115; *Clifton Iron Co. v. Dye*, 87 Ala. 468; 1 Beach, Inj., sec. 42; *Easton v. Railroad*, 9 C. E. Green, 57; Kerr on Inj., p. 201.

BURGESS, J.—This is a suit in equity brought by the plaintiffs, as trustees under the will of James Verdin, deceased, to cancel a certain tax bill, if issued, by the defendant city in favor of the Barber Asphalt Paving Company; if not issued, to restrain the issuance and delivery thereof, and to divest the lien of said tax bill. The Barber Asphalt Company answered. The defendants, city of St. Louis, McMath, and Sturgeon, filed a demurrer to the petition, which was sustained, the petition dismissed, and judgment rendered in favor of defendants against the plaintiffs, and for costs, from which judgment they appealed.

The salient facts, as they appear from the allegations in the petition, are about as follows:

A petition for the improvement of Jefferson avenue was circulated among a portion of the interested property holders, but was not signed by a majority of them, nor by persons owning a majority of the front feet of property to be affected by the costs of the improvements. It was not signed by plaintiffs, nor were they aware of any desire on the part of the property holders to have the street reconstructed with Trinidad lake asphaltum until after the contract was let. The petition was never published, and in the order of the board of public improvements fixing a day for

considering said reconstruction the petition is not mentioned.   In the notice published, "all citizens interested in any of the improvements" are requested to attend a meeting at its office in the city hall, at the hour of 10 A. M., on the twentieth day of September, 1892, for the purpose of reconstructing with asphaltum certain streets named in said notice, and, among the rest, Jefferson avenue.   The notice did not say "Trinidad lake asphaltum," but simply said "asphaltum."

On the same day the board considered the reconstruction of Jefferson avenue, and recommended its reconstruction with asphaltum, and ordered its committee on street department to prepare and submit an ordinance for such reconstruction.   An ordinance (number 17151) was, in pursuance of said recommendation, reported and adopted by the municipal assembly, providing for the reconstruction of the streets with Trinidad lake asphaltum.   This ordinance also directed the board to contract at the same time for the maintenance of the street for nine years.   Thereafter, on April 11, 1893, the president of the board of public improvements was by said board directed to advertise sundry lettings for public work, and May 9, 1893, at 12 M., was set for opening bids thereunder.   The advertisement was:   "For reconstruction, with best quality of Trinidad lake asphalt, Jefferson avenue, from Adams street to Market street, and for maintenance of the same;  the streets to be maintained in good condition for a term of nine years beginning one year after the completion and acceptance of the work."

Among these specifications and forms of contract exhibited in the office of the street commissioner for the information of bidders for said work referred to in the advertisement, was a provision that said commissioner should have the right to make alterations in the line, grade, form, or dimensions of the work to be let,

either before or after the commencement of the work, and plaintiffs aver that all bidders were bound to take notice thereof; that there was no notice given that the board of public improvements would at any time consider the matter of maintenance of said Jefferson avenue after reconstruction, or that such matter would be. taken into consideration in the same letting, bidding, and contract; that in so doing said board claims to have been acting by authority of section number 542 of the Revised Ordinances of said city (revision 1887), by which it is provided that, whenever a street of St. Louis is to be improved on petition of the adjoining owners, said board may submit to the municipal assembly a bill for letting on contract the constructing or reconstructing and maintenance for a term of years, and after such bill shall have become a law said board shall advertise for proposals, including construction or reconstruction and maintenance, under the same regulations as for the improvement of streets.

The petition alleges that said ordinance is null and void because repugnant to the scheme and charter of St. Louis, and especially section 27, article 6; that as to the maintenance of the roadway of that part of Jefferson avenue so reconstructed, said board did not submit to the assembly of defendant city estimates of the amount of cost and maintenance, either as to material, or anything connected therewith, nor was it specified what kind of asphalt should be used in its maintenance; that when the bid was opened therefor, referred to in said ordinance, there was found to be but one under said letting for the reconstruction and maintenance of Jefferson avenue, and that was by defendant Barber Asphalt Company, for the sum of $18,508.80, for which sum it obtained the contract; that the Barber Asphalt Company is a corporation, and has, by concession or grant from the government of

the island of Trinidad, the exclusive right to remove and take asphalt from the asphalt or pitch lake on that island.

The petition further alleges: "That outside of said pitch lake, and outside of the government lands in the island of Trinidad, all covered by the monopoly created by said concessions and the monopoly of the defendant Barber company, there are other sources of supply of asphalt, of just as good a quality for every purpose, in the island of Trinidad itself, and in the island Pedermales, sixteen miles southwest from said Trinidad island, also in the state of Bermudez, in the republic of Venezuela, and also other deposits in the republic of Mexico and in the island of Cuba and in the United States of America, from all of which other deposits large quantities have been and are now being taken and sold in countries presenting a demand for the same, where there is free competition. And plaintiffs now aver that there is no good or sufficient reason for the city of St. Louis, by recommendation of its board of public improvements or by ordinance, to direct the reconstruction of its streets with Trinidad lake asphalt, to the exclusion of other asphalts of an equally good quality, above referred to. By so limiting the reconstruction of its streets to the material known as 'Trinidad lake asphalt,' all such reconstruction is thrown into the hands of the defendants, the Barber Asphalt Paving Company, which results in the city and its property owners being required to pay a larger price for such reconstruction than they would have to pay if the material for reconstruction were not limited to Trinidad lake asphalt; that while the petition aforesaid framed and circulated among the property owners on Jefferson avenue by the agents and solicitors of the defendant, the Barber Asphalt Paving Company, did in terms ask for the reconstruction of said street with

Trinidad lake asphalt, which is controlled by the monopoly hereinbefore alleged, nevertheless said petition was not signed by a majority of the property holders to be affected by the costs of such reconstruction; and the board of public improvements, in finally selecting the material for such reconstruction, and recommending an ordinance therefor, were not in any manner bound by law, duty, or morals to follow the suggestion of said petition as to Trinidad lake asphalt, nor to recommend such reconstruction of Trinidad lake asphalt, of which the said Barber Asphalt Paving Company owns and exercises a monopoly and as to which there can be no competition, as required by the charter of the city of St. Louis.

"On the contrary, as plaintiffs aver, said board of public improvements were bound by law, duty, and morals, in the interest of said city and of all said property owners, to select and recommend for such reconstruction a genuine asphalt, suitable for the purpose, to be taken and drawn from any deposit or source of supply anywhere in the world, so as to bring to the city, its taxpayers and property owners, aforesaid, the benefit of the competition contemplated by the charter of said city. That the limitation of said board, and by the said city of St. Louis, in said ordinance for said reconstruction, to Trinidad lake asphalt, destroyed all competition as to asphalt, and as to said reconstruction; and plaintiffs aver that wherever, in the past, the ordinance of the city of St. Louis for the reconstruction of any of the streets with asphalt has contained a limitation to Trinidad lake asphalt, there has been but one bid, and that by the Barber Asphalt Company, and under the condition of things as heretofore set forth, there never can be but one bid under any such ordinance. That inasmuch as the said Barber Asphalt Paving Company is of necessity the sole

and only bidder on any such contracts, and was of necessity the only bidder for the work of reconstruction aforesaid on Jefferson avenue, the said company was practically given a monopoly and exclusive control of the bids for all other material, limestone, cement, and concrete incidentally necessary for the work of said reconstruction, and enabled said Barber Asphalt Paving Company to obtain an excessive and exorbitant price and compensation for the limestone used in said concrete, and for the six-inch curbing required in said construction, and for removing old roadway.

"And plaintiffs aver that under its bid and contract, under said ordinance, the said Barber Asphalt Paving Company was enabled to charge and obtain the price of ninety-six cents per linear foot for six-inch curbing, when in other contracts for the reconstruction of other streets with wooden pavements, or with granite pavements, where there was no limit as to the source of supply of material to be used and where there was competition, the contractors bid and received only a price running from sixty-five to seventy-five cents per linear foot for similar six inch stone curbing; and obtained $1.18 per square for removing old roadway, when the same could have been done for a profit at (0.75) seventy-five cents per square."

The petition charges that "in view of the asphalt monopoly hereinbefore referred to, and which is aided and abetted by the city of St. Louis, in providing that the reconstruction of said Jefferson avenue should be limited to Trinidad lake asphalt, the defendant, the Barber Asphalt Paving Company, is enabled to impose upon the owners of the property to be affected by the costs of such reconstruction an excessive, exorbitant, and fraudulent price for the reconstruction of said street with Trinidad lake asphalt, while the city of St.

Louis obtains the maintenance of said street at a price about equal to, or less, than the costs of such maintenance."

The petition then proceeds as follows:

"Plaintiffs further state that by reason of the premises,. and by reason of the repugnance of said ordinance number 17151 to the provisions of the charter of the city of St. Louis, and particularly to the provisions of the said charter hereinbefore referred to and set out, the said ordinance is null, and void, of no effect, and the said contract between the defendant, the city of St. Louis, and the defendant, the Barber Asphalt Paving Company, is null and void. and of no effect, and the property of these plaintiffs can not in any manner be bound for the payment of the reconstruction provided for in said ordinance.

"That heretofore, to wit, on the twenty-sixth day of July, 1893, at the beginning of the work by the said Barber Asphalt Paving Company under said contract, these plaintiffs caused to be served upon the said defendant, the Barber Asphalt Paving Company, a written notice, that, for the reasons set forth in this petition, plaintiffs would contest and deny the validity of said ordinance number 17151, and the validity of the awarding of said work of reconstruction, and the legality and validity of the assessment of any part of the cost of said reconstruction, and the validity and legality of any special tax bills for the cost of said reconstruction, so far as such would or could affect the property of plaintiffs hereinbefore described. Nevertheless the defendant, the Barber Asphalt Paving Company, proceeded with said work of reconstruction and has finished the same. And the city of St. Louis by its executive officers is about to, and will, unless restrained by the orders of this court, make out, sign, and certify special tax bills against plaintiffs' property

for the costs of such reconstruction, for about, and not to exceed, the amount of $400, and such tax bills will be registered in the office of the comptroller of the said city of St. Louis.

"Plaintiffs allege that by the terms of section 25 of article 6 of the scheme and charter of the said city of St. Louis, the said special tax bills, when so signed, certified, and registered, as provided for by the terms of said charter, and by the terms of said ordinance 17151, will become a lien on the property of petitioners hereinbefore described, and will be a cloud upon plaintiffs' title to said land, and will damage and injure plaintiffs' title to, and the value of, said land.

"Plaintiffs allege that they have no adequate remedy at law in the premises, but can only have a proper and adequate remedy and relief in a court of equity, where all such matters are properly cognizable. Plaintiffs further aver that unless the defendant, the city of St. Louis, is enjoined and restrained from issuing, registering, and delivering said special tax bills against plaintiffs' property, as aforesaid, the plaintiffs will suffer irreparable injury."

At the beginning of the work under said contract by the Barber Asphalt Paving Company, it was duly notified of plaintiffs' intention to contest and deny the validity of said ordinance number 17151, and everything done thereunder.

It is contended by defendants that the allegations of the petition do not show that there is a cloud upon plaintiffs' title; that they do not show a proper case for equitable interference, and do not state sufficient facts to give a court of equity jurisdiction.

I.   First as to the cloud upon plaintiffs' title.  No principle of law is better settled than that by a demurrer to a petition all material facts alleged therein, for the purposes of the demurrer are admitted as being

true. *Dodson v. Lomax*, 113 Mo. 555; *McKinzie v. Mathews*, 59 Mo. 99; *Butler v. Lawson*, 72 Mo. 227. And it is only where the petition is so "wholly wanting in necessary averments that it fails to state a cause of action," that it is demurrable. *State ex rel. v. Carroll*, 63 Mo. 156.

When the material facts alleged in the petition, which it is unnecessary to again repeat, are admitted to be true, we are unable to see the force of that contention. Under the rulings of this court the petition is not subject to the objections urged against it.

*Page v. St. Louis*, 20 Mo. 137, is relied upon by defendants as holding that an injunction will not be allowed to restrain the exercise of the municipal authority of a city in the levy and collection of a tax, upon the ground that the passage of an ordinance was in violation of the city charter; but in that case plaintiff maintained that no liens had been created on his real estate, nor was it claimed that by reason of the tax proceedings a cloud was cast upon the plaintiff's title, and in this very important matter that case differs from the case in hand.

*Warren v. Paving Co.*, 115 Mo. 572, was not an injunctive proceeding, but was for the cancellation of certain tax bills issued to defendants for street paving, and the question now under consideration was not passed upon in that case. Moreover, the ground upon which it was insisted that the tax bills should be cancelled was because of methods adopted by the city authorities of the city of Westport, which, it was held, were in their discretion, which could not be raised after the work had been done in the absence of fraud or collusion.

*Michael v. St. Louis*, 112 Mo. 610, was an action to enjoin the collection of certain assessments for benefits to the property of plaintiffs, upon the ground that their

property was assessed with benefits in a condemnation proceeding to open a street to which they were not parties and had no notice, and the property assessed derived no benefit from the improvements, and it was held that, "whether property assessed with benefits in a street opening proceeding was in fact benefited by the street improvement, and the extent of such benefit, if any, are not triable in a suit to enforce the tax bills."

A somewhat similar question was involved in *Buddecke v. Ziegenhein*, 122 Mo. 239, where the same rule was announced; but in this case the questions are different, which call in question the validity of the ordinances and contract under which the tax bills had been, or were to be, issued, and which, when issued, became a lien and cloud upon plaintiffs' title, and not to mere irregularities in the proceedings.

In *Lockwood v. St. Louis*, 24 Mo. 20, in passing upon a similar question to the one now under consideration, LEONARD, J., in speaking for the court, said: "This court has allowed relief by injunction in several cases where real property was about to be sold for the nonpayment of taxes assessed by a municipal corporation, but has never allowed it, that I am aware of, to prevent a sale of personal property. The distinction is obvious enough. In one case, a cloud is about to be drawn over a land title, and the court interferes to prevent it; in the other, the legal remedy is full and ample, and no reason exists for the interposition of equity." That case was followed and approved in *Fowler v. St. Joseph*, 37 Mo. 229; *Leslie v. St. Louis*, 47 Mo. 474; *McPike v. Pen*, 51 Mo. 63; *Bank v. Evans*, 51 Mo. 335; *Bank v. City of Kansas*, 73 Mo. 555.

In *McPike v. Pen, supra*, BLISS, J., in speaking for the court, said: "The court has uniformly enjoined the sale of land for the payment of taxes, upon the

ground that a cloud is thereby cast upon the title, although the assessment was illegal."

A similar question was before the court again in *Rubey v. Shain*, 54 Mo. 211, when it was said: "It may be asked, then, what is the remedy in cases where the assessment is illegal, or where it is based on an illegal act of the county court. The answer is that the taxpayer, according to the decision of this court in the case of *Newmeyer v. The Mo. & Miss. R. R. Co.*, 52 Mo. 81, may arrest the execution of an illegal subscription or other order of the county court." That case was followed and approved in *Ranney v. Bader*, 67 Mo. 476, and in *Valle v. Ziegler*, 84 Mo. 218.

The petition in this case alleges that the proceedings under which the tax bills were about to be issued were without authority and void. It also avers in what particular.

Another contention is, that plaintiffs have an adequate remedy at law and can not maintain this suit. In *Parks v. Bank*, 97 Mo. 130, BARCLAY, J., said: "The 'legal remedy' is said to consist in interposing an equitable defense to any action of ejectment that might be brought on the strength of the sheriff's deed under the judgment. Such defense, no doubt, could be interposed, but suppose no such action of ejectment were promptly begun? Plaintiff's equitable estate and ownership antedated the judgment, but that fact did not appear in the public record of titles. The proof thereof rested on facts outside. A sheriff's deed under the judgment would, therefore, apparently carry the title as against the judgment debtor's deed, recorded before the execution sale, but executed after the judgment. That consequence of the sale justified the exercise of the preventive jurisdiction of equity to avoid the casting of a cloud on plaintiff's title."

*Johnson v. Milwaukee*, 40 Wis. 315, was a proceeding by a property owner whose property had been assessed for benefits, to restrain the issue of the certificate to the contractor charging plaintiff's lot with the amount of benefits and creating a lien against it, upon the ground that the contract made with the city for the work was void. RYAN, C. J., in speaking for the court said: "Some objection was made to the right of the respondent to maintain this action, on the ground that the assessment is not a cloud upon his title. We are unable to agree with the learned counsel, and can not think that the cases which he cites supports his position. The assessment has been made, the work has been done, and the city is about to issue a certificate to the contractor charging the respondent's lot, to go into the tax roll if unpaid. Whenever the lien might be held to attach, it appears to us that the facts constitute a cloud upon the plaintiff's title, which a court of equity will remove, within the doctrine of *Judd v. Fox Lake*, 28 Wis. 583. No prudent purchaser would take the property at its full value, in view 'of the impending, unauthorized execution and delivery' of the certificate, which would operate as an apparent charge or incumbrance on it." That case is on all fours with this, and announces the doctrine for which we contend.

The tax bills, although illegally issued, were a cloud upon plaintiffs' title and rendered the property unsalable in the market. No one would have purchased or advanced money upon the property with the tax bills· against it even though they were void, as the defects in the proceedings, previous to their issue, were such as to require legal acumen to discover them, and whether they appear from the face of the proceedings, or by extrinsic evidence, courts of equity will entertain jurisdiction to remove the cloud.

It is true that plaintiffs might have defended against a suit instituted against them on the tax bills, but they were not bound to wait for the institution of such suit, before proceeding to have them canceled, and the cloud on their title created thereby removed, but had the right to do as they did, to act promptly, that no one might be deceived or misled by their silence and want of action. The petition alleges that the contractors were notified about the time they began the work that the legality of the proceeding under which it was being done would be contested.

But it is insisted by defendants that as the petition alleges that the tax bills, and proceedings under which they were issued, were null and void, no cloud was thereby created on plantiff's title, and that they are not entitled to relief, but the authorities seem to be adverse to this contention also.

In *Bank v. Evans*, 51 Mo. 335 (*loc. cit.* 344, 345), in passing upon a deed void upon its face it was said: "Yet the facts of this invalidity would not be manifest to persons unskilled in the law, nor even to the most skillful without close investigation of the several acts of congress, and the authority of the courts to regulate such sales, and therefore the existence of such a deed would throw a cloud over the title of the real owner and render the land less salable. * * * After the final trial and decree the question was raised by motion in arrest, that there was no equity in plaintiffs' petition, and the point is made here that their remedy, if any, is complete at law. I have already intimated that such a title as plaintiffs claim under is sufficient to cast a cloud over the defendant's title and is such as would render their land unsalable in the market. I know that the authorities are somewhat conflicting in regard to what sort of titles constitute a cloud, so as to warrant a court of equity to interfere and remove it. Some

of the courts hold, that if the defect is apparent on the deed, the law will not entertain jurisdiction; but I think that the weight of authority and reason sustain the position, that if the defect is such as to require legal acumen to discover it, whether it appears on the deed or proceedings, or is to be proven· *aliunde*, courts of equity entertain jurisdiction to remove the cloud."

Again, in *State ex rel. v. Philips*, 97 Mo. 331 (*loc. cit.* 339), which was a suit instituted for the purpose of having the cloud removed from relator's property created by certain tax bills issued for the purpose of building a sewer by Kansas City and which were void for the want of authority in the city under its charter to build a sewer, SHERWOOD, J., in speaking for the court, said: "And the special tax bills, though void, being an apparent lien upon the land, furnished ample ground for the relief plaintiff sought. It has frequently been decided by this court that injunction will lie to enjoin the sale of land whereby a cloud would be cast on the title. [Citing *Bank v. City of Kansas*, 73 Mo. 555, and other cases.] And whatever facts furnish basis for an injunction in such cases will also furnish basis for having the tax bill declared void, it being optional with the plaintiff which branch of equitable relief he will seek." See, also, *Railroad v. Apperson*, 97 Mo. 300; *Gardner v. Terry*, 99 Mo. 523.

In the last case it is said that: "The jurisdiction and power of a court of equity to prevent a cloud being cast upon the title to real estate is as well established as is the jurisdiction and power to remove one already created." (P. 526.) See, also, *Harrington v. Utterback*, 57 Mo. 519.

This may be said to be the almost universal rule upon this subject, where the levying and collecting of void and illegal taxes and assessments upon real prop-

erty are sought to be enjoined, and the plaintiffs have no remedy at law.    2 Dill. Mun. Corp., sec. 914.

2.    The plaintiffs insist that the notice published by the board of public improvements that a special meeting would be held to consider the matter of reconstruction of Jefferson avenue with asphaltum was insufficient, inasmuch as it did not comply with the provision of section 14, article 6, of the charter of the defendant city which provides that:

"No ordinance for construction or reconstruction of any streets can be passed unless recommended by the board of public improvements.    That the board may of its own motion and upon the petition of any reputable freeholder of property on any street, alley, or highway, designate a day on which they will consider the improvement of such street, alley, or highway, and shall give two weeks' notice in the paper doing the city printing of the time, place, and object of their meeting.    On such day, if the owners of a major part of the property on the line of the proposed improvement shall remonstrate against the same, the board shall consider such remonstrance, and if said board shall by an unanimous vote of all its members approve such proposed improvement, they shall cause an ordinance for the same to be prepared, and report the same, with the reasons for their action and the remonstrance, to the assembly.    If such a majority of the property owners fail to remonstrate, or shall petition said board for such improvement, the board may, by a vote of the majority of its members, approve the same, and shall cause an ordinance to be prepared and reported to the assembly therefor."

The notice which was given of the letting is as follows:

Vol. 131 mo—6

"Public Notice.

"Office of President Board of }
    Public Improvements.    }
        "St. Louis, September 1, 1892.

"Public notice is hereby given that the board of public improvements will hold a special meeting at the hour of 10 A. M., of the twentieth day of September, 1892, at its office in the city hall, for the purpose of considering the matter of reconstructing, with asphaltum, streets as hereinafter mentioned, viz.:

"No. 3396.  Petition No. 5160—For the reconstruction, with asphaltum, Carr street from Broadway to Seventh street.

"No. 3397.    Petition No. 5162—For the reconstruction, with asphaltum, Jefferson avenue from Adams street to Market street.

"No. 3398.    Petition No. 5163—For the reconstruction, with asphaltum, Jefferson avenue from Market street to Morgan street.

"No. 3399.    Petition No. 5170—For the reconstruction, with asphaltum, Carr street from Seventh to Eighth street.

"No. 3400.    Board's motion for petition No. 5176—For asphaltum, Vandeventer avenue from Ohio street to Page avenue now Page boulevard.    All citizens interested in any of the improvements above mentioned are requested to attend.

"By order of the board.

(Signed) "M. L. Holman, President pro tem.

"Attest:    Emory S. Foster, Secretary."

The notice seems to be a compliance with the city charter in so far as reconstruction with asphaltum is concerned, and contained all that it required as to the asphaltum.    It is difficult to see how any person interested could have been misled or deceived thereby.

While the notice did not state the place or location that the asphaltum was to be had or obtained, it did say, "asphaltum," and the mere fact that that which was determined upon was Lake Trinidad asphaltum did not vitiate the notice, nor did it make any real or substantial difference. We do not think the objection tenable in so far as the asphaltum is concerned.

3. It is contended that section 542 of the Revised Ordinances of the city is repugnant to the letter and spirit of the provisions of the charter of the city of St. Louis, and, therefore, null and void and of no effect, and that the action of the city in letting the contract for reconstruction and maintenance together is obnoxious and unlawful. Said section is as follows:

"SEC. 542. Whenever a street is to be improved, either on the motion of the board of public improvements or on petition of the adjoining property owners, the board of public improvements may submit to the municipal assembly a bill for letting in one contract the work of constructing or reconstructing such street and of maintaining it in good condition for a term of years; and after such bill has become a law the board of public improvements shall advertise for proposals, including the construction or reconstruction and maintenance under the same regulations as are provided for the improvement of streets; but the advertisement shall, in addition to what is prescribed for other street improvements, state the term during which the street is to be maintained in good condition and the amount of bond which the contractor will be required to furnish to secure the execution of the contract for maintenance, in addition to the bond which under existing regulations has to be furnished for all contracts for street improvements. The letting of the work, the awarding of the contract and the approval of the contract and of the bonds shall be carried out as now

provided for other street improvements. In canvassing the proposals, the lowest bid shall be ascertained by taking the aggregate amount of the cost of construction or reconstruction, as the case may be, and the total cost of maintenance, for the term of years designated by the ordinance. The special tax bills against the adjoining property for the work of construction or reconstruction shall be issued whenever the work has been completed and accepted. The contract shall provide that the obligation of the contractor to maintain the streets in good condition shall commence one year after the completion and acceptance of the work of construction or reconstruction, and the contract price shall be paid semiannually out of the city treasury, on the certificate of the street commissioner that the work has been performed in accordance with the contract and specifications. The bond to be given to insure the maintenance of streets during the term agreed upon shall be $15 for every square (of one hundred superficial feet) of the street embraced in the contract. The contract shall provide that the contractor shall, whenever notified by the street commissioner that any repairs are required, at once make such repairs at his own expense, and if they are not made within proper time the street commissioner shall have power to cause such repairs to be made, and the cost thereof shall be paid out of the fund provided for the payment of contracts for street maintenance, and the amount shall be deducted from any money then due under the contract, or which may thereafter become due. And it shall further provide, that if at any time during the term for which the contract for the maintenance of the streets is in force the pavement of such street or any part thereof has deteriorated to such an extent as to require, in the opinion of the board of public improvements, reconstruction, the street commissioner may,

with the approval of the board of public improvements and of the mayor, notify the contractor that reconstruction is necessary, and that the contractor shall, within three months after receiving such notice, reconstruct the whole or such part of the pavement with the same kind of material as heretofore applied, or with some other material approved by the board of public improvements. And the contract shall also provide, that if the contractor fails to reconstruct the street within three months after having been notified, the board of public improvements may, with the approval of the mayor, cancel the contract and relet the work of reconstructing the pavement, and that the cost of such reconstruction shall be paid· by the city and the amount collected by suit from the contractor or his sureties, not to exceed $15 per square of pavement, included in the contract. And the contract shall provide that whenever any repairs of the street are made necessary from the construction of sewers, the laying of pipes or telegraph wires or from any other disturbance of the pavement by parties acting under permits issued by the city, the contractor for the maintenance of the street shall, on notification from the street commissioner, immediately make all necessary repairs in conformity with the specification for this class of work. The cost of all such repairs, exclusive of trenching and back-filling, which shall be done by the parties who hold the permits and in a manner as now required by existing ordinances, shall be paid for at the full contract price for a superficial square of new pavement out of the fund set apart for the payment of contracts for the maintenance of streets, and the amount shall be certified by the street commissioner to the auditor, who shall reimburse, by transfer, the aforesaid fund from the funds of the proper department, if the repairs were made necessary by the construction of any public

improvement; and out of the funds to be deposited by persons obtaining permits for opening streets before such permits are granted, if the repairs are made necessary by work done under such permits. And the contract shall further provide that the contractor for the maintenance of such streets shall have the right to make all repairs which become necessary by the construction of any public improvement or by the work done by private parties under permits given by the city.''

It is argued that the maintenance of Jefferson avenue for nine years amounts to nothing more than "repairs" on the street for nine years, within the meaning of section 27, article 6, of the city charter; that it involves expenditures for labor and material, and is public work, within the meaning of the section; that it is a separate matter from reconstruction, and should have been let to contract separately and independently thereof; that ordinance 17151 for the maintenance and reconstruction of Jefferson avenue is null and void, because, as an ordinance for maintenance,— being for the public work for the repair of Jefferson avenue for nine years,—it should specify the material to be used in such repairs and an estimate of the cost of maintenance, as required by section 15, article 6, of the charter.

By said section 27, article 6, it is provided that any public work, or repairs thereof, and to fix the price or rate therefor, shall be let out by the contract to the lowest responsible bidder, subject to the approval of the council, and any other mode of letting out work shall be null and void. Does the maintenance of Jefferson avenue for nine years, within the meaning of said section, mean, or amount, to repairs?

It must be conceded that such work amounts to the expenditure of labor and money, and that it has no

direct connection with the work of reconstruction. While it is the duty of the board of public improvements, in all cases, except in case of necessary repairs requiring prompt attention, to prepare and submit to the assembly estimates of costs of any proposed work, and, under the direction of the ordinance, advertise for bids, and to let out such work by contract to the lowest responsible bidder, subject to the approval of the council, no such thing was ever done in this case. The costs and expenses attending the maintenance of streets are paid by the city out of the funds set apart annually for street repairs—reconstruction of streets. Section 6, ordinance 17151. The costs of repairs of all streets and highways, and cleaning the same, are also paid out of the general fund of the city. Section 18, article 6, *supra*.

The word "maintain" does not mean to provide or construct, but means to keep up; to keep from change; to preserve (Worcest. Dict.); to hold or keep in any particular state or condition; to keep up (Webst. Dict.).

In *Moon v. Durden*, 2 Exch. 21, it was said: "The verb 'to maintain,' * * * signifies to support what has already been brought into existence." See, also, *Railroad v. Godman*, 4 N. E. Rep. (Ind.) 163.

" ' To repair ' means to restore to a sound or good state after decay, injury, dilapidation or partial destruction. (Webster.)" *Street Railway, etc., Co. v. Galveston*, 69 Tex. *loc. cit.* 663. See, also, *Railroad v. Pittsburg*, 80 Pa. St. *loc. cit.* 76.

It will thus be seen that "maintenance" and "repair" when applied to a street practically mean one and the same thing. Maintenance, being a separate and distinct public work, must be contracted for like any other public work. The material with which it is to be done must be specified by the board, and an

estimate of the cost should be sent to the municipal assembly, together with an ordinance recommending such repairs. Nothing of that kind was done in this case, but the bid for reconstruction and maintenance were both let together, at the same time and to the same party, with no estimate as to the cost of the latter, which could only be made, under the charter, after the repairs became necessary. There was no legal obstacle in the way to one person becoming the contractor for both the reconstruction and maintenance, if under the city charter and ordinance the contract could be let to the lowest bidder, but in any event as the costs of reconstruction are assessed against the property holders, while the costs of maintenance are paid by the city, the lettings must necessarily have been separate, and upon different estimates.

The board of public improvements of the defendant city had, previous to the time of letting the contract for reconstruction and maintenance to the Barber Asphalt Company, publicly announced as a rule for the conduct of said board that no bid for maintenance which should exceed fifty cents per square would be considered or recommended, which was estimated to be about cost, or less than cost, and by letting the contract for maintenance and reconstruction together the bidder was enabled to make a bid for such maintenance at about costs, and thereby protect himself against any possible loss on account of his contract for maintenance by bidding a higher price for reconstruction.

Under section 18, article 6, *supra*, the paving, curbing, guttering, sidewalks, and the materials for the roadways, the repairs of alleys and sidewalks, are charged upon the adjoining property as a special tax, while the cost of their maintenance is paid by the city, and there is no apparent reason why this work could not be done as well by one contractor as another. But by letting

to the defendant, the Barber Asphalt Paving Company, the contract for reconstruction, and at the same time, and as part of the same contract, the contract for the maintenance of Jefferson avenue for the period of nine years at the price of $1,962, the contractor was enabled to obtain from the property holders, in advance, payment in whole or in part for the maintenance which, under the charter, is required to be paid by the city; and if, after the work of reconstruction is completed, the property holders refuse to pay at once, a special tax bill is immediately issued, which is a lien upon the property for the cost of the work of maintenance, which has not been done, and which the contractor may never do.

*People ex rel. v. Maher*, 56 Hun, 81, was upon objections filed to the letting of a contract to the National Vulcanite Company for the grading and paving a street in the city of Albany, New York, with Trinidad sheet asphalt. The contract was objected to because of the fact that it contained a provision which required the contractor to keep in repair the pavement, laid in pursuance of the provision thereof, for the period of seven years, from and after the acceptance by the city, without expense to said city or to the abutting property owners. It was held (we quote from the syllabi), "that the necessary effect of this contract was to charge upon the property owners the cost of keeping the avenue in repair for seven years, in violation of the provision of the act of the legislature which charged such expense upon the city at large. That anything in the contract which imposed upon the property owners more than the obligation of having the pavement well constructed in the outset was unjust to them."

In the case in hand by letting the reconstruction, and maintenance of the street together, plaintiffs were

compelled to pay part of the expense of maintenance, while by law they were only responsible, if at all, for the expense of reconstruction.

Moreover, ordinance number 17151 provides for the reconstruction of Jefferson avenue, by taking up and removing the old pavement of the roadway, preparing the roadbed, renewing and readjusting the curbing, laying a roadway pavement of best quality of Trinidad lake asphalt on a concrete base, except between the rails of the street railway occupying the street, which last mentioned space was to be paved with granite blocks, laid on a bed of sand, the curbing to be of limestone; while ordinance number 542 provides for the letting of such work all in one contract, which is in direct conflict with section 27, *supra*, of the charter, which provides for the letting of such contracts to the lowest bidder, as provided for purchases by the commissioner of supplies, while by section 29, article 4, of the charter it is provided that: "In advertising for proposals to furnish supplies, quantity and quality of all articles shall be fully stated, and any bidder may bid for any one article named."

The notice of the letting of the contract said nothing as to the different kinds of work to be done, or materials to be furnished in reconstruction, although estimates for such work and materials were properly made, but simply gave notice that the board of public improvements would hold a special meeting, at a time fixed, at its office in the city hall, for the purpose of considering the matter of reconstructing with asphaltum Jefferson avenue and other streets. As to work and material, other than asphaltum, there was no notice at all, and even if there had been no one could have bid on any part or parcel thereof because of the fact that the ordinance provides for the reconstruction with Trinidad lake asphalt, a monopolized article, in

one contract, which not only prevented competition in bidding as to that part of the contract, but for any other work or materials also.

No part of the cost of maintenance of the street could be imposed upon the plaintiffs, in the absence of express authority under the charter to do so. We, therefore, conclude that section 542 of the Revised Ordinances of the defendant city is in conflict with, and contrary to, the meaning and spirit of the city charter, and null and void.

Nor do we think the fact that the contractor is required to give bond for the maintenance of the streets legalizes the contract. Here the contract for reconstructing the street, and the maintenance of it after construction, were entirely different matters, having no immediate or necessary connection whatever with each other.

Moreover, ordinance 17151, which provides for the reconstruction and maintenance of Jefferson avenue, being for public work, should have specified the material to be used in such maintenance as required by section 15, article 6, of the charter, and, as it failed to do so, is also null and void.

4. Another contention on the part of the plaintiffs is that the ordinance and the contract between the city and the Barber Asphalt Paving Company are void because said company had a monopoly of material by virtue of a contract with the government of the island of Trinidad, by which it controls all of the Lake Trinidad asphalt. The petition alleges that there are other sources of supply of asphalt of just as good quality for every purpose as Trinidad lake asphalt. By the demurrer the allegations thus made stand admitted.

By section 27, article 6, of defendant's charter it is provided that the board of public improvements

shall in all cases, except in case of necessary repairs requiring prompt attention, advertise for bids as provided for purchases by the commissioner of supplies and let out said work by contract to the lowest responsible bidder, subject to the approval of the council, and that any other mode of letting out work shall be held as illegal and void.   Section 29,  article 4,  of the charter provides that "in advertising for proposals to furnish supplies, quantity and quality of articles shall be fully stated, *and any bidder may bid for any one article named.    The award for each article shall in all cases be made to the lowest bidder therefor.*"

The purposes and intention of the sections of the city charter just referred to were, that there should be competition in bidding for different parts of all public improvements, and by letting the contract for reconstruction by the use of Trinidad lake asphalt of which the Barber Asphalt Paving Company were the sole and exclusive owners, and maintenance of the same material, prevented all competition in bidding by the owners of other asphalt of equal merit, and not in accord with the charter provision of the city.

While the city authorities, assuming to act under its charter, passed an ordinance to reconstruct Jefferson avenue in said city with Trinidad lake asphalt and awarded the contract to the Barber Asphalt Paving Company, who owned the exclusive right to use said asphalt in the reconstruction of said avenue, and when reconstructed to maintain it for nine years with the same material, the ordinance was in violation of the charter in not letting each contract to the lowest bidder, and by the very terms of section 27, article 6, *supra,* is in excess of its authority, and the ordinance and contract thereunder "illegal and void."

*Dean v. Charlton,* 23 Wis. 590, was an action by plaintiff to enjoin the sale of plaintiffs' lands for an

Verdin v. The City of St. Louis.

assessment imposed on them for paving the streets in front of them paved with what is known as Nicholson pavement. The Nicholson pavement is a patented right, and was owned for the state of Wisconsin by one firm in the city of Milwaukee. The charter of the city, Madison, where the improvements were made, required all contracts for such improvements to be let to the lowest bidder. It was held, that the city could not contract at the expense of adjoining lot owners, the right to lay the pavement with that which was patented and owned by one firm, and the injunction was made perpetual. In the course of the opinion it was said:

"It is said that the charter authorizes a contract only for such work as is open to competition, and that this work was not open to competition, because nobody had any legal right to do it except the one firm that owned the patent. Upon these facts alone the objection seems to me unanswerable. And nothing seems to be necessary beyond the simple statement of the requirements of the charter as to the mode of letting work, and the fact that this right was a monopoly, to show that the charter is inapplicable to it, and that a contract for this work would be in violation of the necessary implication from its provisions. Indeed, the counsel for the respondent, by their course of argument, seemed tacitly to admit that there was an apparent incongruity in applying the provisions of the charter to a contract for such work as this. * * * It seems to me, therefore, a conclusion derivable from the very nature of the case, that competition could not be, and was not, preserved in the letting of this contract; and that it was, therefore, beyond the scope and in violation of the spirit of the charter. * * * It was suggested that even though this assessment should be held illegal, still there was nothing to show it to be inequitable, and, therefore, a court of equity ought not

to interfere.    But that principle has never been applied to these special assessments.    And certainly it could not be applied where there is no legal authority to contract for the work at all, to pay for which the assessment was imposed.''

This case was followed and approved in *Dolan v. Mayor*, 4 Abb. Pr. (N. S.) 397.

*Nicolson Pavement Company v. Painter*, 35 Cal. 699, was an action to recover a street assessment for laying down the Nicholson pavement, in a street in the city and county of San Francisco, California.    The law required that such contracts should be let to the lowest bidder, while the board of supervisors of said city advertised for proposals for bids to put down said Nicholson pavement, a patent owned by the Nicholson Pavement Company, who had the sole and exclusive right to lay the same in said city.    There was but one bid for the contract.    The court said:

''We repeat what we have so often had occasion to say, that in the matter of street improvements the board of supervisors have whatever power the statutes upon that subject have conferred upon them, and no other; and that the power which they possess must be exercised in the mode prescribed by the statute, and in no other; for, as was well said by Mr. Chief Justice FIELD, in *Zottman's Case*, 20 Cal. 102, 'the mode in such cases constitutes the measure of the power.'    *    *    *    To advertise for sealed proposals where there can be but one bidder, to open them in open session, to examine and publicly declare them, and thereupon award the work to the lowest responsible bidder, where there is and can be but one,    *    *    *    would be to play as broad a farce as was ever enacted behind the footlights. The law does not permit itself to be thus trifled with, nor allow its ministers to thus substitute pretense for performance.''

In *Burgess v. City of Jefferson*, 21 La. Ann. 143, it was held (we quote from the syllabi): "Paragraph twelve of section seven of the charter of the city of Jefferson (Laws of 1867, number 57), requires that all contracts for opening, widening, paving, and improving the streets, authorized by the common council, shall be adjudicated by the controller, under regulations prescribed by the council, *to the lowest bidder*. An adjudication by direction of the council, by the controller, of a contract for paving one of the streets of the city with the *Nicolson pavement* to a firm or company having the exclusive right to make such pavement within the limits of the state of Louisiana is in conflict with this provision of the statute; and the owners of property fronting on the street paved with this kind of pavement by a company having the exclusive right, can not be compelled to pay the two thirds of the cost of making the pavement. The principle of competition enunciated by the statute must be observed by the council in letting out contracts for the improvement of the streets, otherwise the owners of property fronting on the streets improved can not be compelled to pay the charges assessed against them for making the improvement."

In *State v. City of Elizabeth*, 35 N. J. L. 351, the contemplated improvement was the repairing of one of the streets in defendant city, with the Stow foundation pavement, a patented article, which only a certain company could lay in said city. The city charter required that all contracts for improvements should be given to the lowest bidder. In the opinion of the court it was said:

"In the case of *John Coar et al. v. Jersey City*, at the present term of this court, it is decided that, where the resolution of the city council was to pave with Nicholson pavement, that being a patented pavement,

and the right to use it in Jersey City exclusively held by the only bidder for the work, there was not, and could not be, any competition within the intent of the charter, and for that reason the resolution and proceedings, awarding the contract to such bidder, should be set aside. It requires considerable ingenuity to avoid such a reasonable conclusion from such a plain and direct statutory requirement. No one can compete, on equal terms, with a man who controls the sale of the thing needed. Bidding, under such a condition, is but a form, and the result must be almost necessarily deceptive and injurious to persons who are to be assessed for payment. There can hardly be a lowest bidder, within the intent of the charter, where there can be, in reality, but one bid. * * * I must give a hearty approval of the expression used by Judge CAMPBELL in the *Detroit* case [17 Mich. 246], when he says: 'I can conceive no more fruitful source of possible inducements to corruption than the monopoly of paving the streets of a large city.' "

So in *People ex rel. v. Van Nort*, 65 Barb. 331, it was said that: "Where the work to be done (in paving a street) is under a patent, there is no propriety in advertising for proposals, or in attempting to carry out the provision that the work shall be given to the lowest bidder; there being no opportunity for any competition, in consequence of the patent."

Judge Dillon in his work on Municipal Corporations, volume 1, section 467, says: "The supreme court of Michigan has affirmed, while the supreme court of Wisconsin and of other states have denied, the proposition that where a city charter provides that no contracts shall be made by the city except with the *lowest bidder*, after advertisement of proposals, it does not prohibit the corporation from contracting to lay *Nicholson pavement* though the right to lay it is pat-

ented and owned by a single firm. The question is close; but there seems, so far, to be a tendency in the courts to adopt the Wisconsin view."

In Michigan, New York, and Missouri such ordinances and contracts have been sustained. *Hobart v. Detroit*, 17 Mich. 246; *In re Dugro*, 50 N. Y. 513; *Barber, etc., Co. v. Hunt*, 100 Mo. 22. The same view seems to have been taken by the supreme court of Kansas in *Yarnold v. Lawrence*, 15 Kan. 126, though the question was not decided.

The weight of authority is decidedly in accord with the Wisconsin decision which seems to be in consonance with reason and justice.

We do not question the right of a municipality to contract for the use of a patented or monopolized article in constructing, reconstructing or maintaining its streets, one or both, when by so doing no provision of its charter is violated; as, for instance, when not required to let all such contracts to the lowest bidder. *Warren v. Paving Co.*, 115 Mo. 572. The question involved is not alone one of conflict between the city ordinances in question and the provisions of the city charter, as seems to be supposed; but is also as to the power of the municipal assembly to pass said ordinances with respect to letting contracts for work for street improvements in a manner not authorized by the charter. The municipal assembly of the city of St. Louis, in respect to street improvements, have whatever power is conferred upon them by statute for that purpose, and no other. "The *mode* in such cases constitutes the measure of the power." Justice FIELD, in *Zottman's Case*, 20 Cal. 102. And when by its charter it says that all contracts for street improvements should be let to the lowest bidder, it means that no such contract can be let for a patented or monopolized article for which there can be no competition in bidding.

VOL. 131 mo—7

5.   If the contract was void under the charter, for the want of authority in the city to enter into it, and wholly illegal, plaintiffs can not be held liable for any part of the work done against their will and protests. Upon this subject SHERWOOD, J., in speaking for the court in *Keating v. Kansas City*, 84 Mo. 415, said: "But if the contract with the city was void, owing to the defect in the ordinance, as doubtless it was, this gives no right of action to the plaintiff; for from a a void contract, no cause of action can arise whether of *quantum meruit* or one sounding in damages." See, also, *Mayor v. Eschbach*, 18 Md. 276; *McDonald v. Mayor*, 68 N. Y. 23.

So in *Cheeney v. Brookfield*, 60 Mo. 54, it was said: "Those who deal with the officers of a corporation must ascertain, at their peril, what they will indeed be conclusively presumed to know, that these public agents are acting strictly within the sphere limited and prescribed by law, and outside of which they are utterly powerless to act." See, also, *Cole v. Skrainka*, 37 Mo. App. 436; *Construction Co. v. Geist*, 37 Mo. App. 512.

6. The Barber Asphalt Paving Company contends that plaintiffs have no standing in a court of equity, for, as it alleges, they stood by in silence, and saw money invested upon the faith of the ordinance and contract authorizing the improvements, and failed to make any objection, if any they had, and that in consequence thereof they are now estopped by their silence and want of action.

No such rule applies in case work is being done upon a public street of a city without authority, as under a void ordinance or contract. Plaintiffs had no more control over the street than any other person, whether citizen of the city of St. Louis, or of some other place. It is not like a case where one person

makes valuable improvements upon the land of another with his knowledge, and without his objection. In such case the owner will not be permitted to take advantage of his own wrong, in accepting the benefits and advantages to his property and not make remuneration therefor, but such is not this case. It is only in case of some irregularity in doing the work, or invalidity of some part of the contract for street improvements, that an abutting property owner will be required as a condition precedent to an order enjoining the collection of a general tax the payment or tender of the sum justly due. *Johnson v. Duer*, 115 Mo. 366; *Gibson v. Owens*, 115 Mo. 258. The law as applicable to the facts of this case is correctly announced in *Keane v. Klausman*, 21 Mo. App. 485, as follows:

"The defendant did not cause the making of the contract or the building of the sewer, and was not called upon to interpose against either, or else incur a liability having no foundation in law. In *Perkinson v. McGrath*, 9 Mo. App. 26, a suit on a special tax bill for curbing, guttering, macadamizing, and making cross walks, the property owner demanded of the contractor that he do the work in accordance with his contract, and afterwards, through the city engineer, compelled him to do it over a second time. It was held that this did not estop the owner from defending on the ground of invalidity of the ordinance, it not appearing that he had actual notice of its invalidity, and did not tend to prove an acceptance of the work, or an agreement to pay for it. That bore far more resemblance to a case for an estoppel than does the present. There can be no pretense here that the contractors were induced to take any steps in the work by the action or nonaction of the defendant. No obligation was upon her to follow up the several steps leading to the contract and assure herself of their fitness.

But it did rest upon the contractors to do so, since they were to take every risk of their insufficiency."

In the case at bar plaintiffs by no act of theirs misled the contractors, or induced them to believe that they would pay for the work, but protested against it from the beginning, and notified them that they would contest the legality of the proceedings under which they were acting. They could not have done more, under the circumstances.

From these considerations the judgment should be reversed and the cause remanded. It is so ordered. BARCLAY, J., concurs in the result; GANTT, J., and MACFARLANE, J., agree to paragraphs 1, 2, 5 and 6, and so much of paragraph 3 as holds the ordinances in question in requiring contracts for reconstruction and maintenance to be let in one contract as stated in the petition to be in violation of the charter of the city and void. As to paragraph 4, they feel bound by the decision in *Barber, etc., Co. v. Hunt*, 100 Mo. 22, and for that reason do not agree to what is said in that paragraph tending to overrule that decision. BRACE, C. J., and SHERWOOD, J., dissent. ROBINSON, J., absent.

### SEPARATE OPINION.

BARCLAY, J.—Considering the close division of opinion in this court and the probability of further proceedings in the circuit court, it seems appropriate to indicate the grounds of my concurrence in the judgment here. The discussion of disputed points has been already so prolonged that it is unnecessary to do more now than to merely indicate my position toward them as shortly as possible without elaborate argument.

1. A special tax bill of the sort mentioned in this case is by law *prima facie* evidence of liability of the property for the charge it purports to impose (R. S. 1889, p. 2125, sec. 25), and it is an ostensible lien on

the land for two years from the date of its issue by the
municipal authorities.    R. S. 1889, p. 2125, sec. 26.
In my opinion injunction is available to prevent the
issuance of such a tax bill when about to be issued
under an illegal ordinance, or to cancel it as a cloud on
the title after issue, in the circumstances shown in this
case.    *Rich v. Braxton* (1895), 158 U. S. 375.

2.    The scheme of procedure adopted by the board
of public improvements under ordinance 542 (R. O.,
St. Louis, 1887) in respect of reconstruction and main-
tenance of the proposed street is illegal, because the
plain effect and obvious intent of the scheme are to put
upon the owner of the real property (properly charge-
able by special tax with the cost of reconstruction) a por-
tion of the expense of repairs of the improved street
for a long term of years.    The latter expense the city
is bound by the charter to bear, and can not shuffle off
upon the adjacent property in the mode attempted by
the scheme referred to, as described in the petition in
this suit.

3.    "Maintenance" is a word whose meaning is
greatly influenced by its context.    As used in the ordi-
nance (542) before the court, it appears to me to in-
clude the idea of putting on the repairs needed to
maintain the street in its completed condition.    The city
can not lawfully cast upon the adjacent property (under
the guise of reconstruction) a part of the burden of re-
pairs, which the charter requires the city to bear.    By
calling that burden "maintenance" the nature of the
work is not changed, nor is the liability of the property
owner under the charter enlarged.

4.    The two charges for reconstruction and main-
tenance have been so blended (by the scheme of special
taxation adopted in the case before the court) that the
valid charge for reconstruction can not be definitely
ascertained and severed from the invalid charge for

repairs sought to be thrown upon the adjacent property. Some part of the expense properly chargeable to the city for repairs is embodied in the special tax laid upon plaintiff's property for alleged reconstruction of the street. That is the effect (and obviously the intended effect) of the scheme originating in ordinance 542, as worked out by the board of public improvements, according to the account given of it by the petition. Hence the assessment for reconstruction (as now made) can not be enforced, containing, as it does, an unascertained and uncertain illegal element.

5. The city may lawfully contract for the purchase of a monopolized article, no less than for articles protected by letters patent. The method prescribed for letting public work does not require as an essential to a valid contract that there should be at least two bidders for any proposed work. The steps indicated by the charter as necessary to a final contract show that the municipal authorities are invested with a discretion to approve the offer of a single bidder for such work, if the price is reasonable and the bid otherwise satisfactory and correct. If this was not so, the city, in projecting public improvements, would be deprived of the right to enjoy the benefit of many modern inventions and discoveries; a conclusion which we should not suppose was intended, without a very clear expression of such intent in the charter.

Moreover, the proposition stated at the opening of this paragraph was declared most positively in *Barber, etc., Co. v. Hunt* (1890), 100 Mo. 22 (13 S. W. Rep. 98) by a unanimous court. Prior to that time, in *McCormack v. Patchin* (1873), 53 Mo. 33, a special tax bill for Nicholson pavement in a street had been sustained by the supreme court without any such question being started. Since the *Hunt* case, the published court reports give us a glimpse of the large investments that

have been made in public work of the kind referred to in that judgment. It appears to me that we should closely adhere to that decision on the rule *stare decisis;* though by that remark no doubt is intended to be cast upon the correctness of the ruling as an original one.

6.    Upon the sufficiency of notice of the meeting of the board to consider the reconstruction of Jefferson avenue, my concurrence is fully given to the views expressed in the second paragraph of the learned opinion of Judge BURGESS.

7.    The acts of plaintiffs in respect of the proposed improvement seem to me to furnish no basis for holding plaintiffs estopped to enjoin the enforcement of the special tax in question.

SHERWOOD, J. (*dissenting*).—This equitable proceeding has for its object the divesting of the lien of a certain special tax bill for $400, in favor of the Barber Asphalt Paving Company, for work completed by that company on Jefferson avenue, and to cancel such tax bill if issued; if not issued, to restrain its issuance.

The city, McMath, president board of public improvements, and Sturgeon, comptroller, demurred on several grounds, among them that the petition did not state facts, etc.    The other defendant, the Asphalt Paving Company, filed an answer.. The lower court denied a temporary injunction, held objections raised by the demurrer well taken, and in consequence of plaintiffs' refusal to plead further, dismissed their petition, hence this appeal.    The only question, therefore, this appeal presents *is the sufficiency of the petition.* All facts not included in its allegations are *dehors* legitimate examination.

The petition, of extraordinary length and exceedingly prolix and argumentative, will accompany this opinion, and be referred to and quoted from, from time

to time as occasion may require. An outline of the grounds of the petition is the following:

*First.* That the board of public improvements, and the municipal assembly upon its recommendation, have no authority to unite in one contract maintenance and construction or maintenance and reconstruction.

*Second.* That section 542 of the Revised Ordinances of 1887 is void under the provisions of the charter and as a necessary corollary the board and municipal assembly having no legal right to incorporate the maintenance clause (sec. 6, ordinance 17151) in ordinance 17151, therefore said ordinance 17151 is void; and in addition is void for three other reasons:

*a.* That ordinance 17151 was not indorsed with an estimate of the cost of maintenance as required by section 27 of article 6 of the city charter: "The assembly shall have no power directly to contract for any public work or improvement, or repairs thereof, contemplated by this charter, nor to fix the price nor rate therefor; but the board of public improvements shall in all cases, except in a case of necessary repairs requiring prompt attention, prepare and submit to the assembly estimates of costs of any proposed work, and, under the direction of the ordinance, shall advertise for bids, as provided for purchases by the commissioner of supplies, and let out said work by contract to the lowest responsible bidder, subject to the approval of the council. Any other mode of letting out work shall be held as illegal and void. No security or any bond shall be taken unless he shall pay taxes on property equal in amount to his liability on all bonds on which he may be security to the city. And no contract shall be made under this section without a bond for its faithful performance, with at least two sufficient sureties."

*b.* Because ordinance 17151 does not expressly name the material to be used in the maintenance as required by section 15 of article 6, of the city charter: "All ordinances recommended by said board shall specify the character of the work, its extent, the material to be used, the manner and general regulations under which it shall be executed, and the fund out of which it shall be paid, and shall be indorsed with the estimate of the cost thereof."

*c.* That, as alleged, there is a monopoly in the material specified in the ordinance.

In the first place the sufficiency of the general structure of the petition considered as a bill in equity will be examined, and, after that, its sufficiency for invoking equitable relief in reference to certain particular allegations.

1. The petition does not affirmatively show on its face by the statement of *facts* that the plaintiffs have no plain, adequate, and complete remedy at law. Such allegations of facts in the petition are *jurisdictional*, and their absence may be taken advantage of by the adversary party at any place or at any time or at any stage of the proceedings; or the court of its own motion without suggestion of counsel, or the point being pleaded, may raise the objection. This is the rule laid down by the supreme court of the United States and by the supreme courts of a number of states. *Drury v. Conner*, 1 Har. & G. 229; *Woodman v. Freeman*, 25 Me. 561; *Trimble v. McGee*, 112 Ind. 307. And in this state, *Humphreys v. Milling Co.*, 98 Mo. 542. See Story, Eq. Pl. [10 Ed.], section 473. See, also, *Hoey v. Coleman*, 46 Fed. Rep. 221.

The latest federal adjudication on the subject is found in *Allen v. Car Company*, 11 Sup. Ct. Rep. 682, where the supreme court dismissed a bill filed to restrain the collection of a tax, upon the ground that there was

an adequate remedy at law, notwithstanding the objec-
tion was raised in that court in the first instance, and
had not been taken by plea, demurrer, or answer in the
circuit court.

• As before stated, *facts* must be made to appear on
the face of the petition that the complainant has no
adequate remedy at law; that is to say, the petition on
this point must show the equitable jurisdiction of the
court *"by alleging traversable facts."*

No jurisdiction attaches in a court of equity to
grant relief until and unless such allegations of *facts*
are set forth in the petition as being *expressly averred,
can be expressly denied.* Special circumstances must be
stated which bring the case within some recognized
head of equity jurisdiction, ex. gr.: A complaint
charged the intention of the defendant to take and sell
property, and then proceeded, "thereby subjecting the
plaintiffs to great costs and expense, and involving them
in expensive and vexatious litigation and a multiplicity
of suits, in order to keep control of their property, and
prevent an unjust sacrifice thereof." And the court
held that this statement did not allege *traversable facts,*
but only an inference or prediction as to what would be
the consequences of the threatened levy, remarking:
"If such statements will make a case for an injunc-
tion, it can be made in every case." *Clarke v. Ganz,*
21 Minn. 387.

A court of equity will deny an injunction to re-
strain the collection of taxes when the complainant has
an adequate remedy at law; and if he has not, the fail-
ure to show this by *positive* averment constitutes a fatal
defect in his application for relief. *Duck v. Peeler,* 74
Tex. 272.

General allegations of fraud in the assessment,
made in a bill to restrain the collection of taxes, will be
demurrable and furnish no ground for relief. *Sterling*

*Gas Co. v. Higby*, 25 N. E. Rep. 660. See, also, *Shelton v. Platt*, 139 U. S. 596; *Carlisle v. Stevenson*, 3 Md. Ch. 504; *Crisman v. Heiderer*, 5 Col. 594; *Waldron v. Marsh*, 5 Cal. 119.

The *why* and the *wherefore*, the *facts* and the *reasons* showing that the complainant has no adequate remedy at law, and, therefore, is necessitated to come into a court of equity and invoke relief on one or more of the recognized grounds which authorize the assumption and exercise of equitable jurisdiction, must be plainly and distinctly set forth, because: "An injunction being a harsh remedy, will not be granted * * * except * * * upon positive averments of the equities on which the application for the relief is based. * * * He (complainant) must * * * allege *positively* the facts constituting his grounds for relief. Thus, it is well established that the mere allegation of irreparable injury will not suffice to warrant an injunction, but the facts must appear on which the allegation is predicated in order that the court may be satisfied as to the nature of the injury." 1 High, Injunct. [3 Ed.], sec. 34.

It will not do to plead such general platitudes and legal conclusions as are pleaded in this instance, to wit: "Plaintiffs allege that by the terms of section 25, of article 6, of the scheme and charter of the said city of St. Louis, the said special tax bills, when so signed, certified, and registered, as provided for by the terms of said charter and by the terms of said ordinance 17151, will become a lien on the property of petitioners hereinbefore described, and will be a cloud upon plaintiffs' title to said land, and will damage and injure plaintiffs' title to, and the value of, said land. Plaintiffs allege that they have no adequate remedy at law in the premises, but can only have a proper and adequate remedy and relief in a court of equity, where all such matters are properly cognizable. Plaintiffs further

aver that unless the defendant, the city of St. Louis, is enjoined and restrained from issuing, registering, and delivering said special tax bills against plaintiffs' property as aforesaid, the plaintiffs will suffer irreparable injury." 1 Spelling, Extr. Relf., sec. 658, and cases cited.

Not only do the plaintiffs fail to plead those essential, affirmative, and traversable allegations which authorize equitable interposition, but on the contrary it is alleged in the petition that: "By reason of the repugnance of said ordinance number 17151 to the provisions of the charter of the city of St. Louis, * * * the said ordinance *is null, void, and of no effect* * * *; the said contract, etc., etc., *is null, void, and of no effect,* and the property of these plaintiffs can not in any manner be *legally bound* for the payment of the cost of reconstruction provided for in said ordinance." These allegations certainly show an *adequate remedy at law,* because if the ordinance is *void* it must be void on its face, when compared and construed with the charter with which it is alleged to be repugnant. And section 25, of article 6, of the charter, of which courts take judicial notice, provides that special tax bills shall be collected of the owner of the land by the contractor *"as any other claim in any court of competent jurisdiction."*

Cases there are where courts of equity intervene and afford an abundant relief, where the proceedings, though actually void, are apparently valid, where parol evidence or loose papers liable to loss or destruction are necessary to support the charge of invalidity; there, a court of equity will, by its decree, remove the cloud cast on the complainant's title, by the apparently valid proceedings, but no case can be found in the books where a party coming into a court of equity and merely alleging that the proceedings he seeks to enjoin, can-

cel, vacate, or annul, are *"null, void, and of no effect,"* and that he is not *"legally bound thereby,"* has ever been accorded equitable relief in any of the forms mentioned.

In *Lockwood's* case, 24 Mo. 20, "the church did *not* claim that the assessment was *illegal and void,"* but only *asked* that it be thus *declared.* And the deed in *Bank v. Evans,* 51 Mo. 345, was *"not void on its face;"* on the contrary, the ruling there is put on the *express ground that in order to determine the invalidity of the sale would require close investigation by a skillful lawyer,* into several acts of congress as well as the authority of the courts to regulate such sales. These two cases are but types of others cited by counsel in support of the allegations of their petition now under review.

These direct admissions by plaintiffs in their petition of the nullity of the proceedings they seek to enjoin, cancel, etc., can not but be regarded as admissions overthrowing the very relief they desire to obtain, because, "if the alleged tax has no semblance of legality; if, upon the face of the proceedings, it is wholly unwarranted by law, or for any reason totally void, so that any person inspecting the record and comparing it with the law is at once apprised of the illegality, the tax, it would seem, could neither constitute an incumbrance, nor an apparent defect of title; and, therefore, in law, could constitute no cloud." Cooley, Taxation [2 Ed.], 779, and cases cited.

*Heywood v. Buffalo* was a proceeding in equity to have a certain assessment on plaintiff's land declared null and void, and enjoin the execution of the same. The lower court gave judgment on demurrer against the sufficiency of the petition, and, in commenting on, and affirming, this ruling, in pointing out what were the defects in the petition, the court, among other things, said: "Indeed, it is still the law that a party

who brings an equitable action must maintain it upon some equitable ground; and if his cause of action is of a legal and not an equitable nature, he must bring a legal action, or pursue a legal remedy. Where a matter is clearly or *prima facie* one of legal cognizance, a party must, in order to maintain an equitable action upon it, state clearly facts sufficient to entitle him to equitable relief, and to show that a perfect remedy can not be obtained at law.    *    *    *    The complaint * * * should have alleged, distinctly and plainly, that the proceedings were apparently within the powers of the common council, and upon their face were valid, and created a valid lien; and it should then have alleged that, notwithstanding such apparent validity, the proceedings were wholly void by reason of certain extrinsic matters, which should be stated, and which it should appear by the complaint could only be established by their evidence. *These facts are the very grounds of the jurisdiction. Apparent validity, and total invalidity in fact, which can only be established by proof aliunde.* If partial invalidity only is established, no *case is made for the interposition of equity to remove a cloud. It is no cloud if the lien is to any extent valid.* * * * The doctrine established by the decisions is substantially this, that if the proceedings are void upon their face, they form no cloud upon title; and no ground of interference by a court of equity. And if they are not void upon their face, but merely voidable or irregular, a court of equity will not take cognizance of them, unless other facts are alleged sufficient to bring the matter clearly within some acknowledged head of equity jurisdiction. This is a sound and salutary rule, which should be steadily adhered to upon considerations of public interest and convenience, if no other. It is not the business of courts to furnish new remedies to parties aggrieved, even though existing

ones are found inadequate to afford perfect protection
or redress.   That falls more properly within the prov-
ince of the legislature.   But if they had the power they
would hesitate before extending their equitable juris-
diction over all the acts of these inferior bodies, and
allowing everyone assessed to come in and litigate as
to the validity of his tax, before he should be required
to pay it, who could allege some error in making the
assessment."   14 N. Y. *loc. cit.* 540, 541, 542.

The same idea is reiterated in *Townsend v. New
York*, 77 N. Y. 542, where it is said: "The action is to
set aside and cancel the tax, upon the ground that it is
illegal and a cloud upon plaintiff's title to his lands.
It is claimed to be illegal solely upon the ground that
the law, in pursuance of which it was imposed, is
unconstitutional and, therefore, void.   No other reason
is alleged or claimed for the maintenance of the action.
It is a general rule that the owner of real estate must
wait until his title is assailed, or his possession is dis-
turbed, or his rights are actually interfered with, before
he can invoke the protection of the courts.   The law
generally concerns itself only with actual wrongs, and
not with such as are merely potential.   But there are
some exceptions to this rule.   Courts will, under cer-
tain circumstances, entertain actions to remove a cloud
upon title to land to prevent future harm.   It is not
sufficient that there is a formal title or lien creating the
cloud.   Where the cloud is claimed to be created by a lien,
the lien must be *apparently valid*, and must exist under
such circumstances that it may in the future embarrass
or injure the owner or endanger his title.   But it has
been decided many times in this state that where the
lien is invalid upon its face, or where the invalidity will
necessarily appear in any proceeding taken to enforce
title under it, then the jurisdiction of a court of equity
can not be invoked to set it aside.   Then the owner

must wait until his title is actually assailed under the
lien, and his defense will always be at hand.  * * *  If
this tax be invalid upon the ground claimed, its inva-
lidity will always appear.   The record proceedings and
the statutes will show that it was imposed under the
law claimed to be unconstitutional.   No valid tax can
be imposed under an unconstitutional law.''

This view is illustrated by many cases in this state
and elsewhere; there are none to the contrary, thus:
''The settled rule is, that when a defect appears upon
the face of the record through which the opposite party
can alone claim title, there is not such a cloud upon
the title as to call for the exercise of the equitable
powers of the court to remove it.   But when such
claim appears to be valid upon the face of the record,
and the defect can only be made to appear by extrinsic
evidence, particularly if that evidence depends upon
oral testimony to establish it, it presents a case for
invoking the aid of a court of equity to remove it, as a
cloud upon the title.  * * *  *But if in the investiga-
tion*, in tracing back the title, a defect appears upon the
record, then it is evident there is no cloud, for the face
of the record furnishes the means of detecting the error,
and apprising parties of the true state of the title.''
*Clark v. Ins. Co.*, 52 Mo. *loc. cit.* 276, 277.   The
doctrine of this case was affirmed in *Mason v. Black*, 87
Mo. 344.

A petition showing that plaintiff's property has
been levied upon under an execution issued upon a void
judgment and asking for an injunction, presents no
ground for equitable relief.   *Fletcher v. Heth*, 10 Mo.
App. 594.   A deed void on its face is no cloud on the
title.   *Johnson v. Cottingham, etc., Co.*, 8 Mo. App.
575.

''The sale under such judgment is void, and, hence,
Johnson's deed from the sheriff passed no title and is

worthless. Hence, *the petition states too much.* It shows the deed sought to be set aside is void, which leaves nothing for a court of equity to do, and shows the plaintiff has a complete and adequate remedy at law. *Janney v. Spedden,* 38 Mo. 396; *Odle v. Odle,* 73 Mo. 289. This conclusion settles the case, and it is not necessary to further examine the questions presented." *Holland v. Johnson,* 80 Mo. *loc. cit.* 38.

"All that the allegations of the bill amount to is, that the city and its street commissioner are about to do an unlawful act, that will impose new burthens on appellant, or his property. If these acts are illegal and unwarranted, then any tax or assessment levied for its payment would be illegal and void, and the tax or assessment could not be enforced. The property owners could resist their payment at law." *Brush v. Carbondale,* 78 Ill. *loc. cit.* 76.

"Nor will the court, in any case, interfere to avoid sales, or to cancel conveyances, which, of themselves, afford inherent, intrinsic evidence of their own illegality and invalidity. There is no reason for a judicial interference; for such sale, or conveyance, bearing the evidence of its invalidity, can not create a cloud on the title, nor diminish the security of the true owner. It is not capable of being used as an instrument of vexatious litigation; and the lapse of time can not endanger the means of defense against it, if rights under it should be asserted. * * * The complainants were not in possession of the lands; and if they had been, the sale and conveyance under the decree of the court of probate was void. The illegality vitiating them appeared on the face of the record of the court of probate, which must have been produced as the very source and foundation of any right or title claimed under them; and its exhibition only was necessary to insure its condem-

nation." *Tyson v. Brown*, 64 Ala. 244, *loc. cit.* 249. See, also, *Hannewinkle v. Georgetown*, 15 Wall. 547; 2 Beach, Mod. Eq. Jur., sec. 558, and cases cited.

In *Van Doren v. New York*, 9 Paige, 388, it was held that where a valid legal objection appears upon the face of the proceedings, through which the adverse party can alone claim title to the complainant's land, there is not in law such a cloud upon the complainant's title as to authorize him to apply to a court of chancery to set aside such a proceeding.

"If the invalidity of that which is alleged as a cloud appears on the face of the record by which it is shown to exist, equity will not interfere." *Meloy v. Dougherty*, 16 Wis. *loc. cit.* 270.

Moreover, relief against unjust and illegal taxation is not an original head of equity jurisprudence. "The attempt to enforce an illegal tax, or to sell property for its satisfaction, does not alone furnish any ground for interference. To entitle a party to relief by injunction he must present a case coming under some established head of the jurisdiction, such as fraud, mistake, prevention of multiplicity of suits, cloud upon title, or irremediable mischief. This comprehensive rule has been declared in many cases, and has been given practical recognition in nearly every state, and the courts may be said to hold with unanimity that injunction does not lie against the exercise of the power of taxation unless some special reason be shown for equitable interference." 1 Spelling, Extr. Rel., sec. 642, and cases cited.

If the power to levy the tax, either general or special, exists, and the property be subject to taxation, or to assessment for benefits, mere error and irregularities, according to the better view, should be corrected by *certiorari* or other appropriate legal proceedings, because *equity* ought not to interfere with the

collection of taxes, unless upon a case coming under some acknowledged head of equity jurisdiction. 2 Dillon, Mun. Corp. [4 Ed.], secs. 906, 923; 1 High, Injunct. [3 Ed.], sec. 347.

Nor will a court of equity in instances like the present, sit as a court of errors to review the action of other tribunals, interfere by injunction to correct mere errors of judgment or irregularity, or the exercise of discretion not amounting to oppression or fraud in making the valuation or assessment. 1 Spelling, Extr. Rel., secs. 652, 653; 1 High, Injunct., *supra*, and cases cited.

*Certiorari* is the remedy and affords full and ample means of redress when the proceedings are had before courts and officers of inferior local jurisdiction. *Anderson v. St. Louis*, 47 Mo. 479.

In the just cited case, that of *Ewing v. St. Louis*, 5 Wall. 413, was approvingly followed, where an assessment for benefits was sought to be enjoined, and it was ruled that as a plain, adequate, and complete remedy by *certiorari* existed, *equity had no jurisdiction*, and on that ground a *demurrer to the jurisdiction* was held well taken. To the like effect see *Heywood v. Buffalo*, *supra*, and cases cited; *Steines v. Franklin Co.*, 48 Mo. *loc. cit.* 176; *State ex rel. v. Dowling*, 50 Mo. 134.

Now, in this case, there are no special circumstances specifically and positively averred, such as would bring it under some recognized head of equity jurisdiction; neither fraud nor oppression are charged; the plaintiffs seek relief for themselves alone, and so no question of multiplicity of suits is involved, nor is there any sufficient allegation showing "irreparable injury," nor how or in what way the injury is irreparable. *What injuries are irreparable is a question to be decided by the courts on facts stated. McKinzie v. Mathews*, 59 Mo. *loc. cit.* 102. And the same may be

said respecting the general averment of no adequate remedy at law. And if the last allegation were sufficient, it would be met and answered by *Anderson's* case, *Ewing's* case, and the other cases cited as to the employment of *certiorari*. For who can doubt that such a writ could have accomplished all that was necessary, taking plaintiff's allegations as technically correct and sufficiently specific?

Besides, plaintiffs are in possession of the land to be affected, and, if sued, could, on the facts stated in the petition, to wit, that the ordinance is *"null, void, and of no effect,"* successfully resist any action on the tax bills, and in doing so would not have to resort to parol or extrinsic evidence to make that defense successful. On this point see *Michael v. St. Louis*, 112 Mo. 610, where BRACE, J., said: "In the suits which they complain the city is about to institute for the collection of such tax bills they have a full, complete, and adequate defense of record, without any necessity for resort to extrinsic evidence to make it good, or for invoking the assistance of the powers of a court of equity." This case was followed and approved in *Buddecke v. Ziegenhein*, 122 Mo. 239, per BURGESS, J. See, also, *Boyd v. Selma*, 96 Ala. 144; *Public Ledger Co. v. Memphis*, 23 S. W. Rep. (Tenn.) 51.

If these views are correct, the petition is fatally defective in its *general structure*, and the demurrer, which is really a demurrer to the jurisdiction of the court (Story, Eq. Plead., sec. 473), was properly sustained. Indeed, under the authorities, the lower court would have been amply justified in dismissing the petition of its own motion.

On another ground the petition is seriously defective; it is this: *There is no allegation therein that suit will ever be brought on the bills if issued, or that any threat to that effect has ever been made,* nor to the effect

that the city had threatened to issue such bills. No case can be found where a petition so lacking in such essential allegations has been held sufficient.

"The appropriate function of the writ of injunction is to afford preventive relief only,   *   *   *   and it is only to be used for the prevention *of a future injury actually threatened.*" 1 High, Injunct. [3 Ed.], sec. 23; *Ib.*, sec. 18; *McArthur v. Kelly*, 5 Ohio, 139; *Owen v. Ford*, 49 Mo. *loc. cit.* 437; Beach, Injunct. secs. 428, 34, 17, 1198; *People v. Canal Board*, 55 N. Y. *loc. cit.* 396; *Guest v. Brooklyn*, 69 N. Y. *loc. cit.* 512; *Scribner v. Allen*, 12 Minn. *loc. cit.* 152; *Carroll v. Campbell*, 108 Mo. *loc. cit.* 558.

2. Having thus discussed the legal structure of the petition and found it insufficient to warrant equitable interposition, attention will now be directed to other averments in order to ascertain their alleged sufficiency.

The central point of attack made in the petition is ordinance 542, Revised Ordinances, 1887, which provides, among other things, that "the board of public improvements may submit to the municipal assembly a bill for letting *in one contract* the work of construcing   *   *   *   such street and of maintaining it in good condition for a term of years." This ordinance is claimed in the petition to be "*null, void, and of no effect,*" by reason of its repugnance to the letter and spirit of the charter of the city, and especially to the letter and spirit of section 27, article 6, of the charter heretofore set forth.

How or in what way ordinance 542 contravenes, either in letter or spirit, any provision of the charter, I have been unable to discover. The universal rule is, that in construing statutes passed by the general assembly of the state, the courts will *lean toward a construction which favors and upholds their constitutionality*, and

it would seem that a similar favorable attitude should be assumed by the courts when construing *municipal ordinances*, because when speaking of cities, this court has well said: "Their charters are their constitutions, which authorize the councils to act, and a city council is 'a miniature general assembly, and their authorized ordinances have the force of laws passed by the legislature of the state.'" *St. Louis v. Foster*, 52 Mo. *loc. cit.* 515; *St. Louis v. Boffinger*, 19 Mo. *loc. cit.* 15.

Because, further, such ordinances bear the same relation to the charter, the organic law of the city, as do our statutes toward our general organic law, and, therefore, such ordinances should only be held for naught upon grounds equally good and reasons equally cogent as would suffice for holding a state law void because repugnant to our state constitution. This point has passed into precedent, and received the direct sanction of this court in *Quinette v. St. Louis*, 76 Mo. *loc. cit.* 404, where it is declared that the rule as to a supposed conflict between charter and ordinance is the same as between constitution and statute.

In relation to the investigation of the constitutionality of statutes, and the care to be observed in so doing, and the caution to be exercised in declaring them invalid, it has been said: "As a conflict between the statute and the constitution is not to be implied, it would seem to follow, where the meaning of the constitution is clear, *that the court, if possible, must give the statute such a construction as will enable it to have effect.* This is only saying, in another form of words, that the court must construe the statute in accordance with the legislative intent; since it is always to be presumed the legislature designed the statute to take effect and not to be a nullity." Cooley, Const. Lim. [6 Ed.] p. 218.

"A legislative act is not to be declared void upon a mere conflict of interpretation between the legislature and the judicial power. Before proceeding to annul, by judicial sentence, what has been enacted by the lawmaking power, it should clearly appear that the act can not be supported by any reasonable intendment or allowable presumption." *People ex rel. v. Supervisors,* 17 N. Y. 235.

The author just quoted says, further, on the point: "It has been said by an eminent jurist that when courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained." Cooley, Const. Lim. [6 Ed.] p. 216.

"This court * * * will not declare an act of the general assembly void, as in conflict with the constitution, unless it is so manifest as to leave no doubt on the subject." *Kelly v. Meeks,* 87 Mo. *loc. cit.* 400, and cases cited.

Thus it will be seen, that in order to convict a statute of unconstitutionality the reasons therefor must be so weighty and cogent that if transmuted into evidence, such evidence would be sufficient to convict an accused person of a felony.

Taking this announcement of a fundamental principle of constitutional construction as a guide when applied to *ordinances*, let us examine ordinance 542 in connection and comparison with section 27, aforesaid,

of the charter. Repeating that section for convenient reference, it provides: "The assembly shall have no power directly to contract for any public work or improvement, or repairs thereof, contemplated by the charter, nor to fix the price or rate therefor; but the board of public improvements shall in all cases, * * * prepare and submit to the assembly estimates of costs of any proposed work, and, under the direction of the ordinance, shall advertise for bids, as provided for purchases by the commissioner of supplies, and let out said work by contract to the lowest responsible bidder, subject to the approval of the council. Any other mode of letting out work shall be held as illegal and void. * * *"

Now, how, or in what way, does ordinance 542 conflict with the above section of the charter? There is certainly no prohibition or intimation of prohibition, against there being united in one contract "the work of constructing or reconstructing such street and of maintaining it in good condition for a term of years." True, the former work has to be paid for by the taxpayer and the latter by the city, but where can you put your finger on a provision of the charter, either a line or a letter, forbidding the enactment of an ordinance which provides for the letting in the same contract of the two kinds of work? Under the authorities cited, and the reasons they give, and the rule they announce, unless you can do this, it is your *contention that goes counter to the charter and not the criticised ordinance.*

And the assembly does *not* "directly contract for any public work or improvement or repairs thereof, or fix the price or rate therefor," simply by enacting such an ordinance as 542, which merely makes timely and wise provision for work to be done in the future in that way, and, therefore, does not conflict with section 27 in that regard. The assembly by literally pursuing

ordinance 542 could not, if they would, array them-
selves against the city's organic law, as contained in
the section under review, because they would not
thereby even attempt to confer on themselves a power
to contract "for any public work or improvement, or
repairs thereof, or fix the price or rate therefor." *This
is the only prohibition* section 27 contains, and does not
prohibit an enactment of an ordinance which permits
the letting of two kinds of work in the same contract.

But, in investigation of this supposed conflict be-
tween charter and ordinance, we are by no means con-
fined to section 27; we may resort to its associate
sections of the charter in order to shed light on the
point in hand. Clause 2 of section 26, article 3, of the
charter declares: "The mayor and assembly shall have
power by ordinance to establish, open, vacate, alter,
widen, extend, pave, or otherwise improve and sprinkle
all streets, avenues, sidewalks, alleys, wharves, and
public ground and squares, and provide for the pay-
ment of the costs and expenses thereof in the manner
in this charter prescribed; and also to provide for
grading, lighting, cleaning, and *repairing* the same,
and to condemn private property for public uses, as
provided for in this charter; *to construct, and keep in
repair all* bridges, streets, etc., and to regulate the use
thereof." That this section is the repository of a
broad grant of power to the mayor and assembly, no
one will dispute.

It seems equally indisputable that a distinction is
made and taken in the clause quoted between the word
*"repairing"* a street and the words, *"to construct and
keep in repair"* a street. By this clause of section 26,
two powers would seem to be indubitably granted to
the mayor and assembly, one to *"repair"* all streets,
the other to "construct and keep in repair" all streets.
This section is the only one in the charter by which

the powers in question are conferred; but for it no such powers would be expressly granted. So far as streets, etc., in their repair or construction are concerned, this section is the *power-conferring section of the charter*.

Now, if we apply to the two phrases employed in the quoted clause of section 26 a very familiar, and, indeed, a well-nigh universal, rule of construction, we must attribute to each phrase thus employed its separate and appropriate meaning, because, under the rule referred to, the words used in a charter must be held to have been used with a definite purpose in view, and in furtherance of that object, to have had bestowed on *each* of them its distinct, individual, well defined and usual meaning; and, if possible, such meaning should be accorded to them. For, plainly, it would have been a vain and useless thing to confer on the mayor and assembly power to provide for "repairing" all streets, and also give them power to "keep in repair" all streets, unless these two forms of expression did not have, and were not intended to have, and to bear, a different and distinctive meaning, and that meaning the one in ordinary everyday use.

In short, the first power conferred is authority for "repairing" streets; the second to "construct and *keep* (them) *in repair*." The latter phrase, it will be noted, is not "construct *or* keep in repair" but the copulative conjunction is used, thus linking together the words "construct *and* keep in repair," thereby indicating *an immediate connection* between the two and a junction of authority in the mayor and assembly to provide by ordinance for *doing both things at one and the same time*. In short, as authorizing the exercise of a power whereby a single contract should embody within itself the construction and keeping in repair of the proposed work on a street.

Now, consulting the lexicographers, we find that the verb "maintain" means "to hold in an existing state or condition; keep in existence or continuance; preserve from lapse, decline, failure, cessation; keep up." Cent. Dict., Webster Internat. Dict., and Worcest. Dict. to same effect.

If, then, we consult the adjudicated cases, we find that a covenant in a lease to "maintain the buildings" binds the lessee *to keep them in proper repair at all times during the term*, and the lessor may bring action for breach of the covenant during the term or after its expiration. *Buck v. Pike*, 27 Vt. 529; 14 Am. and Eng. Encyclopedia of Law, 3.

In *Luxmore v. Robson*, 1 Barn. & Ald. 584, the lease contained a covenant "that the lessee should and would well and sufficiently repair, and *keep in proper repair*, all and singular, the buildings" etc., and upon this it was contended for the sued tenant, that the covenant to "keep in repair" would be satisfied by the lessee's "putting the premises *into repair* at any time during the term," and, therefore, no right of action lay during the term; but Lord ELLENBOROUGH, C. J., said: "By the terms of the covenant the lessee is bound to *keep* the premises in repair; then to keep them in repair he must *have them in repair* at all times during the term; and if they are at any time *out of repair*, he is guilty of a breach of covenant, which is the proper subject of an action."

The case just cited marks out very pointedly the difference in meaning between the words *"repair"* and *"keep in repair;"* the former expression indicating, as declared by the standards of our language, "to restore to a sound or good state after decay, injury, dilapidation, or partial destruction" (Webst. Internat. Dict.), while the latter form of expression means, as decided in that case, to *keep* the premises *at all times*

*in repair*, and if they *fall out of repair*, the covenant to keep in repair will be forthwith broken, upon which occurrence, their *restoration* "to a sound or good state *after* (such) decay, injury, dilapidation, or partial destruction," by *repairing them*, will be no answer to an action for a breach of covenant for letting the premises *fall out of repair*. Thus showing that the act of keeping in repair is a continuous act; an act of *forethought and forework,* which *keeps* the premises in their *then existing condition*, and so will not permit them to fall into dilapidation and decay, and thus necessitate the application of the *restorative* process known as *"repair;"* a process which *ex vi termini* imports and implies that the *former* existing condition had been suffered to *lapse*, resulting in injury and partial destruction.

So that, the two adjudications already cited, when placed in juxtaposition and compared with each other, and with the definitions of the lexicons, mean neither more nor less than that *"maintenance"* of a street and *the keeping of it in repair mean one and the same thing.* If so, who can say that ordinance 542, which permits "a bill for letting, in one contract, the work of constructing a street and of maintaining it in good condition for a term of years," violates or contravenes the second clause of section 26 aforesaid, which confers a direct authority to pass an ordinance "to construct and keep in repair * * * all streets?" In a word, the charter enjoins the duty; the maintenance ordinance paves and provides the way for its uniform and regular performance.

And in this connection the point is at least not unworthy of attention that ordinance 542, under discussion, was formerly ordinance 12304, approved February 28, 1883, revised without change in 1887; has been in existence over twelve years, and, so far as

appears, its *charterality* has never been challenged
until now. Consequently, we have the right to assume
that under a belief in the validity of that unquestioned
ordinance, many contracts have been made and many
thousands of dollars have been expended and collected
in the performance of work authorized by its terms,
and, therefore, such circumstances may be said to have
created a rule of property, which, unless moved by the
most cogent reasons, we should not readily set aside
as invalid, even though the faith in the validity of the
ordinance has never received the sanction of an
adjudication in its favor. *Venable v. Railroad*, 112
Mo. 103, and cases cited.

In that case two others were approvingly cited, as
follows: In *Scanlan v. Childs*, 33 Wis. 663, the court
says: "The general understanding of a law, and
constant practice under it for a period of over twenty
years, by all officers charged with the execution of it,
unquestioned by any public or private action, is strong,
if not conclusive, evidence of the true meaning." In
*Packard v. Richardson*, 17 Mass. *loc. cit.* 144, the
court say: "A contemporaneous is generally the
best construction of a statute. It gives the sense of a
community, of the terms made use of by the legisla-
ture. If there is ambiguity in the language, the
understanding and application of it, when the statute
first comes into operation, sanctioned by long
acquiescence on the part of the legislature, and judicial
tribunals, is the strongest evidence that it has been
rightly explained in practice."

In this instance the scheme and charter went into
practical operation in March, 1877, so that ordinance
542 may be regarded as almost a contemporaneous, and
certainly a practical, construction of the charter. Suth-
erland, Stat. Constr., secs. 307, 309, 311. After
remaining in existence and in everyday operation as

long as it has, unchallenged, a court should not feel inclined lightly to question its validity, even were the reasons in support of that validity less weighty and satisfactory than we judge them to be. We, therefore, deem ordinance 542 valid.

3. We come now to consider ordinance 17151, which is assailed because, *first*, of its conformity to the previous ordinance, in the letting of work of reconstruction and maintenance in one contract; *second*, because it fails to specify the material to be used for maintenance; because, *third*, an estimate of the cost of such maintenance was not indorsed on the ordinance, and because, *fourth*, there is a monopoly in the material which the ordinance designates for the work of reconstruction.

We have already said that ordinance 542 was not invalid because of embodying two kinds of work in one contract, but it is well enough to say, before passing to other matters indicated for discussion, that under a statute resembling in its essential features the charter provisions under review, it has been held that the board may let several contracts for improving a street in one contract to one man (*Macadamizing Co. v. Williams*, 70 Cal. 534), and it is not perceived how there is any material difference in point of principle between the letting different portions of a street to one contractor, in one contract, and letting in one contract to one contractor the reconstruction and maintenance of a portion of a street, where there is no charter prohibition of such sort of letting, as is the case here.

In *Trimble v. McGee*, 112 Ind. *loc. cit.* 312, a similar conclusion was reached: "It was alleged that the two ditches were let in one contract, but it was not averred that they were let at too high a price, or could have been let for a less price in two or more contracts. * * * It was not shown, nor is it apparent, that

appellants or their lands were or could be damaged in any way or to any extent by the fact so alleged."

To the same effect is *Emery v. Gas Co.*, 28 Cal. *loc. cit.* 375, where it is held that a resolution of the board to improve a street may include a declaration of intention to both grade and macadamize, the court remarking: "Suppose the board intended to order all the different kinds of work requisite to the full improvement of a street upon a given plan to be done, what sense or reason, in the absence of an express and clear provision to that effect, is there in requiring them to pass and publish a separate resolution for each kind of work when, as to all parties concerned, it can be as well, if not better, done in a single resolution setting forth in connected detail all the improvements intended to be made?   Such, it seems to us, would be the more orderly and systematic method, and therefore most advisable?"

This view has found favor with this court in several instances.   Thus, in *Morse v. Westport*, 110 Mo. 502, where the work was done under a *general authority for contracting, building, making, paving, or repaving* streets by levying a special tax against the property owners, with no provision permitting the letting of the work in one contract, an ordinance which required a guaranty of the contractor that he would "keep and maintain the street in a state of perfect repair for a period of five years from and after the completion and acceptance of the same," was held valid, this court remarking: "It would seem to be the part of wisdom to require the contractor to give such a guarantee as the ordinance requires, as this would tend to stimulate him to do faithful and honest work; such a provision is clearly in the interest of, and for the protection of, the property owners."

So, too, in *Gibson v. Owens*, 115 Mo. *loc. cit.* 270,

this court said: "The further objection is made that the contract required that the contractor should keep the curbing and guttering on the street in proper position and in good repair for six months after the acceptance of the work by the engineer. Under the laws in force at the time the cost of the repairs of curbing and guttering was chargeable against abutting property. That provision of the contract was beneficial to the adjacent property owners and for their protection, and does not affect the validity of the contract."

In *Warren v. Paving Co.*, 115 Mo. 572, the improvements were charged against the abutting property, and the ordinance did *not* provide that the "entire contract should be awarded to one person," as has been said through inadvertent quotation, and yet the awarding of the contract to one person was held valid, MACFARLANE, J., observing: "The work was really only one improvement, viz.: paving the street. The asphalt was only one part of the pavement, the wearing surface. The board of aldermen may have thought that the work could be done cheaper and in a more satisfactory manner as a single improvement, by one contractor, than by dividing it up into parcels, and awarding it to different persons. No charter prohibition being charged, we must assume that the board acted within its discretionary powers in awarding the contract. *Gibson v. Owens, ante*, p. 258, and cases cited; *State v. Council*, 30 N. J. L. 365; *Williams v. Mayor*, 2 Mich. 560."

In *Schenectady v. Union College* (1892), 66 Hun, 179, the city, under its charter, was liable for repairs, and its charter only granted *general* powers to pave and repair streets. It brought suit to recover the cost of street improvements from the property owner, having made a contract with the contractor, containing this provision: "The party of the second part hereby

covenants and agrees that it will do all the work required by such ordinance, and this contract, in such good and substantial manner that no repairs thereto shall be required for the term of five years after its completion." And the city was held entitled to recover, and that the contract did not go further than the ordinance which, under the charter, provided for the *"pavement"* of the streets of the city, the court remarking: "The covenant, therefore, to keep in repair for five years is not an independent obligation, but only a guaranty of the quality of the work contracted to be done." There that case was distinguished from *Maher's Case* (1890), 56 Hun, 81, on the ground that the contract in the latter was entirely different from the one in the former.

So, too, in *Rosetta Gravel Co. v. Payne*, not yet reported, but a certified copy of which is on file here, under a general grant of power, the court of appeals of Louisiana holds, that: "The power and right of municipal authorities of the city of New Orleans, under section 32 of the city charter, Act 20 of 1882, amended by Act 113 of 1886, through contract entered into by them with an undertaker to furnish material and do work under that section, through such contract to bind the owners of the abutting properties, and the properties themselves, for the payments to be made to the undertaker under said section, in our judgment, carry with them *by inevitable implication*, the power and right to include in the contract a provision for keeping the work in repair for such period as the city authorities may deem expedient."

If, then, a city may unite in a contract made for street improvements, the whole cost of which is chargeable against the property owner, a guaranty of the contractor to maintain his work good for a term of

years, and such contract and guaranty be held valid,
why may not the municipal assembly pass an ordi-
nance providing for construction and maintenance to
be let together, charging the cost of the maintenance
against the general revenues of the city? And espe-
cially so, why may not this be done, where, as here, the
charter grants express authority to the assembly to
provide by ordinance for "constructing and keeping in
repair all streets?" If, in the former case, the junc-
tion in one contract of the two matters aforesaid is a
provision dictated by prudential reasons the most
obvious, as tending to bind the contractor by the strong
bond of self interest to do faithful and honest work,
why not in the latter? And especially why may this
not be done in the present instance, when the city is
responsible for repairing under the ruling in the
*Schenectady* case, where, though the city was bound
for the repair of the streets, the contractor was re-
quired to give bond that he would do his work "in such
a good and substantial manner that no repairs thereto
shall be required for the term of five years after its
completion?"

Ah! but it is said that such a union in one con-
tract of construction and maintenance would enable
the contractor to charge a higher price for reconstruc-
tion than otherwise he would, and this at the expense
of the taxpayer. But such an argument does not go
a hair toward abating by one jot or one tittle the
*power* of the city to pass such an ordinance as 542, be-
cause the whole theory of procedure of such arguments
is to deny the existence of a power or jurisdiction, be-
cause such power or jurisdiction *might result in abuse*.
1 Story, Const., sec. 425; Potter's Dwarr. Stat. 215;
*Powell v. Pennsylvania*, 127 U. S. *loc. cit.* 686. Hold-
ing, as we do, the ordinance valid, all question as to

the powers it contains being affected by their abuse vanishes.

4. Passing, now, to the consideration of ordinance 17151, it is sufficient to say that its validity as authorizing the letting of reconstruction and maintenance in one contract has been sufficiently discussed in disposing of ordinance 542; the arguments which uphold the one, support the other.

Taking up, then, the second point above indicated, is ordinance 17151 obnoxious to the objection that it fails to specify the material used for maintaining the streets, and, therefore, void?

In answering this question, it is proper to examine the provisions of that ordinance; there will be found designated the materials required to be used in the process of construction. So that when we turn to the sixth section of the ordinance we find that "the cost of the maintenance shall be paid by the city of St. Louis out of the fund set apart annually for street repairs.— Reconstructed streets." Now, if we attribute to the word *"maintain"* its hitherto accorded and accustomed meaning, that of *keeping in an existing state or condition, keeping without change,* whenever the material with which the work of reconstruction is to be done has been designated, this of necessity specifies the *material* with which the work done is to be *maintained, kept up, or held in the original condition* it was in when completed by the contractor and accepted by the city. Inasmuch, therefore, as Trinidad lake asphalt was the material with which to do the work, so, also, must Trinidad lake asphalt be the material used to maintain it, or keep it in repair. This being the case, it stands both to reason and to lexicography, that the ordinance under review complies with the charter in the matter of designating the material for maintenance, because what the law will imply is as much part and parcel of a statute, ordi-

nance, or contract, as though set forth in terms. *State ex rel. v. Board of Equalization*, 108 Mo. *loc. cit.* 242; Sutherland, Stat. Constr., sec. 334, and cases cited.

An unconscious and involuntary recognition of this necessary implication aforesaid, and the legal distinction between *maintenance and repairs*, is found in plaintiffs' brief number 1, where it is said (pp. 13 and 14): "*While it is to be presumed that, inasmuch as the reconstruction was to be of Trinidad lake asphaltum, and the same contractor was to bid for the maintenance, an inference might be indulged that the material to be used in the maintenance was to be Trinidad lake asphaltum, nevertheless the ordinance does not so 'specify.'*" This little excerpt may serve to show how difficult it is, even for the most adroit,

"The struggling pangs of conscious truth to hide,"

while endeavoring to quibble away the plain meaning of plain words.

But when penning that brief, counsel seem to have forgotten that a much broader admission than that just quoted had been made in their petition, for it is there said: "*Plaintiffs further state that while the said ordinance does not prescribe that said street, after being reconstructed, should be maintained by the use of Trinidad lake asphalt, yet by necessary implication, and by the fact that the maintenance of said street is coupled with the reconstruction thereof, and required to be let in the same contract and to the same contractor, the use of Trinidad lake asphalt in said maintenance is enforced and made necessary.*"

If the foregoing is not an admission as to what maintenance means, and as to the nonnecessity to "specify the material to be used" for that purpose, then ordinary language fails to perform its accustomed office. And it would seem that this court should not be very loath to accept a definition which accords, not

only with established usage and is sanctioned by authority, but which, in their very petition, is confessed by plaintiffs to be the cor rect meaning!

But it is urged that the cost of such maintenance was not indorsed on the ordinance in question. There are several answers to this contention.

*a.* In the first place, the indorsement on an ordinance of the estimate of the cost of any work is almost a *perfunctory matter*. This is obvious from the following considerations:

*b.* There is nothing in the charter requiring the board to keep within the estimate when it comes to awarding a contract for work.

*c.* The estimate when indorsed, *is not to be followed;* the contract may be let for a less or a greater sum. This shows that the requirement of the indorsement of the estimate is, at best, but *directory*, and not of the *essence of the thing to be done*. Where this is the situation, the failure to do a nonessential thing does not invalidate that which is essential and which is done, and this upon the principle of the maxim, *"Utile per inutile non vitiatur."*

This point finds illustration in many cases and meets nowhere with denial. Thus, in *Cape Girardeau v. Riley*, 52 Mo. *loc. cit.* 427, this court said: " 'The course required to be observed in the performance of an act is not always of its essence or vitality. When an act is directed to be done in a particular way, the direction may be merely directory—that is, it is not of the essence of the act, but the act may stand in law notwithstanding the direction was not strictly observed. This is a familiar principle. * * * All we design to hold is that there are forms to be observed in the enactment of laws; that the members of the legislature are sworn to observe those forms, and yet, if they are violated, the constitution never intended that their acts

should be void.'" (*Railroad v. Governor*, 23 Mo. 353).

"If the provision is to be held as directory only, and not mandatory, the rule is that it may be disregarded without rendering the act void. The rule declared by Lord MANSFIELD in *Rex v. Loxdale* (1 Burr. 447) that, 'there is a known distinction between circumstances which are of the essence of a thing required to be done by an act of parliament, and clauses merely directory' has been followed by a long train of cases, and is now universally recognized. And where the language used does not import that it is of substance, the clauses of a law directing its observance are regarded as directory simply, for that is directory which is not of the essence of the thing to be done." To the same effect is *St. Louis v. Foster*, 52 Mo. *loc. cit.* 514, *et. seq.*

In *People ex rel. v. Supervisors*, 4 Seld. 317, WILLARD, J., observed: "The provision of the constitution requiring the question upon the final passage of a bill to be taken immediately upon its last reading, and the yeas and nays to be entered on the journal is only directory to the legislature. There is no clause declaring the act to be void if this direction be not followed."

In this case it will be observed that section 27 of article 6 of the charter does *not* declare that the failure to indorse an estimate upon the ordinance shall invalidate the ordinance. The section *does* say that "the board shall, in all cases, except, etc., prepare and submit to the assembly estimates of costs of any proposed work, and under the direction of the ordinance shall advertise for bids, as provided for purchases by the commissioner of supplies, and let out said work by contract to the lowest responsible bidder, subject to the approval of the council. Any other mode of letting out work shall be held as illegal and void."

It will be here noted that the wording of the declaration of nullity only extends in terms to "any

other mode of *letting out work*," which can only refer to the manner of contracting for the doing of work, advertising for bids, etc.  Had the section declared that any ordinance which fails to comply with the *preceding requirements of the section* should be illegal and void, a different question would be presented.

In *Nowell v. Mayor*, 9· Exch. 456, the precise question here being considered was presented, and even more prominently presented, for there the act of parliament declared that every contract so entered into is binding on the board, *provided* "that, *before* contracting for the execution of any works under the provisions of this act, the said local board shall obtain from the surveyor an estimate in writing, as well of the probable expense of executing the work,". etc.  No estimate, as required, was obtained from the surveyor, and this fact was specially pleaded as a defense, but it was ruled per POLLOCK, Chief Baron, with whom concurred PARKE, ALDERSON, and MARTIN, BB., that the proviso did not constitute a *condition precedent*, but was merely *directory*.  Of like effect is *Matter of New York, etc., School*, 47 N. Y. 556.  *State ex rel. v. Mead*, 71 Mo. 266, enunciates the same principle.  See, also, *Saleno v. Neosho*, 127 Mo. 627, of similar purport.

The foregoing authorities authorize the conclusion that the failure to indorse an estimate of the maintenance on the ordinance was not a fatal omission; at the worst, it was but a nonessential irregularity.

Other reasons conduce to the same result.  The petition alleges that the board had made it an unwritten law for their guidance, and had verbally announced it, that no bid for maintenance would be considered or recommended by the board, which should exceed fifty cents per square.  This, it would seem, was well understood by all contractors, and, at least, there is no allegation that all proposed contractors were not fully

aware of the existence of such rule. If so, such a rule well known and well understood would be equivalent to the filing of specifications in the office of the city clerk, and then referring to them in the ordinance, and this was held sufficient in *Becker v. Washington*, 94 Mo. 375, and this on the principles of *id certum*, etc. The same principle finds recognition in *Moran v. Lindell*, 52 Mo. 229; *Sheehan v. Gleeson*, 46 Mo. 100, and in the more recent case of *Cole v. Skrainka*, 105 Mo. 303.

Here the ordinance calls for maintenance which was recommended to the council, and specifies that the cost thereof shall be paid by the city out of the fund set apart annually for street repairs, and the contract conformed to the ordinance, and was approved by the council. This, under the authorities cited, was tantamount to an indorsement of the estimate of the cost for that purpose on the ordinance. And the board *did* estimate the cost of maintenance in its general announcement applicable alike to all maintenance ordinances, that no higher bid than fifty cents per square would be in any case accepted. Who shall say that such announcement thus made, in the absence of any fraud charged, was an abuse of that discretion of the board which the law has confided to them, and to them alone? And is this not especially the case where, as here, the petition admits that such price is *"at or about the cost"* per year of such maintenance?

Had the ordinance in terms alleged the price as heretofore stated, and that no greater price than fifty cents per square would be allowed, this would certainly have been definite enough, and certainly it could not be less definite under the general rule and general and well understood announcement as aforesaid. The law deals with the substance of things, not their shadows, and the reason of it is the life of it.

5. But granting that ordinance 17151 did not comply with the charter as to indorsement thereon of an estimate for maintenance, does it thence follow that the whole ordinance is null? It must be remembered that the present ordinance separates in distinct sections the work of reconstruction and that of maintenance, and that the contract conforms to it. In such a condition of affairs, many a statute, valid in one portion, but invalid in another and separable portion, has been held valid as to the former, but invalid as to the latter. This is the immutable rule where, as here, the eliminable section is not so closely connected with the valid section as to preclude elimination of the former because of the fact that the valid is so blended with the invalid that both must stand or fall together as an entirety, incapable of diminution without entirely defeating the legislative intent, when framing the statute as a whole. *State v. Clarke*, 54 Mo. 36; *State v. Williams*, 77 Mo. 313.

A like rule of elimination is applicable to municipal ordinances. *St. Louis v. Railroad*, 89 Mo. 44; *Railroad v. Railroad*, 105 Mo. 590; *Lamar v. Weidman*, 57 Mo. App. 514; 1 Dillon, Mun. Corp. [4 Ed.], sec. 421.

The rule mentioned finds enunciation in the declaration: "For the common law doth divide according to common reason; and having made that void that is against law, lets the rest stand." 2 Kent [13 Ed.], 468. An analogous rule is applied even in indictments for the highest crimes, by rejecting the surplusage. *State v. Meyers*, 99 Mo. *loc. cit.* 114, and cases cited.

"When the statutory proceedings necessary to secure a tax bill have not been observed in some particulars, the tax has been held invalid only as to what was done outside the authority of law. *Neenan v. Smith*, 60 Mo. 292; *Farrar v. St. Louis*, 80 Mo. 393." *Johnson v. Duer*, 115 Mo. 379.

Under the authorities, the maintenance section (6) of the ordinance may be stricken out and still leave those sections which provide for reconstruction intact. So that striking out the objectionable section which relates to maintenance, enough of the ordinance will still be left to hold the reconstruction portion of it entirely valid, and the contractor may enforce his claim for compensation for reconstruction against the abutting property owner. And even the objectionable *words of a section* of a statute may be stricken out, and yet leave the unobjectionable and separable portions thereof remaining valid. · This is the doctrine of all the books, and has found forcible and apt illustration in two quite recent cases: *Leep v. Railroad*, 25 S. W. Rep. *loc. cit.* 76, 85; *Railroad v. Jones*, 149 Ill. *loc. cit.* 387. Judge COOLEY announces the same view. Const. Lim. [6 Ed.], 211, 213.

Besides, if the portion aforesaid of the ordinance be rejected as invalid, then a case is presented of *partial invalidity;* but, "if partial invalidity only is established, *no case is made for the interposition of equity to remove a cloud.* It is *no cloud* if the lien is to any extent *valid.*" *Heywood v. Buffalo, supra* (14 N. Y. *loc. cit.* 542).

6. In regard to the point that the defendant company had a monopoly of the material required in the ordinance and contract, to wit, Trinidad lake asphalt, and, therefore, was the sole bidder under the ordinance, and could have no competitor, it is quite sufficient to say that the point now made was formerly made in *Barber, etc., Co. v. Hunt*, 100 Mo. 22, but unsuccessfully, this court holding that, notwithstanding the provisions of section 27 of the charter that the board of public improvements should "let out said work by contract to the lowest responsible bidder, subject to the approval of the council," this would not

prevent the board from contracting for a species of work covered by letters patent.

The point was first thus ruled by BARCLAY, J., *at nisi prius* and our judgment in the case was simply in affirmance of his prior decision and opinion. To the same effect see *Transfer Co. v. Huling*, 22 Mo. App. 654.

In the former opinion herein, the right of the city in the premises as heretofore recognized was reaffirmed. So that this point must be considered as settled.

In intimate connection, however, with the subject of monopoly are some matters of pleading hitherto unnoticed or undeveloped which it is our purpose briefly to discuss.

In wandering through the wilderness of words of the petition, there is one idea which is the dominant one; it is the idea of *"monopoly."* It is the warp and woof of the plaintiffs' complaint. It is the *gravamen* of their grievance. This fact stands forth conspicuous in most parts of the lengthy petition; without it that petition *would have no basis on which to rest.* But this court has decided that such monopoly is valid, and with this element eliminated what becomes of plaintiffs' case as made by the petition? It is not therein pretended that if the ordinance and contract respecting the use of Trinidad lake asphalt are to stand, as valid, any lower bids for the performance of the work of reconstruction could be obtained; so that the whole matter centers and hinges at last upon the validity of the use of that particular material. That use being held lawful, it is not averred that any lower price could be obtained from any other bidder, but on the contrary the complaint as stated in the petition is that as long as the Asphalt Paving Company has the ownership or control of the Trinidad lake asphalt "there can be no competition" and "it is of necessity the sole and

only bidder on all such contracts," and "was of necessity the only bidder for the work of reconstruction on said Jefferson avenue; and the said company was practically given a monopoly and exclusive control of other material," etc. And it is further stated that: "By so limiting the reconstruction of its streets to the material known as Trinidad lake asphalt, all such reconstruction is thrown into the hands of the defendants, the Barber Asphalt Paving Company, which results in the city and its property owners being required to pay a larger price for such reconstruction than they would have to pay if the material for reconstruction were not limited to Trinidad lake asphalt."

Granting this to be true, how is this consequence to be escaped so long as the particular material is owned by one party, and that party is employed, and, it must be conceded, lawfully employed, by the board of public improvements to use that material in the process of reconstruction?

So that the whole matter comes back to the simple question of the monopoly of the material, and this holds good. Now, if, as has been decided, it is perfectly competent for the city to contract with one who is necessarily the sole bidder, because the sole owner of a certain material, *who* is to determine what is the proper and reasonable price to be paid for reconstruction?

Under the provisions of section 27, article 6, of the charter, the power is delegated to the board of public improvements to let out the work "to the lowest responsible bidder subject to the approval of the council." And with that board, subject as aforesaid, is lodged the authority, judgment, and discretion to determine who is the lowest responsible bidder; and with that discretion and judgment—absent fraud and collusion, neither of which are charged against the

board, assembly, or council—the courts will not, indeed can not, interfere.   And the presumption is that the city authorities have done their duty and have not abused their discretion.   Elliott, Roads and Streets, 410, 411; *State ex rel. v. McGrath*, 91 Mo. 386; *Clapton v. Taylor*, 49 Mo. App. *loc. cit.* 123.

In *Morse v. Westport*, 110 Mo. 508, it was said: "The authorities of a city are invested with a large discretion in determining the necessity or expediency of ordinances they shall adopt; and when those powers are exercised within the bounds of reason and apparent necessity, they should not be held null by the courts.   *Corrigan v. Gage*, 68 Mo. 541."

In a later case, MACFARLANE, J., speaking for the court observed: "In the performance of duties in which discretion is lodged with the governing authorities of a city, we think objections to the methods adopted by them, which are within such discretion, should be made before the work is done, unless fraud or collusion is shown.   It would be unjust to a contractor who has completed an improvement in full compliance with a contract awarded him by the board of aldermen, which is within the general powers conferred upon it, to refuse payment for the simple reason that the courts may conclude that the means or methods adopted by the board were not of the best or cheapest.   If contracts could be vacated for such reasons, all security to contractors would be destroyed and the cost of improvements necessarily increased in order to insure against such contingencies.   *Sheehan v. Owen*, 82 Mo. 464; *Ross v. Stackhouse*, 114 Ind. 200; *Cole v. Skrainka*, 105 Mo. 309; *Gibson v. Owens, ante,* p. 258; *Morse v. Westport*, 110 Mo. 502; *Johnson v. Duer, ante,* p. 368." *Warren v. Paving Co.*, 115 Mo. *loc. cit.* 580.

Again, recurring to the question of maintenance once more, it is not alleged that the price bid by

defendant company for maintenance is less than the work can be done for; the allegation is, *"about the cost thereof"* etc., which may very well include and mean something *more* than cost, indeed, a *profit* to the contractor therefor. Nor is there a statement in the petition that anyone would have bid *less*, or indeed, *could*, in view of the *monopoly* aforesaid, *have bid less*, because of the insertion of the maintenance clause in the ordinance which authorized the improvement. Nor does the petition allege that plaintiffs have been damaged to the extent of a penny by reason of the failure to indorse the maintenance clause on the ordinance. In the circumstances, it is not seen how plaintiffs have been injured; if they have not, they certainly have no ground of complaint, and no standing in a court of equity.

7. Complaint is made that the notice published for the time required by law by the board of public improvements of the intended meeting to consider the question of the reconstruction of certain streets, among them the one involved in this case, was insufficient upon the ground that it specified asphaltum, and not Trinidad lake asphaltum, as the material to be used on the proposed work.

Inasmuch, however, as section 14 of article 6 of the charter is the only authority concerning the publication of notice, in such circumstances, and no requirement of the specification of any material is mentioned therein, and as the notice in question contained all that was necessary, the failure to specify *Trinidad Lake* asphaltum can not be deemed a defect in such notice; it simply contained more than was required.

8. In the case at bar there can be no doubt that the board of public improvements acquired jurisdiction, thorough and complete, to have the work of reconstruction performed. If anything irregular inter-

vened, it was in relation to the maintenance and to that alone; but that, under the authorities, was but an irregularity at the worst, and could not overthrow the jurisdiction previously acquired, nor defeat and render valueless the bill for compensation for valuable services rendered whereby the property of plaintiffs has been greatly benefited and enhanced in value.

a. In such circumstances, where the party complaining has stood by and seen the beginning, progress, and completion of the work, costing large sums of money invested on the faith of the validity of the ordinance and consequent contract, he will not be allowed at that late day to attack the validity of the assessment, and all of its precedent proceedings, and thus get something for nothing; thus "reap where he has not sown, and gather where he has not strewn." This is illustrated in many cases, and denied by none.

Thus, in a proceeding to enjoin the collection of certain special taxes, it is said: "Could the plaintiff in this action complain of any irregularity in levying the taxes or the assessment of the property? He stood silently by and saw the old sidewalk repaired and all the new ones built, before he made any complaint. He knew of the city ordinances, and without objection permitted the expenditure of large sums of the public money; saw his property benefited and enhanced in value by the building of long lines of sidewalk in front of his property fronting these streets, and after all the work had been completed he complains of irregularities in order to defeat the collection of taxes to pay in part for these improvements. If he wished to test this question, he should have done so before the work was finished. He ought not to be allowed to do it now." *Ritchie v. South Topeka*, 38 Kan. *loc. cit.* 374.

In another proceeding instituted by the plaintiff and twenty-four others to restrain the execution of certain

tax deeds and to have the special assessments declared illegal and void and canceled on the county records as clouds on plaintiff's titles to their respective tracts of land, the court said: "They waited until it (improvement) was done so that they could reap the benefit in the enhanced price of their lands. * * * They do not offer to do equity by paying what is justly due, but seek to be relieved entirely from liability. This can not be permitted in a court of conscience. The burden of constructing the ditch must be borne by some one or more, and it is but justice that those receiving the benefit should assume the obligation. In *Barker v. Omaha*, 16 Neb. 269, this court required a lot owner who sought to enjoin the assessment for want of notice to do equity by paying the amount which his property had been benefited by the improvement. The same rule will be applied in this case." *Darst v. Griffin*, 31 Neb. *loc. cit.* 673.

In this court the same doctrine has been announced where plaintiffs instituted a proceeding in equity to cancel and set aside a special tax bill which had been properly issued to the defendant in payment for work done, etc., in reconstructing a street. The circuit court found the issues for the defendant and dismissed the bill, and on appeal this judgment was affirmed, in the court of appeals, and also here. This court, after discussing cases where the defect was *jurisdictional*, proceeds to discuss others differing therefrom, where the defect was not of such a radical nature, remarking: "On the other hand, it was held, in a suit to collect the cost of macadamizing a street, that a substantial compliance with the law must be shown, but that an observance of all the formalities prescribed by ordinance would not be required. *City of St. Joseph v. Anthony*, 30 Mo. 538. Again, this court said, in *Sheehan v. Owen*, 82 Mo. 458: 'We are not inclined to

turn a plaintiff out of court, who has given his time and expended his money in the improvement of their property, on mere technicalities which in no manner affect the substantial rights or interests of the parties. If, in any material respect, the ordinances of the city bearing upon the question involved had been disregarded by the city authorities or the plaintiff, his suit on his tax bill could not be maintained.' These cases are sufficient to show that this court has never adopted the extreme view that, in order to recover for these local improvements, the plaintiff must show a literal compliance with all the provisions of the ordinances. Distinction must be made between those matters which affect the substantial rights of the parties and those which are formal or directory." *Cole v. Skrainka*, 105 Mo. *loc. cit.* 309.

In *Gibson v. Owens*, 115 Mo. 258, this court, by MACFARLANE, J., ruled that: "Where all the jurisdictional steps which authorize a contract for a street improvement have been taken, a property owner, who has made no objection till the work has been completed and has received the benefit of it, is estopped in a suit on a special tax bill therefor to question the validity of the action of the proper officer in awarding the contract."

In another case, when speaking on the point in hand, it was observed by the same learned judge: "When the relief is not sought until after the work has been completed, at a great cost to the contractor, and when the complaining landowner has received the benefits of the improvement, the relief should not be granted except upon an exceedingly strong showing. As was well said by ELLIOTT, C. J., in a recent Indiana case: 'The assessment is made upon the theory that the benefit to the property is equivalent to the expense.

VOL. 131 mo—10

The owner, therefore, receives a thing of value, and he ought, in equity and good conscience, to pay for it, notwithstanding the fact that the local officers may not have obeyed the statute in every regard. It is just to protect his title when he offers to pay for the things of value rendered him in the form of the benefit resulting from the improvement; but it is not just to relieve him from paying the assessment because the local officers have made mistakes.' *Jackson v. Smith*, 22 N. E. Rep. 432." *Johnson v. Duer*, 115 Mo. *loc. cit.* 378.

A distinguished author touching the topic under discussion, says: "Irregularities or errors not jurisdictional can not ordinarily be made available in a suit for injunction. The question whether the work has been done according to contract is one to be tried at law and not in injunction proceedings. In a suit for injunction the question whether the yeas and nays were taken on the passage of the ordinance directing the improvement can not be litigated. It may safely be affirmed, without multiplying illustrations, that where nothing more than errors or irregularities in the proceedings appear, an injunction will not be awarded, unless it is applied for before the work has been done, and even then the writ will not issue if the errors are not of a material character, nor will it issue if there is an adequate remedy at law." "In cases where there is jurisdiction, property owners may be estopped from questioning the validity of the proceedings of the highway officers by standing by and permitting the work to be done without interposing any objection. The weight of authority is very decidedly in favor of the rule that where there is jurisdiction the property owner who sees the improvement made and offers no objection until after the work has been done can not defeat the assessment upon the ground that the pro-

ceedings have not been regular." Elliott, Roads and Streets, pp. 442, 418, 419.

Numerous other authorities attest and enforce the just and reasonable rule here announced.

*b.* And in cases like the present, a party who desires redress from a court of equity must act *promptly;* he must ask for *injunctive relief at or before* the inception of the contemplated work. In a proceeding to enjoin the collection of certain assessments for street improvements, it was pertinently observed: "The property owners could not stand by and see the improvement made without making any effort, *by injunction,* to prevent it, and then, after the work is done, or nearly done, refuse to pay for it. This rule has been applied by this court in several cases very similar to this one. *Hellenkamp v. The City of Lafayette,* 30 Ind. 192; *Palmer v. Stumph,* 29 Ind. 329; *Lafayette v. Fowler,* 34 Ind. *loc. cit.* 146.

*c.* Besides, it has also been ruled that a *mere notice or threat* to the contractor of intention to institute legal proceedings against him if he goes on with the work, will count for nothing, nor relieve the notifier of his subsequent laches or acquiescence in seeing the work progress to completion. *Traphagen v. Mayor,* 29 N. J. Eq. *loc. cit.* 209; *Easton v. Railroad,* 9 C. E. Green, *loc cit.* 57.

A like observation was made by BURGESS, J., in *Planet Property, etc., Co. v. Railroad,* 115 Mo. *loc. cit.* 620, as to the ineffectuality of notice in similar circumstances, and of the necessity of resort to *preventive measures.* This case is approvingly referred to, on this point, in 1 Beach, Injunction, section 42.

Accepting these rulings as correct, the notice in writing given by plaintiffs to the contractor, at the beginning of the work, that they would contest and

deny the validity of ordinance 17151, etc., etc., etc., should be held as without any legal force or effect.

And certainly it would be very hard on, and very embarrassing to, a contractor, if, after he had entered into a contract and given bond for its faithful performance, he could be stopped from going on with the contract work, by simply notifying him not to do so, when he would be held liable on his bond, also, if he failed to comply with his contractual obligations.  If a party desires to stop the proposed work, or to cancel the whole proceedings, he had just as well initiate proceedings by injunction *first* as *last*.  A court of equity would certainly.look upon him with more favor, did he resort to preventive procedure, than if he leisurely delayed action until rights then incipient had ripened into rights which a court of equity will not willingly disturb.

*d.*  Furthermore, the recital heretofore of the previously stated facts herein, shows that the contractor is at least entitled to payment for the work of *reconstruction*; but there is no *tender* thereof, nor *offer* to pay same, in the petition.  This failure makes the petition *demurrable*.  Without such tender or offer in the petition to pay what is justly due, a court of equity will refuse to grant relief either by injunction or otherwise, but will dismiss the petition, on the ground that it states no reason for equitable interposition.  *Board of Com'rs v. Elston*, 32 Ind. *loc. cit.* 34; *Fanning v. Dunham*, 5 Johns. Ch. *loc. cit.* 143; *Powell v. Hopkins*, 38 Md. *loc. cit.* 13; *Corby v. Bean*, 44 Mo. *loc. cit.* 381; High, Injunct., sec. 76; *Johnson v. Duer*, 115 Mo. *loc. cit.* 382; *Darst v. Griffin*, 31 Neb. 673, *supra.*

In Pennsylvania, this case arose:  On a bill filed for the cancellation of a lien and for an injunction, the plaintiffs sought to restrain the collection of the lien filed against them for grading, curbing, and paving a

street, and to secure the cancellation of the lien.
Judgment had been entered on the lien in a court of
law, but could not be enforced by reason of some
defect in the statute, which had been held unconstitu-
tional as to the foot-front rule so far as concerned
rural property, and cancellation was asked as to such
lien. The property of plaintiffs had been greatly en-
hanced in value; but they stood on their strict legal
rights, and asked the removal of the lien as a cloud on
their title, without paying or offering to pay what was
justly due, and because of this failure their bill was
dismissed as stating no equity, the court remarking:
"The plaintiffs have strenuously resisted all efforts to
collect the cost of this improvement or any part of it,
and have neither contributed nor offered to contribute
their equitable proportion toward it. They have waited
until their lands have become practically urban, and
are in demand for building purposes in consequence of
the work done by the city, and now they come into a
court of equity and ask the court to enjoin the city
against making any further effort to enforce its lien for
the work which has brought their lands into market at
greatly increased prices, and that the lien be canceled
so that they make a title to purchasers free from all
future liability therefor. It is incumbent on one who
seeks equity to do equity. The plaintiffs have derived
great benefit from the expenditures of the city on
Forbes street, for which they have paid nothing. If
they have made any effort to do equity, to settle upon
any fair and conscionable basis with the city, the evi-
dence fails to disclose it. They stand, so far as the
bill or the report of the master informs us, upon their
strict legal rights.  *  *  *  It may be that the rule
they invoke will prevent the enforcement of the lien in
the court in which it is entered. If so, a court of law
will apply the rule; but we must leave them to such

relief as a court of law can give, until they can present some equitable ground for our interference. It is neither against law nor good conscience for the city of Pittsburgh to seek compensation for its expenditures in grading, paving, and curbing Forbes street." *Pittsburgh's Appeal*, 118 Pa. St. 466, 467.

For the foregoing reasons it seems to us that the demurrer to the petition was well taken; that the petition neither in its general structure, nor in its more particular allegations states any ground for equitable relief, and, therefore, that the judgment of the circuit court should be affirmed.

The foregoing remarks were addressed to the opinion of this court as first announced, in this case, which appeared in 27 S. W. Rep. 447. Since my former remarks, however, were written and read, a new opinion has been formulated and read by the same learned judge who wrote the first opinion, touching which I desire to offer some additional obeservations which I deem pertinent and responsive thereto, although, in so doing, I may have to thresh over a good deal of old straw, for which, unfortunately, no patented thresher has yet been invented.

1.   And first, as to the demurrer to the petition herein:

No lawyer doubts the hackneyed assertion that a demurrer admits for the purpose of the demurrer as being true the allegations of the petition against whose sufficiency the demurrer is directed; but it is a truism equally as trite as the former, and as well understood by lawyers, that no allegations in a petition are admitted by the demurrant to be true, unless "*well pleaded.*" Bliss, Code Plead. [3 Ed.], sec. 418; Com. Dig., Pl. Q. 6; 1 Chit. Pl. [16 Am. Ed.] * 613, and cases cited.

Mere statements that a cloud will be cast on plaintiffs' title to certain land, or that plaintiffs will suffer

irreparable injury, or that plaintiffs have no adequate remedy at law, are but statements of legal conclusions, and such statements not being statements of *issuable facts*, being mere conclusions of law, are treated as *no statements at all*, and, therefore, obnoxious to attack by general demurrer. Bliss, Code Plead. [3 Ed.], sec. 413, and note, secs. 210, 212; *Craft v. Thompson,* 51 N. H. *loc. cit.* 540; *McKinzie v. Mathews,* 59 Mo. *loc. cit.* 102.

Under our. code, the facts in a pleading are *constitutive*, and, in order to be proved, must be distinctly alleged. *Pier v. Heinrichoffen,* 52 Mo. 333, and other cases. Every substantial fact which the plaintiff, in order to recover, must prove, he must, also, allege so that an issue can be made thereon. *Lanitz v. King,* 93 Mo. 513.

Chitty says: "An averment signifies a positive statement of facts in opposition to argument or interference." Vol. 1, 351.

In paragraph 1 of my former opinion, I have stated that no case could be found reported where any court had held that injunctive relief should go, where the party applying therefor has alleged in his pleading that the proceeding he sought to enjoin or cancel are *"null, void, and of no effect,"* and that he is not *"legally bound thereby."* Since expressing this view, it has been my good fortune to encounter a similar view expressed in *Russell v. Interstate Lumber Company,* 112 Mo. 40. There the plaintiffs alleged that a threatened sale under execution would cast a cloud on the title to property about to be sold. He also made further allegation that the judgment and execution were void for want of jurisdiction, and because of other grounds appearing in the record of the suit to enforce the mechanics' lien, and upon such allegations an injunction was asked. The lower court dismissed the petition as containing no

equity, and, on appeal to this court, BRACE, J., speaking for this court in affirming the judgment, said:

"From these facts substantially set out in the petition, the plaintiff therein deduces the conclusion, and avers: That said judgment and execution are null and void, because said Harford and Goodin, at the time the judgment was rendered, had no interest in the property, and the 'court had no jurisdiction over the subject-matter of said suit or the persons of the defendants against whom judgment was given;' nevertheless, he avers that the sale of the property will cast a cloud upon his title; wherefore he prays that the sale be restrained. If the deduction drawn by the pleader be correct, that the judgment is null and void for these reasons, more particularly assigned in his brief, as: That the suit was dismissed as to Harkness & Russell before judgment; that the lien was not verified, as required by law, and that the defendant Harford was not legally summoned therein—all of which facts are necessarily matters of record in the lien suit, under the judgment in which the defendant alone is shown to have, or to claim, any right whatever in the premises; then the plaintiff's interest can be in no way injuriously affected by the sale, at which the purchaser can only acquire just such title as the judgment of the lienor warrants. The plaintiff, upon his petition and proof, shows no ground for the interposition of a court of equity by way of injunctive relief, as prayed for. He will be in just as good a position the day after the sale is made as he was the day before."

But it is well enough before entering further upon a discussion of the merits of the petition and the pertinency of the authorities bearing on the point in hand, to lay a premise by asking and answering this question: *What is a cloud on title?* And the answer is: "A cloud upon title is a title or incumbrance apparently

valid, but in fact invalid." 2 Am. and Eng. Ency-
clopedia of Law, 298, and cases cited.

In order, therefore, to make a petition good, which
seeks to remove a supposed cloud, it must be made to
appear by *facts alleged that it is really a cloud* that is
sought to be removed; this could only be done, in the
language of *Heywood v. Buffalo*, 14 N. Y. 541, *supra*,
by alleging, "distinctly and plainly, that the proceed-
ings were apparently within the powers of the common
council, and *upon their face were valid, and created a
valid lien*," and the complaint "should then have
alleged that, notwithstanding such apparent validity,
the proceedings were wholly void by reason of certain
extrinsic matters, which should be stated, and which, it
should appear by the complaint, could only be estab-
lished by other evidence."

Of the doctrine asserted in the quotation just
made, I here venture the assertion that it has never
been doubted, denied, or even so much as questioned
by intimation or suggestion, by any authority on
equity jurisprudence; that doctrine indeed is buttressed
by the fundamentals of common sense, the logic and
science of good pleading, and by a felicitous accuracy
of perception which is able to distinguish between
specific allegations of fact and lumping conclusions of
law, between the validity of the former and the indige-
nous insufficiency of the latter. Of course there are cases
to be found like that of *Lockwood v. St. Louis*, 24 Mo.
20, where utterance is given to the shopworn platitude
that equity will enjoin a sale of real property where it
is about to be sold for taxes assessed by a municipal
corporation, on the ground that the contemplated sale
will cast a cloud on the title, where in similar circum-
stances equity will refuse such relief in respect to per-
sonal property. No one doubts or denies this doctrine;
but it is one thing to say that a court of equity will

enjoin a sale in order to prevent a cloud from being cast, and quite another thing to define and determine what are the requisites of a petition considered solely as a pleading, which seeks the equitable relief aforesaid.

Obviously, the assertion of the general and undisputed doctrine that equity will prevent by injunction, etc., or remove by cancellation, etc., a cloud on title, has no pertinency or relevancy to questions which relate to the component parts which can only validly constitute a petition which will stand the test of judicial scrutiny, as it invokes the application of the general doctrine to the particulars of specified facts.

Through inadvertence sometimes this court, without its attention being called to the fact, has overlooked the vital characteristics of a bill to enjoin a sale which would cast a cloud; but whenever its attention has been directed to the point it has never failed to declare that the constituent elements of a cloud on title are apparent validity, associated with real, though hidden, invalidity, an invalidity which could only be disclosed by evidence *aliunde* the record on which the proposed or perfected sale had occurred or would occur. This is exemplified in *Harrington v. Utterback,* 57 Mo. 519, where the plaintiff acquired a homestead, and, after such acquisition, his homestead was sold under execution, and defendants becoming the purchasers placed their deed on record, and it was ruled that the deed of defendants was a cloud which it would require parol evidence to .remove, and thus show that their apparently valid title was really invalid, and so plaintiff was afforded relief as prayed. This case was approvingly followed in that of *Gardner v. Terry,* 99 Mo. 523, where a proceeding was instituted to prevent a sale under a deed of trust, and the petition being held in the lower court insufficient on demurrer, it was said,

*loc. cit.* 527, "The present invalidity of the deed of trust does not appear from the face of the records. It only appears by a resort to other evidence, and parol evidence at that; so that there can be no objection to the petition on the ground that the proposed sale will be void on the face of the records. It is to the interest of all parties that the present validity of the deed of trust should be settled before a sale thereunder, and . our conclusion is that the demurrer should have been overruled."

This quotation not only reiterates the established doctrine aforesaid, but enforces by clear and indubitable intimation and recognition what is said in *Michael v. St. Louis*, 112 Mo. 610, and *Russell v. Lumber Co.*, *Ibid.*, 40, *supra*, that it would have been "an *objection to the petition*" if the "*proposed sale would be void on the face of the records.*" To the same effect see *Clark v. Ins. Co.*, 52 Mo. 276; *Holland v. Johnson*, 80 Mo. 38; *Odle v. Odle*, 73 Mo. 289; *Janney v. Spedden*, 38 Mo. 396; *Mason v. Black*, 87 Mo. 344; Cooley, Tax. 779; and *Heywood v. Buffalo, supra*.

In *Peirsoll v. Elliott*, 6 Pet. 95, Chief Justice MARSHALL, speaking for the court, dismissed the bill because the deed therein mentioned being void at law, for matter apparent on its face, the plaintiffs had not shown any circumstances which disclosed a case proper for a court of equity to relieve against such void deed.

Recurring, now, to other cases adverted to in the opinion under comment, that of *State ex rel. v. Philips*, 97 Mo. 331, was a proceeding by mandamus to compel the reinstatement of a proceeding, dismissed by the court of appeals, which was instituted by Bayha to have canceled certain special tax bills, which, though void, were an apparent lien on his land, and, therefore, furnished ground for the relief prayed.

*Parks v. Bank*, 97 Mo. 130, was another case of

the same sort and affording illustration of the meaning of the words a cloud on title, to wit, that it is an apparently valid, though really invalid, title or lien, and BARCLAY, J., in commenting on the facts elicited in that case, said: "Plaintiff's equitable estate and ownership antedated the judgment, but that fact did not appear in the public record of titles. The proof thereof rested on facts outside. A sheriff's deed under the judgment would, therefore, apparently carry the title as against the judgment debtor's deed, recorded before the execution sale, but executed after the judgment. That consequence of the sale justified the exercise of the preventive jurisdiction of equity to avoid the casting of a cloud on plaintiff's title."

*Railroad v. Apperson*, 97 Mo. 300, was one where a sheriff levied on a train of cars loaded with live stock and perishable property, chained it to the track, thereby obstructing traffic on the road and injuring the live stock and perishable property by the delay. This levy was made to collect taxes, and there was abundant other personal property out of which the illegal levy could have been satisfied. It would seem the injunction was granted because of the extortionate and oppressive character of the act of making the levy.

In *Johnson v. Milwaukee*, 40 Wis. 315, the complaint *did not allege that the contract made with the city for work was void*, but only asked that it *"might be declared void."* In that case, that of *Judd v. Fox Lake*, 28 Wis. 583, is approvingly cited, followed, and quoted, where, in defining such a contract respecting a municipal assessment for street improvements as would create a cloud on title and authorize equitable interposition, it is said: "An apparently valid contract entered into by the officers of the corporation, but which is in reality invalid by reason of some extrinsic defect." Besides, in *Judd's* case, *Heywood v. Buffalo* is approved, so that

the indorsement of *Johnson's* case is really an unwitting indorsement of the doctrine in *Heywood's* case, approvingly quoted from by Mr. Justice FIELD in *Dows v. Chicago*, 11 Wall. 108.

It is idle, however, to talk of an apparently valid contract in reality invalid by reason of some extrinsic defect, because *there is no such contract here pleaded*, and by the case as made by his pleading the plaintiff must stand or fall, because the court will not supply by intendment an averment the pleader has failed to make. *Cook v. Putnam Co.*, 70 Mo. 668.

As to the case of *Bank v. Evans*, 51 Mo. 335, which announces the "*legal acumen*" doctrine, I am persuaded, on mature reflection, it should no longer be recognized as a sound exposition of the law. It is directly opposed to the doctrine asserted in the later and far better considered case of *Clark v. Ins. Co.*, 52 Mo. 272, and cases which followed that one.

Under the teaching of *Bank v. Evans*, if the doctrine therein asserted be reduced to its last and logical analysis, be put to an every day working test, every case where a layman has to consult a lawyer respecting the validity of proceedings where realty is involved, will resolve itself into a case of cloud upon title, which is simply preposterous.

For these reasons as well as others heretofore given, I am convinced that the circuit court was entirely correct in holding that the petition was wholly insufficient.

2. The second and third paragraphs of the opinion under review may be considered together, inasmuch as the former as well as the latter touch upon and treat of the insufficiency of the notice given by the board of public improvements to the effect that a special meeting would be held, etc., to consider the matter of reconstructing with asphaltum, Jefferson avenue and other

streets.   The third paragraph also treats of the matter of monopoly in awarding the contract of reconstruction. Of these, in their order.

Respecting the subject of notice, it is said:   "The notice of the letting of the contract said nothing as to the different kinds of work to be done or materials to be furnished in reconstruction, although estimates for such work and materials were properly made, but simply gave notice that the board of public improvements would hold a special meeting at a time fixed, at its office in the city hall, for the purpose of considering the matter of reconstructing with asphaltum, Jefferson avenue and other streets."   No complaint is made in the *petition* that proper notice was not given of the letting of the contract, and certainly the letting of the contract could not occur if the *charter* is to govern, until *after* an ordinance recommended by the board had been passed by the assembly.   So that the language just quoted seems quite remarkable, in that it strangely commingles and confuses the duty of the board when publishing a notice calling a special meeting to consider whether certain streets should be reconstructed, and the duty of that board in reference to publishing notice of bids to be received for contracts for work in reconstructing certain streets.

The only complaint I find in the *petition* in respect to the meeting of the board is that the notice of such meeting, which is copied in full, does not specify that *Trinidad* asphaltum was to be employed in the work of reconstruction.

But in reference to the omission of the word "Trinidad," it is held not prejudicial, and it is said respecting this point:   "The notice seems to be a compliance with the city charter in so far as reconstruction with asphaltum is concerned, and contained all that it required as to the asphaltum."   The plain inference

from this assertion is that the notice by the board call-
ing the meeting is *bad* because it fails to specify other
material besides the one mentioned.

An easy answer is found to this objection to the
notice, and it lies in the simple fact that section 14, of
article 6, of the charter, relied on by plaintiffs in their
petition, *requires nothing of the kind.* Look at that sec-
tion now presented, and see if it does. It provides
that:

"Sec. 14. No ordinance for the construction or
reconstruction of any street, alley, or public highway
of the city, shall be passed unless recommended by the
board of public improvements, as hereinafter provided.
The board may, of its own motion, and upon the peti-
tion of any reputable freeholder of property on any
street, alley, or highway, designate a day on which they
will consider the improvement of such street, alley, or
highway, and shall give two weeks' public notice in the
papers doing the city printing of the time, place, and
object of their meeting."

This quotation *plainly shows that no material* need be
specified in the notice, so that the insertion in the notice
of the word "asphaltum" was *ultra vires* the duty of
the board, and wholly unnecessary. Under the terms
of that section, an ordinance is perfectly valid on the
bare recommendation of the board, and it is only where,
after notice is given, a remonstrance occurs that it
becomes necessary for a unanimous vote of the board
"to approve such proposed improvement." It is not
alleged that there was any remonstrance in this
instance, and if there had been it would not have
affected any question *of material to be used, but only a
unanimity of vote.*

The next section of the same article, however, does
provide for the specification of the material to be used,
for it says:

"SEC. 15. All ordinances recommended by said board shall specify the character of the work, its extent, the material to be used, the manner and general regulations under which it shall be executed, and the fund out of which it shall be paid, and shall be indorsed with the estimate of the cost thereof."

It is conceded that the provisions of this section were complied with by the ordinance passed, and it is but a fair, legitimate, and legal inference, as well as an orthodox rule of construction, that as *this* section *does* require that an ordinance passed in pursuance thereof shall specify the character of the work, its extent, the material to be used, etc., etc., while its associate, section 14 of the same article, does *not* require such specification, that, therefore, the maxim, *expressio unius*, etc., applies, and anything more is but a work of supererogation; and it does not admit of doubt that it lies within the province and power of the board to recommend *any material it may see fit;* and if the ordinance specifying the material to be used, be adopted, who can doubt the validity of such ordinance? For it must be observed that, by the provisions of section 27, article 6, of the charter, the board of public improvements, *"under the direction of the ordinance* shall advertise for bids," etc.

The *ordinance* in such cases, as in the case at bar, fixes the *character of the material,* and no subsequent action in advertising for bids could by any possibility change the *nature* of that material. And, besides, the penalty of nullity is not denounced against the validity of the *ordinance* because certain materials are specified, but that sentence of nullity only extends to the *mere method of letting out work;* that and nothing more.

And it is well settled in this state that, as here, a legislative declaration against the validity of a specified act, unless performed in a specified way, has

no force or detrimental bearing against other acts not thus specifically declared to be null for failing to be done in that particular way.    *State ex rel. v. Mead*, 71 Mo. 267; *Barber, etc., Co. v. Hunt*, 100 Mo. 22.

Now, if it lies, as no doubt it does, within the exclusive province and power of the board to recommend *any material it may see fit*, and if the ordinance specifying such material to be used be passed, who can doubt the validity of such ordinance?   If the ordinance be valid at its passage, could the happening or nonhappening of subsequent occurrences defeat its validity? Who will dare answer this interrogatory in the affirmative?

But it is said in the paragraph under consideration, that section 29 of article 4 of the charter is applicable to street improvements.    Let us examine this position, That section reads as follows:

"SEC. 29.   The commissioner of supplies shall purchase all articles needed by the city in its several departments.   The municipal assembly shall provide, by ordinance, for the purchase of all articles, so far as practicable, by advertising for proposals at stated periods.   All purchases made by him without advertising for proposals shall be approved by the comptroller before the same shall become binding on the city.    In advertising for proposals to furnish supplies, quantity and quality of all articles shall be fully stated, and any bidder may bid for any one article named.   The award for each article, shall, in all cases, be made to the lowest bidder therefor.   The commissioner of supplies shall furnish to the bidders printed blanks, which shall be filled up by the bidders with the price of the article to be furnished, and shall, in specifying the quantity and quality of any article, recite the advertisement. All bids shall be sealed, and opened at an hour and place to be stated in the advertisement for proposals, in

the presence of as many of the bidders as may desire
to be present, and shall be subject to the inspection of
the bidders.   All bids having any alteration or erasure
upon them shall be rejected.   All contracts shall be
approved by the mayor before they shall become bind-
ing upon the city."

And it is asserted in the paragraph mentioned that
this section requires *each* material which is to be used
in the construction of a street to be advertised for
separately, and separate bids to be taken for each of
said materials.

A glance at this section of the charter it seems
should convince anyone that it applies only to the
commissioner of supplies and does not apply, only to a
limited extent as hereafter explained, to the board of
public improvements, when performing the very impor-
tant duties assigned to it, under the provisions of section
27, article 6, of that charter.

That section provides that:   "The assembly shall
have no power directly to contract for any public work
or improvement   *   *   *   but the board of public
improvements shall in all cases   *   *   *   prepare and
submit to the assembly estimates of the cost of any
proposed work, and, under the direction of the ordi-
nance, shall advertise for bids, as provided for purchases
by the commissioner of supplies, and let out said work
by contract to the lowest responsible bidder, subject to
the approval of the council."

Contrasting these two sections of the charter many
points of essential difference are discovered.   Under
section 29, article 4, the commissioner receiving the
bids for the articles advertised for passes upon them,
and awards the contract to the *"lowest bidder,"* subject,
however, to the approval of the mayor, while under
section 27, article 6, the board advertises as provided
"for purchases by the commissioners of supplies,"

receives the bids and lets out the said work by contract to the lowest *responsible* bidder, subject to the approval of the *council*, and not to the approval of the mayor. In the one case, it is a contract of *purchase;* in the other, a contract for *work*, and the board of public improvements has no more authority to contract for *material* than has the commissioner to contract for *work*. In the one case the commissioner awards the contract of purchase to the *"lowest bidder,"* and is accorded no discretion; in the other, the board lets the contract of *work* to the "lowest *responsible* bidder." In other words, lets the contract to that contractor which the board in its discretion thinks will most satisfactorily perform the work; the board having a margin of discretion in the matter, the commissioner having no discretion whatever.

It seems quite plain, therefore, that section 27 of article 6, in so far as it refers to advertisements as provided for purchases by the commissioner of supplies, means only *the form of the advertisement, the number of times it is to be inserted, etc.* This view is sanctioned by abundant authorities which hold that the letter of a statute may be enlarged or restrained, according to the true intent of the framers of the law. *Whitney v. Whitney,* 14 Mass. 92; *State ex rel. v. Emerson,* 39 Mo. 80; *State ex rel. v. King,* 44 Mo. 283; *Riddick v. Walsh,* 15 Mo. 519. In such cases, the *reason* of the law prevails over its *letter*, and general terms are so limited in their application as not to lead to injustice, oppression, or an absurd consequence, the presumption being indulged that the legislature intended no such anomalous results. *United States v. Kirby,* 7 Wall. 482; *People ex rel. v. McRoberts,* 62 Ill. 38; *Fusz v. Spaunhorst,* 67 Mo. 256; Sutherland, Stat. Constr., p. 288.

These two sections of the charter, section 29 of article 4, and section 27 of article 6, are so essentially

different in their objects and operation that it is passing strange that they should be confused.

There are other cogent reasons why it is impossible that the several constituent elements of a street should be advertised for separately and separate bids received therefor. It is a matter of common knowledge that a street is a homogeneous whole from the substructure of earth upon which the superstructure rests, up through that superstructure to the top of the wearing surface; all of the elements which enter into its construction, sand, lime, cement, broken stone, wood, or asphalt, compose nothing more nor less than a *completed street*. It is a matter of serious doubt whether it would be possible for the board to advertise for the component parts of a street—sand, broken stone, cement, etc., etc.—in their proper and just proportions.

However this may be, there are several reasons, the first a legal reason, why the construction being combated is untenable and should not prevail, but leads to manifest and manifold absurdities. Now, first, the legal reason:

By section 18 of article 6 of the charter it is provided that: "The cost of construction of all the foregoing improvements within the city shall be apportioned as follows: The grading of new streets, alleys, and the making of crosswalks, and the repairs of all streets and highways and cleaning of the same, and of all the alleys and crosswalks, shall be paid out of the general revenue of the city; and the paving, curbing, guttering, and sidewalks, and the material for the roadways, repairs of all alleys and sidewalks, shall be charged upon the adjoining property as a special tax, and be collected and paid as hereinafter provided."

Section 24 of article 6, declares that: "All special tax bills for work contemplated by this charter shall be made out by the president of said board, and by

him registered in his office in full, and certified and delivered to the comptroller, and his receipt taken therefor and by him registered and countersigned and delivered to the party in whose favor it is issued for collection, and his receipt taken in full for all claims against the city, on account of said work.''

Section 25 of article 6 of the city charter provides: ''Said tax bill shall be and become a lien on the property charged thereunder and may be collected of the owner of the land in the name of and by the contractor, as any other claim, in any court of competent jurisdiction, with interest at the rate of ten per cent per annum after thirty days from date of demand, and if not paid within six months after such demand then at the rate of fifteen per cent per annum from the date of said demand. In case the owner of the ground is a nonresident of the state, suit may be brought against him by attachment which shall be a demand of its payment.''

It will be readily seen that these sections of the charter provide for the issuance of a special tax bill *for a completed street,* and that there is no provision for the issuance of a special tax bill for each material of which the completed street shall be composed.

Why the advertisement calling for bids should set forth the amount and quality of each material which shall compose the completed street, and why separate bids should be taken for each of said materials, when the board would have no authority to award separate contracts for each material, for the plain reason that the board would have no authority to issue separate tax bills to each contractor, is a very difficult question to answer. If the board has no power to issue a special tax bill to pay each contractor for the proportion of the work done by him, it seems that to advertise for

separate bids and attempt to award separate contracts would be a very vain and nugatory proceeding.

If a separate advertisement is necessary and separate bids must be received for each material which is to compose a completed street, then, as a matter of course, each contractor must be paid separately the amount to which he is entitled.   He can only be paid this amount by *a special tax bill*, because the section of the charter just quoted provides that the cost of the improvements shall be charged as a lien on the adjoining property. So that we would have separate advertisements for the different materials that compose the completed street, separate bids therefor, and separate awards, and then the board would find itself in the position of being without the power to issue a tax bill to each contractor for the work done by him.   The charter contemplates and provides for the issuance of but *one* tax bill against each property owner, and that tax bill is for the proportion of the cost of the completed street in front of his property.   So much for the legal reason.

But there are practical reasons why such a theory as is now being combated is not a true construction of the charter provisions.

A familiar rule requires that all of the provisions of the charter bearing on the subject be construed together, so that a consistent, sensible course of conduct shall be pursued.   Now, if a contract have to be invited and may be awarded by the board for each separate material or kind of work included in this thing we know as a completed street, then there may be as many contractors as there are different materials or kinds of work.   So that all the contractors in turn would be dependent on the first and delayed by his delay of the work, and each contractor would in turn be dependent upon and delayed by the contractor just ahead of him.   Each one of the contractors would have

to carry out faithfully his portion of the work.   But the action of the elements, the vicissitudes of the weather during the progress of the construction of the street, might destroy or greatly impair the work done by a preceding contractor; the contractor next in turn could neither be expected nor compelled to put in suitable condition his portion of the work, that portion which had just been destroyed or seriously impaired by the elements, and the same is true of the contractor who had already completed his portion of the work; he would not be required to *"maintain"* it at what it was when he gave it the last stroke of his labor, nor to *"repair"* it after it had suffered detriment, because he has completed his portion of the work; and so on, thus resulting in interminable delay and confusion for no useful purpose.

Again, if the theory be correct that the board must award contracts for each separate material that enters into the make-up of a completed street, just as does the commissioner of supplies, then this result will indubitably follow: The city, through its agent, the board, having advertised for and awarded contracts for certain materials, of course must *pay for them*, although the charter provides that the city shall not be liable for the construction or reconstruction of streets.   Well, then, the city having *bought* this lot of material, for the purchase of which by the city or by its board there is not one word nor shred nor patch of legislative authority, must of course, *sell it again* in order to reimburse and make itself whole!

This illustration shows that the theory advanced would compel the city and its board to do a useless and absurd act.   A child's game of cross purposes would not have a more singular termination.

Now as to the monopoly question.   The opinion in this case as in 27 S. W. Rep. reported, followed with

express approval *Barber, etc., Co. v. Hunt*, 100 Mo. 22. But the opinion under revision has changed front on the question, and now asserts the contrary doctrine.

The opinion in *Hunt's* case is amply supported by authority. *Hobart v. Detroit*, 17 Mich. 246; *Yarnold v. Lawrence*, 15 Kan. 126; *In re Dugro*, 50 N. Y. 513; *Baird v. Mayor*, 96 N. Y. 567; *Mayor v. Bonnel*, 31 Atl. Rep. 408. These two cases in the New York court of appeals directly repudiate the rule announced in *Dolan's* case, 4 Abb. Pr. (N. S.) 397, and *People ex rel. v. Van Nort*, 65 Barb. 331. When thus repudiated by the court of last resort, it is not customary to cite any longer the ruling of the lower courts as authority.

The view in *Dean v. Charlton*, 23 Wis. 590, was expressed by a divided court. There was a vigorous dissenting opinion by DIXON, C. J., and shortly thereafter the legislature changed the rule announced by the majority, and permitted municipalities to have the benefit of patented articles.

In Louisiana views in accord with that first announced in Wisconsin have been expressed. *Burgess v. City of Jefferson*, 21 La. Ann. 143. To the same effect is *Nicolson Pavement Co. v. Painter*, 35 Cal. 699, and an earlier case in that state. The case in 35 N. J. L. 351, *State v. City of Elizabeth*, has been recently decided in New Jersey not to have ruled the point in question, which last case, *Mayor v. Bonnel*, 31 Atl. Rep. 408, approves *Hobart's* case in Michigan and also that of *In re Dugro*, 50 N. Y. 513.

In such conflict of authority, it would seem that a rule once adopted by the unanimous opinion of a court of last resort, and which has remained unchallenged for years, should not be lightly departed from. And this is especially the case where the doctrine thus established has become a rule of property, as is the case here.

Even a single decision not questioned for years has been held to create a rule of property, and has been respected as such. See 23 Am. and Eng. Encyclopedia of Law, p. 28, sec. 3; *Wilson v. Lumber Co.*, 67 Fed. Rep. 674, per PHILIPS, J.; Wells, Stare Decisis, sec. 598.

In *Bates v. Relyea*, 23 Wend. 340, COWEN, J., said: "The decisions of this court, while unreversed, always formed the absolute law of the cases, and entered with very decisive effect into the body of precedents. They must, from the nature of our legal system, be the same to the science of law, as a convincing series of experiments is to any other branch of inductive philosophy. They are, on being promulgated, immediately relied upon according to their character, either as confirming an old, or forming a new, principle of action, which perhaps is at once applied to thousands of cases. These are continually multiplying throughout the whole extent of our jurisdiction. Numerous and valuable rights, offensive and defensive, may be claimed under them. * * * Sir William Jones has written an excellent commentary on the maxim *stare decisis*, etc., by way of reply to a remark of POWELL, J., who said, 'Nothing is law that is not reason.' 'This is a maxim,' says Jones, 'in theory excellent, but in practice dangerous, as many rules, true in the abstract, are false in the concrete; for, since the reason of *Titius* may, and frequently does, differ from the reason of *Septimius*, no man who is not a lawyer, would ever know how to * * * advise, unless courts were bound by *authority* as firmly as the pagan deities were supposed to be bound by the decrees of fate.' Jones on Bailm. 60, Am. Ed., 1804. The court almost always, in deciding any question, creates a moral power above itself; and now when the decision construes a statute, it is legally bound for certain purposes,

to follow it as a decree emanating from a paramount authority, according to its various applications in and out of the immediate case.    *    *    *    This would be so of such a constructive decision, even were we to rule it as erroneous, by a subsequent one."

And on this point Chief Justice TANEY said in *Ohio Life Ins., etc., Co. v. Debolt,* 16 How. *loc. cit.* 432: "The sound and true rule is, that if the contract when made was valid by the laws of the state, as then expounded    *    *    *    and administered in its courts of justice, its validity and obligation can not be impaired by any subsequent act of the legislature of the state, or decision of its courts, altering the construction of the law."

In other words, in the circumstances mentioned, such subsequent conduct on the part of the legislative or judicial departments of a state, would impair the obligations of a contract, something forbidden by the constitution of the United States.

But apart from the binding force of a unanimous opinion which has become a rule of property, the ruling in *Barber, etc., Co. v. Hunt, supra,* commends itself to our approval on other and independent grounds, to wit:    That in this era of progress, when nearly every first-class article, not in its raw or original state, bears the stamp of a government patent upon it, a municipality should not be debarred from using the patented article as does the world at large, no matter how urgent the need for its use, until fourteen years have expired, and the article has ceased to bear the odious insignia of governmental approval.

A ruling which would enforce such a retrogressive prohibition would be most unreasonable and disastrous to the material interests and welfare of cities and their citizens, and should not be permitted to prevail upon a mere surmise or implication, but only upon the basis

of a clear and emphatic declaration; because the legislature should not be presumed to have intended such a hurtful and unreasonable result.

But even did the charter plainly announce the prohibition claimed for it, unless such prohibition is free from absurdity, oppressive and unreasonable consequences, the ruling which accords it recognition should be rejected. Sutherland, Stat. Constr., sec. 218, p. 288, and other authorities *supra*.

This was the view taken in *In re Dugro*, 50 N. Y. 513, *supra*. There the common council of the city had a similar general grant of power in relation to the construction of streets, choice of material, etc., as in the case at bar. Subsequently, the act of 1870 was passed. Section 104 of that act required all work to be done and supplies to be furnished by contract  *  *  *  and directed all contracts to be made or let after an advertisement for proposals, to the *"lowest bidder."* Under this condition of things, a contract was let and finished for a "Nicolson pavement," and the objection was urged that as the right to lay such pavement was in a single person or corporation, therefore, the contract was void, and the assessment for the work illegal. In answering this objection, ALLEN, J., said:

"It is urged that because a statute prescribing general rules for the exercise of the powers granted to the municipal corporation are not in all their detail applicable to every case that may arise, that to the extent they can not be applied, the powers are annulled and can not be exercised. This would be to give undue effect to the act prescribing the forms of procedure, and modal in its character, at the expense of the general grant of power.  *  *  *  The general rule is, and this case does not form an exception, that statutes prescribing forms of procedure, and providing for the orderly conduct of proceedings by public officers or

bodies, are only obligatory to the extent, and in cases to which they are by their terms applicable. The legislature can not be presumed to have intended to declare that no power should be exercised, or work done, or supplies furnished, unless of a character that would admit of competitive bids. * * * A thing within the letter is not within the statute, unless within the intention. The act of 1870 can have full effect in cases to which it can be applied, but if there are cases to which it could not be reasonably applied, they are not within the intention, and, therefore, not within the statute. * * * If, as alleged, there could be no competition for the paving with the Nicolson pavement, the common council had nevertheless the power to cause the street to be paved with it, and it is simply a case not within the statute, although the words are broad enough to include it. It constitutes one of the necessary exceptions to it."

But it is not really true that because an article belongs to the patented class therefore competition for its purchase is beyond the range and reach of reasonable competition, and of being contracted for and purchased just as unpatented articles are. This view was taken in *Hobart v. Detroit, supra,* by COOLEY, C. J., who, with admirable prevision, discerned, that the fact that an article was patented did not prevent it from being contracted for even by a person not having it at the time of contract made. This clear perception of the distinguished jurist as to the nonmonopolistic character of patented articles, though owned by a single person or corporation, has found ample vindication in actual practice. Thus, in *Barber, etc., Co. v. Gogreve,* 5 So. Rep. 848, upon evidence adduced, it was judicially ascertained and determined that competitive bids could be had in the circumstances men-

tioned. So that this question of monopoly in its bearing on the case at bar may be thus summarized:

In the *first* place it can not be applied to the *material* to be selected by the board for the construction or reconstruction of a street, for the simple reason *that such material is unalterably settled and fixed by the board*, when in the exercise of its discretion, a discretion not reviewable by the courts, it submits to the assembly an ordinance, which specifies "the character of the work, its extent, the material to be used," etc., and such ordinance is passed by the assembly.

Because, *second*, the declaration of nullity mentioned in section 27, article 6, only applies to the mere formal method of *"letting out work,"* and not to the previous action of the board and assembly.

Because, *third*, even if the declaration of nullity is within the *letter* of section 27, it ought to be held, for reasons already given, and under the authorities cited, as not within the *intent* of that section.

Because, *fourth*, waiving all previous considerations, the rule *"stare decisis"* should inflexibly be applied to the circumstances of this case, where, upon the faith of the unanimous decision of this court, rendered years ago, a contract valid when made according to that decision is now assailed and its obligatory force attempted to be broken. This can not be done without impairing the obligation of that contract, which, valid when made, must so remain, no matter what changes may occur by reason of *judicial vacillations*.

"The national constitution forbids the states to pass laws impairing the obligation of contracts. * * * That end can be accomplished unwarrantably no more by judicial decisions than by legislation." *Pine Grove v. Talcott*, 19 Wall. *loc. cit.* 678.

"After a statute has been settled by judicial construction, the construction becomes, so far as contract

rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment of the law by means of a legislative enactment." *Douglass v. County of Pike,* 101 U. S. *loc. cit.* 687. See, also, *Gelpcke v. Dubuque,* 1 Wall. 175; *New Buffalo v. Iron Co.,* 105 U. S. 73.

3. Under quotations already made from the charter, the board, independent of any notice given or of any special meeting, had full power and exclusive jurisdiction to recommend to the assembly, by ordinance to that effect, any material the board deemed best for the reconstruction of the streets mentioned in that ordinance. And, besides, as heretofore shown, the requisite notice was given of such special meeting, which notice fully complied with the provisions of section 14, article 6, of the charter.

· This being the case, and the ordinance recommended by the board having passed the assembly, the jurisdiction of the board became complete to take the further steps it did take, and no subsequently occurring error, omission, or irregularity could divest ·or defeat such previously acquired jurisdiction. Wells, Jurisdict., sec. 79.

And the same rule applies as to the acquisition of jurisdiction by *quasi* tribunals and officers as applies to regularly organized courts. *State ex rel. v. Bank,* 120 Mo. *loc. cit.* 172; Cooley, Torts [1 Ed.], 417.

In the case at ·bar, all the precedent steps were taken by the board, down to, and inclusive of, the time when the contract for letting out the work of reconstruction was approved by the council and awarded by the board, and these things are shown by the questioned petition. So that the contract was by no means "*void under the charter, for the want of authority in the city to enter into it.*"

The contract, then, being valid and in accordance with the charter, that contract is capable of enforcement so far, at least, as the work of reconstruction is concerned, because under the authorities which have been cited, even if the contract as to maintenance be invalid, the maintenance section may be stricken out and still leave those sections which provide for reconstruction intact, and in full force and operation.

In such circumstances as the foregoing, cases like *Keating v. Kansas City*, 84 Mo. 415, can have no possible application to the case in hand, for there *no ordinance at all had been passed* by reason of the ordinance not having been properly authenticated, as will be seen by reference to *Keating v. Skiles*, 72 Mo. 97, on which the action in the former case was based.

Here, on the contrary, the ordinance and contract are valid so far as reconstruction is concerned, and when this is the case, when any separable portion of the contract is valid, there can be no cloud on the title. *Heywood v. Buffalo*, 14 N. Y. *supra*. And the owner who seeks to enjoin the collection of the special tax must perform the condition precedent of tendering the amount justly due. *Johnson v. Duer*, 115 Mo. 366, and other cases.

In reference to other matters, the maintenance clause of the contract, the validity of ordinances 542 and 17151, the existence of remedies at law, etc., they have been so fully discussed in my former opinion herein that it is thought unnecessary to dwell upon them any further.

I think now, as I thought when concluding my former opinion, that abundant and cogent reasons exist and have been presented for the affirmance of the judgment of the circuit court. BRACE, C. J., concurs in all that has been said, except that he expresses no opinion on the third paragraph of the present opinion. ROBINSON, J., concurs.